**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MATTHEW MARSH, *et al*,<br>Defendants. | Crim. No. 05-40025-FDS |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

The United States of America, by and through the undersigned Assistant U.S. Attorney, hereby files its Opposition to the *Motion to Suppress Unlawful Stop of Defendant's Vehicle and Subsequent Search and Seizure of Buy Money and Any Subsequent Identifications of the Defendant* filed by the defendant Matthew Marsh (hereinafter, "Defendant" or "Marsh") on February 6, 2006. For all of the reasons set forth below, Defendant's motion lacks merit and should be denied without a hearing.

## I. RELEVANT FACTS

Marsh and his co-defendant Nydia Bernabel, a/k/a "Nonni," a/k/a "Nanni," ("Bernabel") are charged with conspiracy to distribute at least 5 grams of cocaine base, also known as "crack cocaine," in violation of 21 U.S.C. § 846 (Count 1) and two substantive counts of distributing cocaine base, also known as "crack cocaine," in violation of 21 U.S.C. §841(a)(1) (Counts 2 and 3). The two transactions underlying Counts 2 and 3 took place in Fitchburg, Massachusetts, on November 9, 2004:

(1) The 1.7-Gram Crack Transaction: The first transaction occurred at approximately 5:50 p.m., at which time an undercover agent employed by the Drug Enforcement Administration ("UC-1") purchased 1.7 grams of crack cocaine from the defendants.

Copies of the DEA reports detailing this transaction are attached hereto as **Exhibit 1**. In sum, at approximately 5:00 p.m., Bernabel agreed to meet UC-1 on Leighton Street in Fitchburg to sell him $320 worth of crack cocaine. UC-1 drove an undercover vehicle to the intersection of Leighton and Kimball Streets, where he waited for Bernabel to arrive. At approximately 5:50 p.m., a 1996 Jeep Cherokee bearing MA License No. 6815MX pulled up next to UC-1's undercover vehicle. UC-1 observed Bernabel in the driver's seat and a heavy set male, who was subsequently identified as Marsh, in the passenger seat. When UC-1 asked Bernabel how the crack cocaine rocks looked, Marsh handed a package to Bernabel, who displayed it to UC-1. UC-1 then handed $300 to Bernabel, who passed it to Marsh, who immediately began counting the money. Further details are in the DEA reports attached as **Exhibit 1**, which are incorporated by reference herein. After completing the sale, Bernabel and Marsh sped away in the Jeep Cherokee at a high rate of speed. *See* **Exhibit 1** at Bates No. 30.

(2) The 4.7-Gram Crack Transaction: The second transaction took place approximately 40 minutes later on Birch Street in Fitchburg, near St. Anthony's School. Copies of the DEA reports detailing this transaction, which are incorporated by reference herein, are attached hereto as **Exhibit 2**. In short, at approximately 6:30 p.m., a second undercover DEA agent ("UC-2"), who was working with a confidential witness ("CW"), purchased 4.7 grams of crack cocaine from the defendants. Once again, the defendants arrived in a dark colored Jeep Cherokee bearing MA License No. 6815MX, which they pulled up alongside the undercover vehicle. This time, Marsh was driving the Jeep and Bernabel was riding in the passenger seat. After the

CW introduced UC-2 to Bernabel, she handed a package of crack cocaine to UC-2, who handed her $600 in serialized funds in return. Marsh then drove the Jeep Cherokee away from the area. *See* **Exhibit 2**.

Both of the foregoing transactions were audio-recorded, video-recorded, and observed by numerous surveillance agents, including both DEA agents and local Fitchburg Police Officers, who were working collaboratively with DEA as DEA "Task Force Agents" ("TFA's"). *See* **Exhibits 1** at Bates No. 30 (listing Fitchburg Police detectives assigned as DEA Drug Task Force Agents); **Exhibit 2** at Bates No. 32 (same).

Shortly after the second transaction concluded, Fitchburg Police Officer Kenneth W. Gaetz, Jr., received a call from one of the Fitchburg Police Officers assigned to the undercover Drug Task Force. *See* Gaetz Affidavit attached hereto as **Exhibit 3** at ¶ 3. The TFA asked Officer Gaetz for assistance in locating and stopping the Jeep Cherokee. *Id.* The TFA told Officer Gaetz that the Jeep Cherokee: (i) was dark in color, (ii) bore Massachusetts License No. "6815MX," (iii) was occupied by two individuals, (iv) was unregistered and uninsured, and (v) might be located near the nail salon on Summer Street, across the street from George's Hot Dog Stand. *Id.*

Equipped with this information, including the fact that the Jeep Cherokee was an unregistered motor vehicle, Officer Gaetz immediately drove to the nail salon on Summer Street near George's Hot Dog Stand. **Exhibit 3** at ¶ 4. Officer Gaetz was dressed in his police uniform and was driving a marked police cruiser. *Id.* To avoid detection, he parked across the street from the nail salon and turned off the cruiser's lights. *Id.* He then began surveillance of the area surrounding the nail salon, looking for a dark-colored Jeep Cherokee with MA License No. 6815MX occupied by two individuals. *Id.*

Within minutes, Officer Gaetz observed a dark-colored Jeep departing from a driveway near the nail salon. **Exhibit 3** at ¶ 5. In addition to observing the dark color of the Jeep, Officer Gaetz observed that it was, in fact, a Jeep Cherokee occupied by two individuals. He immediately began to follow the Jeep, at which time he confirmed that it bore MA License No. 6815MX. **Exhibit 3** at ¶ 5. After proceeding down Summer Street, Officer Gaetz observed the Jeep make an abrupt left-hand turn onto Boutelle Street. *Id.* Based on his training and experience as a patrolman, Officer Gaetz considered the abrupt left turn to be unsafe. *Id*. As stated in his affidavit, Officer Gaetz described the abrupt turn as "a quick, aggressive turn off of Summer Street, which is a heavily traveled roadway that links to downtown Fitchburg." *Id.*

After observing this quick, aggressive turn, Officer Gaetz followed the Jeep Cherokee down Boutelle Street, where he observed the Jeep make a second abrupt turn onto Goodrich Street. **Exhibit 3** at ¶ 6. Again, the turn was made in a sudden and aggressive manner, which Officer Gaetz, in his training and experience, considered unsafe. *Id.*

At this point, Officer Gaetz determined that the operator of the Jeep Cherokee had violated Fitchburg Traffic Ordinance § 169-70, which requires that the driver of any vehicle use care in starting, stopping and turning the motor vehicle, ensuring that such movement is made in safety. **Exhibit 3** at ¶ 7. A true and accurate copy of Fitchburg Traffic Ordinance § 169-70 is attached hereto as **Exhibit 3(A)**.

After observing the Jeep Cherokee make the two abrupt turns described above, and after confirming the license plate was, in fact, MA License No. 6815MX, Officer Gaetz activated his cruiser's emergency lights and pulled the Jeep over on Lawrence Street. **Exhibit 3** at ¶ 9. Prior to speaking with the occupants, he contacted the Fitchburg Police Department ("FPD") dispatcher to run the license plate. Upon doing so, dispatch advised Officer Gaetz that the vehicle was, in fact, unregistered and uninsured, in violation of Mass. Gen. L. c. 90, § 9. *Id.*

Officer Gaetz approached the Jeep and asked both occupants for identification, which they produced – Matthew Marsh and Nydia Bernabel.  **Exhibit 3** at ¶ 10.  Officer Gaetz issued a citation to Marsh, who was driving the Jeep, for Operating an Unregistered Motor Vehicle in violation of Mass. Gen. L. c. 90, § 9.  *Id.*  A true and accurate copy of the Citation (Citation No.  M1618281) is attached hereto as **Exhibit 3(B)**.  As stated in his affidavit, Officer Gaetz did not include the violation of Fitchburg Traffic Ordinance § 169-70 in the citation because he decided to cite the more severe penalty – *i.e.*, Operating an Unregistered Motor Vehicle ($100 fine) rather than the local traffic infraction ($20 fine).  **Exhibit 3** at ¶ 10.

Officer Gaetz then asked the FPD dispatcher to run the identifications on Marsh (DOB 7-2-75) and Bernabel (DOB 12-27-72) to check for outstanding warrants.  **Exhibit 3** at ¶ 11.  The dispatcher did so, and informed Officer Gaetz that both individuals did, in fact, have outstanding warrants for their arrests.  *Id.*

At this point, Officer Gaetz placed both Marsh and Bernabel under arrest on the outstanding warrants.  **Exhibit 3** at ¶ 12.  He then called for assistance and waited for back-up to arrive.  Marsh and Bernabel were separated and transported back to the FPD police station at 20 Elm Street, Fitchburg, Massachusetts, for booking.  *Id.*  During the booking process, the following items were seized from Marsh:  (1) wallet, (2) nose ring, and (3) a belt.  The following items were seized from Bernabel:  (1) $570 U.S. currency, (2) earrings, and (3) jewelry.  True and accurate copies of defendants' itemized booking receipts are attached hereto as **Exhibit 3(C)**; *see also* **Exhibit 3(D)** (copy of defendants' Arrest Reports summarizing November 9, 2004 arrests).

Later that night, after the booking process was complete, one of the Fitchburg TFAs working with DEA traveled to the Fitchburg police station to view the items seized from Marsh and Bernabel.  Upon learning that numerous U.S. currency bills were seized from Bernabel's person, the TFA cross-referenced the serial numbers of Bernabel's currency to the serial numbers of the currency

used in the undercover crack transactions described above. *See* **Exhibit 2** at Bates No. 37. This cross-referencing confirmed that 18 of Bernabel's bills, totaling $400, matched the bills used by UC-2 in the undercover 4.7-gram crack transaction described above. *Id.* This is the "marked money" (a copy of which is attached hereto as **Exhibit 4**) that Marsh now seeks to suppress.

## II.    ARGUMENT

According to Marsh, the Court should suppress any and all evidence seized as a result of the motor vehicle stop discussed above, including the "marked money" seized from his co-defendant, Bernabel, as well as any identifications of Marsh himself. In support of this motion, Marsh asserts that: (i) "there was no probable cause for the stop and [his] arrest," *see Deft's Motion* at 2-3, (ii) "there was no articulable suspicion for the stop and [his] arrest," *see id.* at 3, and (iii) "the Defendant has the standing to bring this motion to suppress," *see id.* at 3-5.

For all of the following reasons, however, the government respectfully disagrees. First, Marsh has not, and can not, carry his burden of proving a reasonable expectation of privacy in the "marked money" seized from his co-defendant's person. He therefore lacks standing to challenge the admissibility of the money on Fourth Amendment grounds. Accordingly, the only evidence subject to possible suppression is Officer Gaetz's identification of Marsh as the driver of the Jeep Cherokee at the time of the stop. Defendant's challenge to this identification, however, also fails. As discussed below, the stop of the Jeep Cherokee was entirely proper because Officer Gaetz had: (1) probable cause to the stop the Jeep Cherokee for a traffic violation, and (2) probable cause and/or reasonable suspicion to stop the Jeep under the "collective knowledge" / "fellow officer" rule. Marsh's motion therefore fails.

### A.    Defendant's Motion Should be Denied Without a Hearing

As an initial matter, Marsh's motion should be denied without a hearing because he has failed to make the threshold showing required for an evidentiary hearing. As stated by the First

Circuit, "[a] criminal defendant has no absolute or presumptive right to insist that the district court take testimony on every motion." *United States v. Lewis,* 40 F.3d 1325, 1332 (1st Cir. 1994). Instead, "[a] hearing is required only if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record." *United States v. Staula,* 80 F.3d 596, 603 (1st Cir.), *cert. denied*, 519 U.S. 857 (1996). In particular, evidentiary hearings on motions to suppress are required only when a defendant makes a sufficient showing that an illegal search has occurred. *Lewis,* 40 F.3d at 1332. "To make this showing the defendant must allege facts, sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented." *Id.* (citations omitted).

Here, Defendant has failed to meet this standard. In support of his claim that the stop of the Jeep Cherokee was unconstitutional, Defendant supplies no affidavit containing <u>any</u> facts, much less facts establishing his entitlement to suppression. *See United States v. Gomez,* 770 F.2d 251, 253 (1st Cir. 1985) (defendant has burden in motion to suppress to establish reasonable expectation of privacy/standing). Instead, the sole factual support for Marsh's motion is his unverified and factually inaccurate interpretation of Officer Gaetz's police report, which is summarized in a one-paragraph "statement of facts" in his supporting memorandum. *See* Deft.'s Memo. at 1-2. Such a submission falls far short of meeting the "sufficient threshold showing" required by First Circuit law. *See, e.g., Lewis,* 40 F.3d at 1332 (finding defendants who failed to submit personal affidavits in support of suppression motion, relying instead on an attorney affidavit setting forth only conclusory allegations, failed to show entitlement to evidentiary hearing).

Defendant's motion also violates Local Rule 7.1(B)(1), which requires "[a]ffidavits and other documents setting forth or evidencing facts on which the motion is based." L.R. 7.1(B)(1). Instead, as stated above, Marsh simply sets forth a one-paragraph summary of Officer Gaetz's police report and asserts that "Gaetz stopped the defendant's vehicle for no reason at all." *Deft.'s Motion* at 3.

Such assertions, however, are precisely the sort of conclusory statements that are insufficient under First Circuit precedent. Indeed, Defendant admits that "it was discovered that both the defendant and co-defendant had warrants outstanding for their arrest" and that the "marked money" was discovered on Bernabel's person incident to that arrest. *See Deft.'s Memo.* at 2. For all of the reasons set forth below, the uncontroverted essential facts, as set forth in the government's affidavit and exhibits, establish that Marsh's motion is without merit. Accordingly, the Court should deny the motion without conducting an evidentiary hearing. *See Lewis*, 40 F.3d at 1332 (finding district court "completely justified" in refusing to conduct suppression hearing where defendant failed to make required factual threshold showing).

**B. Marsh Lacks Standing to Challenge the Seizure of "Marked Money" from his Co-Defendant's Person**

Marsh's Fourth Amendment challenge to the admissibility of the "marked money" seized from his co-defendant's person should be rejected at the outset. Even a cursory review of applicable law shows that Marsh lacks standing to challenge the "marked money" seized from Bernabel incident to her arrest. As stated by the First Circuit, "*Rakas v. Illinois*, 439 U.S. [128 (1978)] ... makes clear beyond question that '[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.'" *United States v. Soule*, 908 F.2d 1032, 1035 (1st Cir. 1990) (*quoting Rakas*, 439 U.S. at 130, n.1) (emphasis added). The Supreme Court has often repeated that "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969) (emphasis added); *see also Rakas*, 439 U.S. at 133-34.

It is well settled that "*Rakas* reformulated the 'standing' inquiry as a matter of substantive fourth amendment law." *Soule*, 908 F.2d at 1035. The determinative inquiry is: "whether

governmental officials violated any legitimate expectation of privacy held by petitioner." *Id.* (emphasis added); *see Rawlings v. Kentucky*, 448 U.S. 98, 106 (1980) (noting *Rakas* established that controlling inquiry is whether law enforcement officers violated any legitimate expectation of privacy held by the party seeking suppression). As explained by the Supreme Court:

> A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. . . . And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, . . . it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.

*Rakas*, 439 U.S. at 134 (citations omitted). Therefore "[i]n order to embark on a suppression challenge, a 'defendant must show that he had a reasonable expectation of privacy in the area searched and in relation to the item seized.'" *United States v. Kimball*, 25 F.3d 1, 9 (1st Cir.1994), citing *United States v. Aquirre*, 839 F.2d 854, 856 (1st Cir. 1988). Only if a defendant passes this threshold inquiry will a court examine the merits of the Fourth Amendment claim. *United States v. Lochan*, 674 F.2d 960, 963 (1st Cir. 1982); *Aquirre*, 839 F.2d at 856 ("[u]nless and until the 'standing' threshold is crossed, the *bona fides* of the search and seizure are not put legitimately into issue"); *United States v. Lochan*, 674 F.2d 960, 963 (1st Cir. 1982) (instructing "first inquiry in examining a fourth amendment claim is whether the defendant had a reasonable expectation of privacy in the area searched or the item seized").

Here, Marsh has not, and can not, cross this fundamental "standing" threshold. In an attempt to do so, Marsh argues that he has standing to challenge the "marked money" found on Bernabel by virtue of the "poisonous tree" doctrine. *See Deft.'s Memo.* at 4-5. According to Marsh, "[i]f the initial stop of a vehicle was illegal, evidence seized by virtue of that stop, such as the money in this instance, may be subject to exclusion under the fruit of the poisonous tree doctrine." *Id.* at 4. Citing the Supreme Court's decision in *Wong Sun v. United States*, 371 U.S. 471 (1963), Marsh concludes

that his right to privacy was invaded by the (allegedly) illegal stop of the Jeep Cherokee and that he therefore "has standing to challenge ... all fruits of this unlawful stop including the search into the vehicle or his passengers." *Id.*

The Court should reject Marsh's argument for several reasons. First, it flies in the face of *Rakas* and its progeny. As discussed above, it is well settled that a defendant seeking suppression of evidence must establish (i) "not only the unlawfulness of the challenged governmental action," but also (ii) "that it intruded upon some legitimate expectation of privacy *of the proponent*." *Soule*, 908 F.2d at 1034; *see Rawlings*, 448 U.S. at 104-05; *Rakas*, 439 U.S. at 130 n.1. To establish a legitimate expectation of privacy, the defendant must illustrate both (i) an actual, subjective expectation of privacy and (ii) that such expectation is one that "society is prepared to recognize" as objectively reasonable. *Smith v. Maryland,* 442 U.S. 735, 740 (1979); *United States. v. Mancini,* 8 F.3d 104, 107 (1st Cir.1993); *see also Rawlings,* 448 U.S. at 104 (noting it is defendant's burden to assert and prove expectation of privacy).[1]

The Supreme Court's decision in *Rawlings* is instructive. In *Rawlings,* the Court considered whether the defendant had a legitimate expectation of privacy in the contents of a purse belonging to a third-party (which contained drugs belonging to the defendant). *Rawlings,* 448 U.S. at 100-01. The defendant argued that he had standing to challenge the search of the purse because he immediately claimed ownership of the drugs contained therein. *Id.* at 105. The Court rejected the defendant's argument, holding that he failed to meet his burden of proving a legitimate expectation

[1] Such inquiries are fact-specific, depending generally, though not exclusively, on the following factors: "possession or ownership of the area searched or the property seized; prior use of the area searched or the property seized; legitimate presence in the area searched; ability to control or exclude others' use of the property; and a subjective expectation of privacy." *United States v. Gomez*, 770 F.2d 251, 254 (1st Cir.1985), citing *Lochan*, 674 F.2d at 965. *See also United States v. Cruz Jimenez*, 894 F.2d 1, 6 (1st Cir. 1990) (listing factors such as "ownership, possession, and/or control" and "historical use of the property searched" as "pertinent to this threshold inquiry").

of privacy in the purse. *Id.* at 105. In support of this holding, the Court noted the following factors: (i) the relationship between the parties, (ii) the precautions taken by the defendant to maintain privacy, (iii) whether the defendant had a right to control the purse and exclude others from using it, and (iv) whether the defendant had proven a subjective expectation of privacy in the purse. *Rawlings*, 448 U.S. at 105. Importantly, the Court also held that the mere fact that the defendant had claimed ownership of the drugs inside the purse did not clothe him with standing to challenge the search of the purse. *Id*. at 105-06; *see also United States v. Gomez*, 770 F.2d 251, 254 (1st Cir. 1985) (explaining that defendant may have "*possessory interest* in goods seized in places where he has no expectation of privacy") (emphasis in original).

Likewise, Marsh has simply not established that he had any legitimate expectation of privacy in the items seized from Bernabel's own pockets. Not only has he failed to establish such a subjective expectation of privacy, but any such assertion would fail as objectively unreasonable. He has advanced no facts, in an affidavit or otherwise, that assert a property or possessory interest in either the Jeep Cherokee or in the currency seized from Bernabel's person. Marsh's only factual assertion in support of his "standing" argument is that he was driving the Jeep Cherokee at the time of the stop. *See Deft.'s Memo.* at 5. This sole fact falls far short of establishing a legitimate expectation of privacy in Bernabel's belongings under controlling law. *See, e.g., United States v. Padilla*, 508 U.S. 77 (1993) (per curiam) (rejecting Ninth Circuit view that defendants have any special standing to challenge searches of their co-conspirators' or co-defendants' property).

Second, the First Circuit has already addressed – and rejected – a similar argument in *United States v. Soule*, 908 F.2d 1032 (1st Cir.1990). In *Soule*, the First Circuit considered whether the defendant had standing to challenge the stop and search of a pickup truck operated by his co-defendant, who was the sole occupant of the truck at the time of the stop. Like Marsh, the defendant argued that the motor vehicle stop was unconstitutional and that all evidence obtained during the

stop should be suppressed as unconstitutionally acquired. *Id*. at 1034. The court rejected this argument, holding that the defendant did not have standing to challenge the stop and search of the truck because he failed to establish a legitimate expectation of privacy in either the truck or its contents. In support of this holding, the court noted that the record showed "no proprietary or possessory interest in the vehicle, or its contents, and no right to exclude anyone from the vehicle." *Id.* at 1036, n.7.

Moreover, like Marsh, the defendant in *Soule* cited *Wong Sun v. United States,* 371 U.S. 471 (1963), in support of his standing argument. *Soule*, 908 F.2d at 1036. Like Marsh, Soule argued that according to *Wong Sun*, he had standing to challenge the stop and search of his co-defendant's truck based on the "fruit of the poisonous tree" doctrine. *Id.* In rejecting this argument, the First Circuit stated:

> The defendant cites *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), as support for the unsound assertion that the "gravaman (sic) of the fruits of the poisonous tree doctrine is that the tainted evidence cannot be used *at all*." ... Of course, *Wong Sun* stands for a much narrower rule of exclusion.

*Soule*, 908 F.2d at 1036. The court explained that *Wong Sun* involved an unlawful arrest of defendant Toy and that certain evidence had to be excluded as against Toy. As to Wong Sun, however, "*[t]he seizure of this heroin invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at trial*." *Id.* at 1037 (emphasis in original). In concluding that the "fruits of the poisonous tree" doctrine did not cloak Soule with standing to challenge the stop and search, the First Circuit cautioned as follows:

> "Finally, it must be cautioned that a defendant, in any event, can prevail on a 'fruit of the poisonous tree' claim only if he has standing regarding the violation which constitutes the poisonous tree."

*Soule*, 908 F.2d at 1036, quoting 4 W. LaFave, Search and Seizure § 11.4 at 371 (2d ed. 1987) (emphasis added).

Finally, federal courts that have addressed suppression motions under similar fact patterns (*i.e.*, motions to suppress evidence seized from a co-defendant), have uniformly rejected such motions on grounds of standing. *See, e.g., United States v. Herbst,* 641 F.2d 1161, 1166-67 (5th Cir. 1981) (defendants had no standing to object to search of co-defendant's person, which yielded cocaine taped to co-defendant's leg); *United States v. Kelly,* 46 F.Supp.2d 624, (E.D.Tex. 1999) (defendant had no expectation of privacy in purse of passenger in car that defendant was driving); *United States v. Perez,* 574 F. Supp. 1429, (E.D.N.Y. 1983) (defendant lacked standing to challenge cash found in co-defendant's purse).

For all of the foregoing reasons, Marsh's Fourth Amendment challenge to the "marked money" seized from Bernabel fails on the threshold ground of "standing."

### C. The Motor Vehicle Stop Comported Fully with Constitutional Requirements

In light of the foregoing, the only evidence subject to possible suppression in this matter is the identification of Defendant at the time of the stop.[2] This portion of Marsh's motion also fails, however, because Officer Gaetz had: (1) probable cause to the stop the Jeep Cherokee for a traffic violation, and (2) probable cause and/or reasonable suspicion to effect a valid *Terry* stop under the "collective knowledge" / "fellow officer" rule.

#### 1. Officer Gaetz had Probable Cause to Stop the Jeep Cherokee for Traffic Violation

Where law enforcement officers have probable cause to believe that a traffic violation has occurred, the decision to stop a car is fully consonant with the Fourth Amendment. *See United States v. Whren,* 517 U.S. 806 (1996); *Delaware v. Prouse,* 440 U.S. 648, 653 (1979); *Pennsylvania*

[2] To the extent that the Court disagrees, the arguments set forth in this section of the government's memorandum apply equally to the "marked money" seized from Bernabel, providing further grounds to deny Marsh's motion.

*v. Mimms,* 434 U.S. 106, 109 (1977). In *Whren*, the Supreme Court upheld the temporary detention of individuals in connection with a traffic stop where, as here, the police had probable cause to believe that a traffic violation had occurred. *Whren,* 517 U.S. at 813. The Court has also made clear that the subjective intent of the police officers in making the stop is irrelevant for Fourth Amendment purposes. *Id.* The First Circuit summarized the *Whren* decision as follows:

> [In *Whren,*] the Supreme Court affirmed the denial of a motion to suppress drugs seized when the police stopped a car for a traffic violation. The Court held that the temporary detention of a motorist upon probable cause to believe the traffic laws have been violated does not transgress the Fourth Amendment's prohibition on unreasonable seizures, even if the officer would not have stopped the motorist absent some additional law enforcement objective. *Whren*, [517] U.S. at [813], 116 S.C. at 1774. Because the Fourth Amendment allows certain actions to be taken in certain circumstances, regardless of motives, the Court rejected any inquiry into the officers' subjective intent or into what a "reasonable officer" would have done in similar circumstances. *Id*. at 1775. The Court thus foreclosed any argument that ulterior motives can invalidate an otherwise justified traffic stop. *Id.* at 1774.

*United States v. Andrae*, 94 F.3d 9, 12 (1st Cir. 1996); *see also United States v. Woodrum*, 208 F.3d 8 (1st Cir. 2001)*; United States v. Bizier,* 111 F.3d. 214 (1st Cir. 1997).

Thus, so long as Officer Gaetz had probable cause to believe that a traffic infraction had occurred, he was fully entitled to stop the Jeep Cherokee on the night in question. It is wholly irrelevant to the Fourth Amendment analysis that Officer Gaetz was asked to stop the Jeep, if circumstances permitted, to assist the DEA agents and Fitchburg TFAs in their undercover narcotics investigation. *Whren,* 517 U.S. at 813. It is also irrelevant that Officer Gaetz ultimately cited Marsh for the more severe violation of Operating an Unregistered Motor Vehicle rather than for the local traffic violation. *See Bizier*, 111 F.3d at 218 (probable cause justifying initial arrest need not be for the charge eventually prosecuted). Instead, the sole question is whether Officer Gaetz had probable cause to believe that a traffic infraction occurred. "Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a

reasonably prudent person would believe the suspect had committed or was committing a crime." *United States v. Young*, 105 F.3d 1, 6 (1st Cir. 1997).

The facts surrounding the instant stop easily meet this standard. Officer Gaetz witnessed the Jeep Cherokee make two abrupt and unsafe turns. **Exhibit 3** at ¶¶ 5-6. According to Officer Gaetz, both turns were made in a "sudden" and "aggressive" manner, one of which was made off a particularly busy roadway near downtown Fitchburg. *Id*. In light of his personal observations of the Jeep, and his training and experience as a Fitchburg Patrolman, Officer Gaetz determined that the operator of the Jeep Cherokee had violated Fitchburg Traffic Ordinance § 169-70, which requires motorists to use care in making turns.[3] *See* **Exhibit 3** at ¶ 7; **Exhibit 3(A)**. Having witnessed these violations, Officer Gaetz clearly had probable cause necessary to make a traffic stop.

**2. Officer Gaetz also had Probable Cause and/or Reasonable Suspicion of Criminal Activity based on the "Collective Knowledge" Rule**

Marsh's motion should also be denied because based on the "collective knowledge" / "fellow officer" rule, Officer Gaetz had probable cause and, at minimum, reasonable suspicion to effect a constitutional stop of the Jeep.

**a. The "Collective Knowledge" / "Fellow Officer" Rule**

Under the "collective knowledge" doctrine, also known as the "fellow officer" rule, "law enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime." *United States v. Meade*, 110 F.3d 190, 193 (1st Cir. 1997). Officers are entitled to rely on such collective knowledge in forming both (i) probable cause and/or (ii) reasonable suspicion. *See*

[3] Fitchburg Traffic Ordinance § 169-70 provides as follows: "Care in starting, stopping, turning or backing: The driver of any vehicle, before starting, stopping, turning from a direct line or backing shall first see that such movement can be made in safety. If the operation of another vehicle should be affected by a stopping or turning movement, the driver of such vehicle shall be given a plainly visible signal, as required by statute." *See* **Exhibit 3(A)**.

*Hensley*, 469 U.S. at 223 (holding officer is entitled to conduct investigatory stop based on flyer issued by neighboring police department, where officers who issued flyer had articulable facts for flyer, even though such facts were not included in flyer, which simply stated defendant was wanted for robbery investigation); *United States v. Cook*, 277 F.3d 82, 85 (1st Cir. 2002) (where law enforcement officers are jointly involved in executing investigative stop, knowledge of each officer is imputed to others for purposes of determining validity of stop); *Bizier,* 111 F.3d at 217 ("[p]robable cause is to be determined based on the "collective knowledge and information of all the officers involved"), quoting *United States v. Paradis*, 802 F.2d 553, 557 (1st Cir. 1986); *Meade*, 110 F.3d at 193-94 (finding probable cause based on fellow-officer/collective knowledge rule); *see also United States v. Taylor*, 162 F.3d 12, 18 (1st Cir.1998) (officer who received call to "be on the lookout for" certain vehicle based on information from informant was deemed to be involved in same investigation with fellow officer who knew informant; knowledge of informant's identity was imputed to officer who received call to establish reasonable suspicion for stop); *United States v. Fernandez Santana*, 975 F.Supp. 135, 141 (D.P.R. 1997) (indicating that information received from other officers could provide basis for reasonable suspicion for valid investigatory stop).[4] In applying this doctrine in *United States v. Meade*, 110 F.3d 190, 193 (1st Cir. 1997), the First Circuit

---

[4] This "collective knowledge" / "fellow officer" rule is recognized in several circuits. *See, e.g., United States v. Hinojos*, 107 F.3d 765, 768 (10th Cir. 1997) ("fellow officer" rule allows officers to pool information and reasonable suspicion may be established on basis of collective knowledge); *United States v. Mikell*, 102 F.3d 470, 475 (11th Cir. 1996) (reasonable suspicion justifying investigatory car stop determined from totality of circumstances and collective knowledge of officers involved), *cert. denied*, 520 U.S. 1181 (1997); *United States v. Chhunn*, 11 F.3d 107, 110 (8th Cir. 1993) (accord)*; United States v. Perkins*, 994 F.2d 1184 (6th Cir.), *cert. denied*, 510 U.S. 903 (1993); *United States v. Nafzger*, 974 F.2d 906, 910 (7th Cir. 1992) (officer making stop does not need to be personally aware of all articulable facts justifying vehicle stop; sufficient that officer aware of facts communicated his or her reasonable suspicion to officer making stop);*United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1986) (collective knowledge rule applies where officer makes vehicle stop based on information from other law enforcement officials).

explained, "when a law enforcement officer with information amounting to probable cause directs an officer who lacks the knowledge to make the arrest, we 'impute' to the arresting officer the directing officer's knowledge." *Meade*, 110 F.3d at 193.

**b. Officer Gaetz had Probable Cause and/or Reasonable Suspicion <u>to Stop the Jeep Cherokee under the Collective Knowledge Rule</u>**

Upon applying the "collective knowledge" doctrine to the instant case, it is clear that Officer Gaetz had probable cause to stop the Jeep Cherokee for being unregistered and uninsured. As set forth in his affidavit, shortly after the defendants completed their sale of crack cocaine to UC-2, Officer Gaetz received a call from a Fitchburg TFA, who asked for assistance in locating and stopping the Jeep Cherokee that defendants used in the crack transaction. *See* **<u>Exhibit 3</u>** at ¶ 3. The TFA described the Jeep Cherokee in detail to Officer Gaetz, stating that it: "(i) was dark in color, (ii) had a Massachusetts license plate numbered "6815MX," (iii) would be occupied by two individuals, (iv) <u>was unregistered and uninsured</u>, and (v) might be located near the nail salon on Summer Street, across the street from George's Hot Dog Stand." *Id*. (emphasis added). Officer Gaetz was entitled to rely on this detailed information that he received from the TFA – including the tip that the Jeep was unregistered and uninsured – in formulating probable cause. *See Meade*, 110 F.3d at 193; *see also United States v. Ventresca*, 380 U.S. 102, 111 (1965) ("[o]bservations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number").

At minimum, the record shows that Officer Gaetz had "articulable and reasonable suspicion" to effect a valid *Terry* stop. *Prouse*, 440 U.S. at 663. It is well settled that a law enforcement officer may stop a car and briefly investigate any "<u>reasonable suspicion that the vehicle's occupants were, are, or will be engaged in criminal activity</u>." *Kimball*, 25 F.3d at 6 (emphasis added); *see Terry v. Ohio*, 392 U.S. 1 (1968) (brief investigative stops are permitted when reasonable suspicion of

criminal activity exists). This suspicion must be based on "specific and articulable facts." *United States v. Hensley*, 469 U.S. 221, 226 (1984), citing *Prouse*, 440 U.S. at 653-55. As stated by the Supreme Court:

> [T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause. The officer, of course, must be able to articulate something more than an inchoate and unparticularized suspicion or hunch. The Fourth Amendment requires some minimal level of objective justification for making the stop. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means a fair probability that contraband or evidence of a crime will be found, and the level of suspicion for a *Terry* stop is obviously less demanding than that for probable cause[.]

*United States v. Sokolow*, 490 U.S. 1, 7 (1989); *see also* United States v. Woodrum, 202 F.3d 1, 6-7 (1st Cir. 2000) (officer must be able to articulate something more than an unparticularized and inchoate suspicion or hunch).

Here, it is clear that such reasonable suspicion, grounded on specific and articulable facts, existed. As noted above, Officer Gaetz, was alerted that there was an "unregistered and uninsured" car in his area, along with numerous facts identifying the precise motor vehicle at issue, including (i) its color, (ii) the model of vehicle, (iii) the license plate number, (iv) the number of occupants in the vehicle, and (v) a possible area where the vehicle could be found. *See* **Exhibit 3** at ¶ 3. Upon locating the vehicle in the very area identified by the TFA and observing all of the identifying factors (including color, model, licence plate, and number of occupants), Officer Gaetz clearly had an articulable and reasonable suspicion that the driver was operating an unregistered vehicle in violation of Mass. Gen. L. c.90, § 9. Moreover, upon pulling the Jeep over on Lawrence Street, Officer Gaetz contacted dispatch to run the license plate, which did, in fact, come back as unregistered and uninsured. *Id.* at ¶ 9. Such actions are precisely the type of investigatory actions for which a *Terry* stop was created. *See United States v. Walker*, 924 F.2d 1, 3 (1st Cir. 1991)

(actions taken during Terry stop must be "reasonably related in scope to the circumstances which justified the interference in the first place").

Officer Gaetz was also justified in stopping the Jeep Cherokee based on his reasonable suspicion that the occupants were engaged in criminal drug activity. As stated in his affidavit, upon receiving the call from the TFA, who Officer Gaetz knew was an undercover Drug Task Force agent, Officer Gaetz "immediately understood that the two occupants of this Jeep had been involved in an undercover drug operation." **Exhibit 3** at ¶ 3. As explained by the First Circuit, Terry stops are allowed where the officer has reasonable suspicion that the occupants of the vehicle "were, are, or will be engaged in criminal activity." *Kimball*, 25 F.3d at 6 (emphasis added).

**D. The Arrests and Seizures Following the Stop were also Entirely Proper**

Once stopped, Officer Gaetz ran the license plate and confirmed that the Jeep was, in fact, unregistered. Upon doing so, Officer Gaetz had probable cause to arrest Defendant, who was driving the Jeep, for operating an unregistered motor vehicle. Contrary to the assertions set forth in Defendant's motion, Officer Gaetz did, in fact, issue a citation to Defendant for this offense. *See* **Exhibit 3(B)** (citation issued to Marsh on November 9, 2004, for operating unregistered motor vehicle in violation of Mass. Gen. L. C. 90, § 9).

Not only was Officer Gaetz entitled to arrest the driver of an unregistered vehicle, but upon running the defendants' records, he discovered that both Marsh and Bernabel had outstanding arrest warrants. *See* **Exhibit 3** at ¶¶ 9-11. At this point, Officer Gaetz had probable cause to arrest both defendants pursuant to their outstanding warrants, which he did. *See* **Exhibit 3** at ¶¶ 11-12.

The arrests justified the searches of defendants' persons incident to their arrests. *Chimel v. California*, 395 U.S. 752 (1969) (instructing that "[t]he right without a search warrant contemporaneously to search persons lawfully arrested ... is not to be doubted"); *United States v.*

*Cruz Jimenez*, 894 F.2d 1, 7 (1st Cir. 1990) ("a search incident to a valid arrest may be made without procurance of a warrant"). Accordingly, even if Defendant had a reasonable expectation of privacy in the "marked money" seized from Bernabel (which he does not), that search and seizure was entirely proper as a search incident to Bernabel's arrest on her outstanding warrant, which developed out of a valid stop.[5] The Court should deny Defendant's motion for all of these reasons.

## III. CONCLUSION

For all of the foregoing reasons, Defendant Matthew Marsh's Motion to Suppress should be denied without a hearing.

Dated: February 23, 2006

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: ***/s/ Lisa M. Asiaf***
LISA M. ASIAF
Assistant U.S. Attorney
Tel: (617) 748-3268

---

[5] In any event, even if the Court determined that the initial stop was improper, Officer Gaetz's intervening investigation of the license plate (which revealed that the Jeep was unregistered) and the defendants' identifications (which revealed that outstanding arrest warrants existed against both defendants), purged any primary taint associated with the initial stop. As such, all evidence that flowed from Officer Gaetz's independent investigation subsequent to the initial stop is free from any taint flowing from the initial car stop. *See United States v. Pimental*, 645 F.2d 85 (1st Cir. 1985) (affirming district court's refusal to suppress photograph of defendant's automobile was not fruit of initial illegal detention made without reasonable suspicion where intervening circumstances created probable cause before challenged evidence was obtained by police). *See also Johnson v. Louisiana*, 406 U.S. 356 (1972) (intervening factor subsequent to arguably illegal arrest cured any deficiency in initial arrest).

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 23, 2006.

***/s/ Lisa M. Asiaf***
LISA M. ASIAF

# EXHIBIT 1

## REPORT OF INVESTIGATION

**Page 1 of 4**

| | | |
|---|---|---|
| 1. Program Code **MET-100** | 2. Cross File     Related Files | 3. File No. ▇▇▇▇▇▇    4. G-DEP Identifier ▇▇▇▇▇▇ |
| 5. By: S/A Steven C. Story    At Boston, MA | ☐ ☐ ☐ ☐ | 6. File Title ▇▇▇▇▇▇ |
| 7. ☐ Closed ☐ Requested Action Completed   ☐ Action Requested By: | | 8. Date Prepared **11-10-2004** |

9. Other Officers:

10. Report Re: Undercover meeting with Nydia "Nanni" BERNABEL on 11-09-2004 in Fitchburg, MA and the resulting Acquisition of Exhibit 38 (crack cocaine)

### SYNOPSIS:

On 11-09-2004, Nydia "Nanni" BERNABEL and Matthew MARSH sold undercover S/A Steven Story approximately three grams of crack cocaine [Exhibit 38] in exchange for $300 [OAF], during a pre-arranged meeting at the intersection of Foster Street and Leighton Street in Fitchburg, MA.

### DETAILS:

1. Reference is made to the following associated investigative report: DEA 6, Report of Investigation, by S/A Kevin Sawyer, dated 11-12-04, re: surveillance of the Purchase of Exhibit 38 on 11-09-04 in Fitchburg, MA, and the Acquisition of Exhibit N-97, under this same case file; DEA 6, Report of Investigation, by S/A Dan Genese, dated 11-12-04, re: UC Purchase of Exhibit 39 from Nydia BERNABEL on 11-09-04 and the Acquisition of Exhibit N-96 on 11-09-04 and N-100 on 11-10-04, under this same case file.

2. At approximately 5:00 PM, on 11-09-04, S/A Story placed an unrecorded call to cellular telephone to 978-580-6051 to negotiate a crack cocaine transaction with "Nanni [previously identified as Nydia BERNABEL]." [NOTE: Business records obtained by subpoena revealed that NEXTEL cellular telephone 978-580-6051 was subscribed to by Karen IOVANNE, 77 Forest Street, Fitchburg, MA, during this timeframe.] S/A Story spoke to "Nanni [BERNABEL]" who agreed to sell S/A Story eight "40's [eight individual increments of .4 gram quantities of crack cocaine which are

| 11. Distribution: | 12. Signature (Agent) *S/A Steven C. Story* | 13. Date **11-18-04** |
|---|---|---|
| Division | | |
| District | 14. Approved (Name and Title) Richard W. ▇▇▇▇ Group Supervisor | 15. Date **11-18-04** |
| Other | | |

**DEA SENSITIVE**
Drug Enforcement Administration

Form - 6
1996

- Prosecution

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 6/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION (Continuation) | 1. File No. [redacted] | 2. G-DEP Identifier [redacted] |
|---|---|---|
| | 3. File Title [redacted] | |
| 4. Page 2 of 4 | | |
| 5. Program Code MET-100 | 6. Date Prepared 11-10-2004 | |

generally worth $40 each]" for $320. "Nanni" and S/A Story then made arrangements to meet on Leighton Street in Fitchburg in one hour to complete the proposed transaction.

3. At approximately 5:45 PM, S/A Story, who was acting in an undercover capacity, traveled to the intersection of Kimball and Leighton Streets in Fitchburg, where S/A Story parked the undercover vehicle to await the arrival of BERNABEL. At approximately 5:50 PM, S/A Story observed a 1996 Jeep Cherokee, bearing Massachusetts registration 6815MX, turn onto Leighton Street and then stop next to the undercover vehicle. S/A Story approached the open driver's side window of the subject Jeep Cherokee to converse with the two occupants. S/A Story observed that the driver of the Jeep was a black female [identified by S/A Story as Nydia "Nanni" BERNABEL], and the passenger was a heavy set male [who was subsequently identified as Matthew MARSH]. The ensuing conversation was recorded as Exhibit N-97 via the concealed transmitter worn by S/A Story.

4. As S/A Story exchanged brief greetings with BERNABEL and MARSH, S/A Story observed BERNABEL answer an incoming call on her cellular telephone [which was believed to be the pre-arranged call of CS [redacted] for the purpose of introducing BERNABEL to undercover S/A Dan Genese for a subsequent crack purchase to immediately follow S/A Story's pending transaction]. S/A Story asked BERNABEL, "How do they [the crack cocaine rocks] look, are they pretty good?" BERNABEL replied, "Yes," as MARSH placed a package in "Nanni's" extended right hand. BERNABEL then displayed the package in her open right hand to S/A Story. S/A Story told BERNABEL that he only had $300 rather than the previously agreed $320. BERNABEL commented, "Don't worry about it [regarding the $20 discrepancy]." S/A Story then handed BERNABEL the $300 serialized OAF, while BERNABEL placed the crack cocaine package in S/A Story's hand. BERNABEL then cautioned S/A Story by saying, "Watch out [meaning for S/A Story to quickly conceal the crack cocaine on his person]."

5. S/A Story rapidly inspected the cocaine package and then asked BERNABEL, "Are they pretty good sized 40's?" BERNABEL did not respond, and S/A Story observed BERNABEL immediately hand the $300 to MARSH. As Marsh was counting the money, BERNABEL received two more incoming cellular telephone calls, both of which BERNABEL quickly concluded. S/A Story

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION (Continuation) | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| | 3. File Title | |
| 4. Page 3 of 4 | | |
| 5. Program Code MET-100 | 6. Date Prepared 11-10-2004 | |

asked BERNABEL, "Are all eight there? [in reference to his original order of eight 40's of crack cocaine]. BERNABEL replied, "No, there's three hundred worth there [which S/A Story understood to mean that the crack cocaine was not packaged as individual .4 gram increments, but was instead packaged as one approximate three gram unit worth $300]." S/A Story told BERNABEL that was "cool," and BERNABEL received another incoming cellular call. The deal was then concluded, and BERNABEL and MARSH sped away from the area.

**CUSTODY OF EVIDENCE:**

**Drug Evidence:**

**Exhibit 38** is described as one (1) clear plastic baggie that was twist-tied at the top and contained an off-white colored rock-like substance. Exhibit 38 was purchased by U/C S/A Steven Story from Nydia "Nanni" [BE]RNABEL and Matthew MARSH for $300 OAF on 11-09-04 in the vicinity of Leighton Street, Fitchburg, MA. S/A Story maintained custody of Exhibit 38 until transferring said evidence to S/A David DiTullio on that same date. S/A DiTullio conducted a cocaine field test on Exhibit 38, which yielded positive presumptive results for the presence of cocaine base. S/A DiTullio relinquished custody of Exhibit 38 to FPD Detective James Gilbert, who secured said evidence at the FPD on that same date. On 11-10-04, FPD Det. Gilbert transferred custody of Exhibit 38 to S/A Edgar Sarabia. S/A Sarabia then transported Exhibit 38 to DEA in Boston, MA, where said evidence was secured in the NEFD drug evidence storage vault. On 11-15-04, S/A Sarabia removed Exhibit 38 for the NEFD vault and subsequently mailed Exhibit 38 to the DEA Northeast Regional Laboratory in New York, NY via RMRRR # RA897688692US for analysis and storage.

**INDEXING:**

1. BERNABEL, Nydia Sharaai (aka Nydias BERNABEL, Nadia BERNABEL, Nydia VENTURA, "Nanni", "Nonni"): [redacted] DOB: 12-27-1972; Hispanic female, 5'08" tall, 200 pounds, black hair, brown eyes; SSN: [redacted] cellular telephone: 978-580-6051; last known residential address: 70 Pleasant Street, Apartment #1, Fitchburg, MA.

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION (Continuation) | 1. File No. [redacted] | 2. G-DEP Identifier [redacted] |
|---|---|---|
| 4. Page 4 of 4 | 3. File Title [redacted] | |
| 5. Program Code MET-100 | 6. Date Prepared 11-10-2004 | |

**INDEXING (Continued):**

2. MARSH, Matthew A.: [redacted] DOB: 07-02-1975; white male, 5'09" tall, 245 pounds, blonde hair, brown eyes; SSN: [redacted] last known residential: 118 Myrtle Avenue, Fitchburg, MA.

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

# REPORT OF INVESTIGATION

| | | |
|---|---|---|
| 1. Program Code MET-100 | 2. Cross File / Related Files | 3. File No. [redacted] / 4. G-DEP Identifier [redacted] |
| 5. By: S/A Kevin C. Sawyer At Boston, MA | ☐ ☐ ☐ ☐ ☐ | 6. File Title [redacted] |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | | 8. Date Prepared 11/12/04 |

9. Other Officers: See paragraph below

10. Report Re: SURVEILLANCE OF THE PURCHASE OF EXHIBIT #38 AND THE ACQUISITION OF EXHIBIT N-97 ON 11-09-2004

**DETAILS:**

1. On Tuesday, 11-9-2004, at approximately 5:30 p.m., surveillance was established in the vicinity of the intersection of Kimball and Leighton Streets, Fitchburg, MA. At approximately 5:35 p.m., S/A Sawyer observed S/A Story, acting in an undercover capacity, drive into the parking lot of the PACE Gas station, Kimball and Rollstone streets, Fitchburg, MA. At approximately 5:40 p.m., S/A's Sawyer, Desmond, Karamourtopoulos, and Det. Connolly observed S/A Story drive from the PACE gas station to the corner of Kimball and Leighton St and park. At approximately 5:50 p.m., S/A's Desmond and Karamourtopoulis observed a 1996 Jeep Grand Cherokee, MA registration: 6815MX, listed to Karen Iovane, 77 Forest St. Fitchburg, MA, arrive and S/A Story to be engaged in conversation with the front seat passenger. S/A's Desmond and Sawyer observed this vehicle to be occupied by two individuals. After several minutes, Agents observed the Jeep depart. Surveillance of the Jeep was incomplete as the vehicle sped away at a high rate of speed.

2. Other Officers (Cont.) G/S Richard Guerard, S/A's Steve Story, Tim Desmond, Paul Karamoutopoulis, Dan Genese, Clem Fisher, Dave Ditullio, Detectives Jake O'Leary, Jim Gilbert, Jim Connolly, and Chuck Demming.

| | | |
|---|---|---|
| 11. Distribution: Division NEFD Intel; District; Other SARI | 12. Signature (Agent) S/A Kevin C. Sawyer [signature] | 13. Date 11/15/04 |
| | 14. Approved (Name and Title) Richard Guerard Group Supervisor [signature] | 15. Date 11-15-04 |

DEA Form - 6 (Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

- Prosecutor

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION *(Continuation)* | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| | 3. File Title | |
| 4. Page 2 of 2 | | |
| 5. Program Code MET-100 | 6. Date Prepared 11/12/04 | |

**NON DRUG EVIDENCE:**

N-97. Exhibit N-97 consists of an original DVD-R disquette containing recorded images and voice of the meeting between S/A Story and VENTURA on 11-9-2004 during the U/C purchase of Exhibit # 38. S/A Desmond recorded N-97, retained custody, and gave to S/A Karamourtopoulis for safekeeping, processing, and subsequent transfer to the NEFD non drug evidence custodian at a later date.

**INDEXING:**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

# **EXHIBIT 2**

U.S. Department of Justice
Drug Enforcement Administration

# REPORT OF INVESTIGATION

| 1. Program Code MET-100 | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|
| 5. By: S/A Dan Genese At Boston FD-Group 2 | ☐ ☐ ☐ ☐ ☐ | | 6. File Title | |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | | | 8. Date Prepared 11/12/04 | |

9. Other Officers: G/S Guerard, S/A's DiTullio, Karamourtopoulos, Desmond, Sawyer, Story, Fisher, TFA's Connolly, O'Leary, Deming, Gilbert, Connolly, Fitzpatrick.

10. Report Re: UC purchase of Exhibit #39 from Nydia BERNABEL & the acquisition of Exhibit N-96 on Nov. 9, 2004 & N-100 on Nov. 10, 2004

**DETAILS**

1. Reference is made to DEA-6's written to this case file and title relative to the Acquisition of Exhibit's 24 and 38 from Nydia BERNABEL. Reference is also made to a DEA-6 written by TFA Gilbert relative to the surveillance of the UC purchase of Exhibit #39 on Nov. 9, 2004.

2. On Nov. 9, 2004 TFA Gilbert met with DEA Confidential Source (hereafter referred to as the CS), and was advised by the CS that the CS could purchase crack cocaine from Nydia BERNABEL, (known to the Fitchburg Police Dept. as a crack cocaine distributor). Later the same day, the CS contacted TFA Gilbert and advised that the CS spoke with BERNABEL, (at GILBERT's earlier direction), and made arrangements for the introduction of the CS's friend, (an undercover), to BERNABEL for the purpose of the UC purchasing crack cocaine. The CS arranged for a half ounce to be purchased from BERNABEL for $600.00.

3. On Nov. 9, 2004, in response to the aforementioned information, the above noted personnel met and formulated plans for S/A D. Genese, (acting in an undercover capacity, hereafter referred to as the UC), through an introduction to BERNABEL by the CS, to purchase crack cocaine from BERNABEL in Fitchburg, MA.

| 11. Distribution: | 12. Signature (Agent) | 13. Date |
|---|---|---|
| Division Boston FD-Intelligence | S/A Danny F. Genese | 11-12-2004 |
| District | 14. Approved (Name and Title) | 15. Date |
| Other SARI | Richard W. Guerard Group Supervisor, Group 2 | 11-12-04 |

DEA Form - 6 (7-96)
ex39
- Prosecutor

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION (Continuation) | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| | 3. File Title | |
| 4. Page 2 of 4 | | |
| 5. Program Code MET-100 | 6. Date Prepared 11/12/04 | |

4. On the same date, at approximately 6:00pm, the CS, using the UC's telephone, placed a recorded call, (N-96), to BERNABEL at telephone number 978-580-6051 which was witnessed by the UC and TFA Gilbert. In sum, the CS advised BERNABEL that the UC was in town and ready to purchase the crack cocaine. BERNABEL told the CS to call her when the CS was ready.

5. Minutes later the UC, equipped with a wireless voice transmitter, (monitored by S/A Karamourtopoulos and Desmond), and $600.00 US currency, OAF, traveled to Birch St., across from St. Anthony's school with the CS. Minutes later, the CS placed a call, (not recorded), to BERNABEL using the UC telephone. The CS got through, but the call was disconnected for unknown reasons. Several calls were placed to BERNABEL with the CS ultimately getting through. The CS advised BERNABEL that the CS and UC were on Birch St. by St. Anthony's School. Subsequently, the CS exited the UC vehicle and waited outside the vehicle for BERNABEL to arrive. Moments later, the CS advised the UC that BERNABEL was pulling up. The UC subsequently exited the UC vehicle and noted a dark colored Jeep pull along side the UCV. The front passenger's side window of the Jeep rolled down at which time the UC noted BERNABEL to be occupying the passenger's seat. In sum, the CS introduced the UC to BERNABEL at which time BERNABEL handed the UC a clear plastic bag containing an off-white chunky substance, (subsequently identified as Exhibit #39). The UC handed BERNABEL the aforementioned $600.00 US currency in exchange. The Jeep then departed the area with the UC and CS re-entering the UCV and departing the area to a pre-determined location while surveillance was maintained on the Jeep.

6. The following day, Nov. 10, 2004 TFA Gilbert provided S/A Genese with a photo image of BERNABEL and Matthew MARSH, (both arrested on Nov. 9, 2004 by the FPD subsequent to the sale of Exhibit #39 to the UC.) Note: Both were arrested on outstanding default warrants, unrelated to the sale to Exhibit #39 to the UC). The UC initialed and dated both photo's. The UC positively identified BERNABEL as the subject who sold exhibit #39 to the UC and MARSH as the driver of the Jeep which transported BERNABEL.

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION (Continuation) | 1. File No. [redacted] | 2. G-DEP Identifier [redacted] |
|---|---|---|
| | 3. File Title [redacted] | |
| 4. Page 3 of 4 | | |
| 5. Program Code MET-100 | 6. Date Prepared 11/12/04 | |

**CUSTODY OF DRUG EVIDENCE**

Exhibit #39 is described as one clear plastic bag bearing the initials "DG" and the date "11-9-04", containing an off-white chunky substance. Exhibit #39 was purchased by S/A D. Genese on Nov. 09, 2004 from Nydia BERNABEL in Fitchburg, MA for $600.00, US currency, OAF. On the same date, S/A Genese turned the exhibit over to S/A D. DiTullio who field tested the exhibit with positive results and weighed the same, (approximately 6.3 net grams & 31.5 gross grams). On the same date, S/A DiTullio turned the exhibit over to Det. J. O'Leary of the FPD who secured the exhibit at the FPD overnight. On Nov. 10, 2004 Det. Gilbert turned the exhibit over to S/A E. Sarabia who secured the exhibit at the NEFD drug evidence vault. On a later date, S/A Sarabia mailed the exhibit to the NERL for further testing and analysis.

**CUSTODY OF NON-DRUG EVIDENCE**

Exhibit N-96 is described as an original audiocassette recording of a telephone conversation between CS[redacted]and Nydia BERNABEL on Nov. 9, 2004 prior to the UC purchase of Exhibit #39 on the same date. On the same date, S/A Genese duplicated the exhibit and turned the original over to S/A P. Karamourtopoulos for further processing. On a later date, S/A Karamourtopoulos submitted the exhibit with the NEFD Non-Drug Evidence Custodian for safekeeping.

N-100 is described as one photo image of Nydia BERNABEL and one photo image of Matthew MARSH provided to S/A Genese by TFA Gilbert on Nov. 10, 2004. The exhibit was turned over to S/A P. Karamourtopoulos on Nov. 10, 2004 who submitted the exhibit at the NEFD Non-Drug Evidence room on a later date.

**INDEXING**

BERNABEL, Nydia -[redacted]

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION**<br>*(Continuation)* | 1. File No. ██████████ | 2. G-DEP Identifier |
|---|---|---|
| | 3. File Title ██████████ | |

| 4.<br>Page    4    of    4 | |
|---|---|
| 5. Program Code<br>MET-100 | 6. Date Prepared<br>11/12/04 |

MARSH, Matthew – ██████████

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

1 - Prosecutor

U.S. Department of Justice
Drug Enforcement Administration

# REPORT OF INVESTIGATION

| 1. Program Code MET-100 | 2. Cross File / Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|
| 5. By: TFA James Gilbert At Boston FD-Group 2 | ☒ | 6. File Title | |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | ☐ ☐ ☐ ☐ | 8. Date Prepared 11/12/04 | |

9. Other Officers: G/S Guerard, S/A's DiTullio, Story, Desmond, Fisher, Sawyer, Karamourtopoulos, TFA's O'Leary, Connolly, Fitzpatrick and Deming.

10. Report Re: Surveillance of the purchase of Ex# 39 by S/A Genese and C from Nydias BERNABEL on 11-09-04. Acquisition of Ex# N-98 and N-102.

**DETAILS**

1. Reference is made to a DEA-6 written to this case file and title by S/A Dan Genese relative to the UC purchase of Exhibit# 39 from BERNABEL on Nov. 09, 2004. Further reference is made to all DEA-6's written to this case file relative to the purchases of Exhibit's 24 and 38 from BERNABEL. On Nov. 9, 2004 the above noted personnel formulated plans for the undercover purchase of crack cocaine from Nydias BERNABEL later the same day.

2. Later the same day, in furtherance of the operation, surveillance was established in the area of Birch St., Fitchburg, MA near the St. Anthony's School. At approximately 6:20pm, the UC and DEA-CS (hereafter referred to as the CS), arrived at the aforementioned area and waited in the UCV for BERNABEL's arrival as observed by TFA Gilbert. Moments later, the CS exited the UCV and stood outside the vehicle on Birch St., by the driver's side of the UCV as observed by S/A T. Desmond.

3. At approx. 6:31pm, a black Jeep arrived at and parked aside of the UCV, which was parked on side of roadway by St. Anthony's school as witnessed by S/A T. Desmond (The plate on the Jeep: "6815 MX"). Upon the Jeep's arrival, the UC exited the vehicle and approached the

| 11. Distribution: | 12. Signature (Agent) | 13. Date |
|---|---|---|
| Division Boston FD-Intelligence | TFA James Gilbert | 11-15-04 |
| District | 14. Approved (Name and Title) Richard W. Guerard Group Supervisor, Group 2 | 15. Date 11-17-04 |
| Other SARI | | |

DEA Form - 6
(Jul. 1996)

gesurv.doc
- Prosecutor

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION (Continuation) | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| | 3. File Title | |
| 4. Page 2 of 3 | | |
| 5. Program Code MET-100 | 6. Date Prepared 11/12/04 | |

passenger's side of the Jeep with the CS as witnessed by S/A T. Desmond.

Moments later, the Jeep left the area westerly on Birch St as witnessed by S/A T. Desmond. The UC and CS also departed the area as S/A's P. Karamourtopoulos and T.Desmond followed to the UC and CS to a pre-determined location. ***(It should be noted that UC and CS were under constant surveillance throughout this operation.)***

4. Later the same day, TFA Gilbert learned that at approx. 7:04pm, Fitchburg Ma Police Officer Kenneth Gaetz Jr. while on routine patrol in a marked cruiser observed a black Jeep Grand Cherokee bearing MA reg# 6815MX being operated in an unsafe manner within Fitchburg MA. This was the same Jeep that was involved in the UC purchase of Ex#39 approx 30 minutes prior. PO Gaetz then conducted a civil m/v infraction stop of this vehicle. As a result of this stop, the two occupants were placed under arrest for outstanding default warrants issued out of Mass. State courts. Arrested as a result were BERNABEL who was still the front seat passenger and the operator Matthew MARSH.

5. Once at the Fitchburg Police Department, TFA J. Gilbert at approx. 8:30pm, then viewed the property of both Marsh and BERNABEL which was being held as part of their respective booking procedures. Among BERNABEL"S property were numerous US currency bills. TFA Gilbert then conducted a cross reference of these currency bills serial numbers with the serial numbers of the OAF money and recorded on DEA form # 6a which was used by UC Genese in the purchase of Ex #39 earlier this date. As a result of this cross referencing, eighteen (18) bills, (totaling $400, US currency), in BERNABEL'S property matched with the serial numbers of OAF money used to purchase Ex# 39. The matching bills were checked accordingly by TFA for evidence purposes. (A photocopy of the aforementioned DEA-6a Re; Ex #39 and a photocopy of the corresponding bills were submitted as Non-Drug Evidence, Exhibit N-102.)

<u>CUSTODY OF NON-DRUG EVIDENCE</u>

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION (Continuation) | 1. File No. [redacted] | 2. G-DEP Identifier [redacted] |
|---|---|---|
| | 3. File Title [redacted] | |
| 4. Page 3 of 3 | | |
| 5. Program Code MET-100 | 6. Date Prepared 11/12/04 | |

Exhibit N-98 is described as one DVD (audio and video) recording of the UC purchase of Exhibit #39 from Nydias BERNABEL on Nov. 9, 2004 in Fitchburg, MA. The exhibit was produced by S/A T. Desmond on the same date and turned over to S/A Karamourtopoulos. On a later date, S/A Karamourtopoulos turned the Exhibit over to the NEFD Non-Drug Evidence Custodian for safekeeping.

Exhibit N-102 is described as a photocopy of US currency that matched serialized bills from the DEA-6a corresponding to the purchase of Exhibit #39 & a photocopy of the aforementioned DEA-6a. The exhibit was produced by TFA Gilbert on Nov. 9, 2004. The Exhibit was initialed and dated by TFA Gilbert on Nov. 10, 2004 prior to TFA Gilbert turning the exhibit over to S/A D. Genese for processing. On the same date, S/A Genese turned the exhibit over to S/A P. Karamourtopoulos who submitted the same to the NEFD Non-Drug Evidence Custodian for safekeeping.

**DEXING**

1. BERNABEL, Nydias (aka: Nanni) - [redacted] Black Female, DOB: 12/27/1972, SS# [redacted] Hair: Black, Eyes: Black, 508, 180 lbs. 77 Forest St in Fitchburg Ma. (978) 343-8337. On 11-09-04 sold TFA one-half ounce of crack-cocaine, Fitchburg MA.

2. MARSH, Matthew - [redacted] D.O.B: 07-02-1975, Address: 118 Myrtle Ave. Fitchburg, MA. SS# [redacted] White male, 245 lbs, 5'09".

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

# EXHIBIT 3

**AFFIDAVIT OF KENNETH W. GAETZ, JR.**

I, Kenneth W. Gaetz, Jr., being duly sworn, do hereby depose and state as follows:

1. I have been employed as a law enforcement officer for approximately ten (10) years. From 1996 until 2001, I was a Sergeant in the Worcester County Sheriff's Department in Worcester, Massachusetts. On November 26, 2001, I joined the Fitchburg Police Department, Fitchburg, Massachusetts, where I worked as a Patrol Officer from April 2002 until June 26, 2005. I am currently employed as a Trooper for the Massachusetts State Police Department ("MSP"), which I joined on June 27, 2005.

2. Prior to joining the Fitchburg Police Department ("FPD"), I earned a Master's Degree in Criminal Justice Administration from Western New England College in Springfield, Massachusetts. Upon joining the FPD, I completed a 22-week law enforcement training program at the Massachusetts Criminal Justice Training Council. During my tenure at the FPD, I also attended annual training programs regarding various law enforcement policies, procedures and techniques.

3. On November 9, 2004, I was on duty as a Patrol Officer for the FPD. At approximately 6:45 p.m., I received a call from a Fitchburg Police Officer assigned to the undercover Drug Task Force (the "TFA"), who asked for my assistance in locating and stopping a Jeep Cherokee. The TFA described the Jeep Cherokee to me, stating that it: (i) was dark in color, (ii) had a Massachusetts license plate numbered "6815MX," (iii) would be occupied by two individuals, (iv) was unregistered and uninsured, and (v) might be located near the nail salon on Summer Street, across the street from George's Hot Dog Stand. Upon receiving this information from the TFA, who I knew was an undercover Drug Task Force agent,

I immediately understood that the two occupants of this Jeep had been involved in an undercover drug operation.

4. Equipped with this information, including the fact that the Jeep Cherokee was an unregistered motor vehicle, I immediately drove to the nail salon on Summer Street near George's Hot Dog Stand. I was dressed in my police uniform and was driving a marked police cruiser. To avoid detection, I parked my cruiser across the street from the nail salon and turned off my lights. I then began surveillance of the area of the nail salon, looking for a dark-colored Jeep Cherokee with MA License No. 6815MX occupied by two individuals.

5. Within minutes, I observed a dark-colored Jeep Cherokee departing from a driveway near the nail salon. In addition to observing the dark color of the Jeep, I observed that it was, in fact, a Jeep Cherokee occupied by two individuals. I immediately began to follow the Jeep, at which time I confirmed that it bore MA License No. 6815MX. After proceeding down Summer Street, I observed the Jeep make an abrupt left-hand turn onto Boutelle Street. In my training and experience, I considered the abrupt turn unsafe. It was a quick, aggressive turn off of Summer Street, which is a heavily traveled roadway that links to downtown Fitchburg.

6. I then followed the Jeep down Boutelle Street, where I observed the Jeep make another abrupt turn onto Goodrich Street. Again, the turn was made in a sudden and aggressive manner, which I considered unsafe.

7. At this point, I determined that the operator of the Jeep had violated Fitchburg Traffic Ordinance § 169-70, which requires that the driver of any vehicle use care in starting, stopping and turning the motor vehicle, ensuring that such movement is

made in safety. A true and accurate copy of Fitchburg Traffic Ordinance § 169-70 is attached hereto as **Exhibit 3(A)**.

8. During my tenure as a Fitchburg Patrol Officer, I have issued numerous traffic citations for violations of Fitchburg Traffic Ordinance § 169-70, including citations for unsafe turns, rolling through a stop sign, backing into traffic, cutting off another motor vehicle, or other such unsafe driving.

9. After observing the Jeep Cherokee make the two abrupt turns described above, and after confirming the license plate was, in fact, MA License No. 6815MX, I activated my cruiser's emergency lights and pulled the Jeep over on Lawrence Street. I then contacted FPD Dispatch to run the license plate, which did, in fact, come back as unregistered and uninsured.

10. I approached the Jeep and asked both occupants for identification, which they produced – Matthew Marsh (DOB 7-2-75) and Nydia Bernabel (DOB 12-27-72). I issued Marsh, who was driving the Jeep, a citation for Operating an Unregistered Motor Vehicle in violation of Mass. Gen. L. c. 90, § 9. I did not include the traffic violation of Fitchburg Traffic Ordinance § 169-70 in the citation because I decided to cite the more severe penalty – *i.e.*, Operating an Unregistered Motor Vehicle ($100 fine) rather than the local traffic infraction ($20 fine). A true and accurate copy of the Citation (Citation No. M1618281) issued to Marsh on November 9, 2004, is attached hereto as **Exhibit 3(B)**.

11. I then asked FPD Dispatch to run the identifications on Marsh (DOB 7-2-75) and Bernabel (DOB 12-27-72) to check for outstanding warrants. Dispatch informed me that both individuals did, in fact, have outstanding warrants.

12. At this point, I placed both Marsh and Bernabel under arrest. I then called for assistance and waited for back-up to arrive. I also called a tow company to remove the Jeep Cherokee. Marsh and Bernabel were separated and transported back to the FPD police station at 20 Elm Street, Fitchburg, Massachusetts, for booking. During the booking process, the following items were seized from Marsh: (1) wallet, (2) nose ring, and (3) belt, and the following items were seized from Bernabel: (1) $570 U.S. currency, (2) earrings, and (3) jewelry. True and accurate copies of their itemized booking receipts are attached hereto as **Exhibit 3(C)**.

13. A true and accurate copy of the Arrest Reports of Marsh and Bernabel, including my narrative report of the events preceding their arrests, is attached hereto as **Exhibit 3(D)**. I purposely did not include facts regarding the call that I received from the Fitchburg TFA in my narrative report because I knew that the defendants would receive a copy of the report and I did not want to tip them off to the undercover drug operation.

Signed under the pains and penalties of perjury this 23 day of February, 2006.

Kenneth W. Gaetz, Jr.

# EXHIBIT 3(A)

### § 169-63. Overtaking of other vehicles.

A. The driver of a vehicle shall not overtake and pass a vehicle proceeding in the same direction unless there is sufficient clear space ahead on the right side of the roadway to permit the overtaking to be completed without impeding the safe operation of any vehicle ahead.

B. The driver of a vehicle, when about to be overtaken and passed by another vehicle approaching from the rear, shall give way to the right in favor of the overtaking vehicle, on suitable and audible signal being given by the driver of the overtaking vehicle, and shall not increase the speed of his vehicle until completely passed by the overtaking vehicle.

### § 169-64. Obstructing traffic.

No person shall drive in such a manner as to obstruct unnecessarily the normal movement of traffic upon any street. Officers are authorized to require any driver who fails to comply with this section to drive to the side of the roadway and wait until such traffic as has been delayed has passed.

### § 169-65. Rotary traffic. [Amended 7-17-1990 by Ord. No. 293-90]

Within the areas described below, vehicular traffic shall move only in a rotary counterclockwise direction, unless traffic is otherwise directed by properly placed City signs or by a police officer in uniform; those areas at the intersection of:

| Intersection |
|---|
| Daniels Street, Kimball Street and River Street |

### § 169-66. Entering intersections or crosswalks.

No driver shall enter an intersection or a marked crosswalk unless there is sufficient space on the other side of the intersection or crosswalk and on the right half of the roadway to accommodate the vehicle he is operating without obstructing the passage of other vehicles or pedestrians, notwithstanding any traffic-control signal indication to proceed.

### § 169-67. Emerging from alleys or private driveways.

The operator of a vehicle emerging from an alley, driveway or a garage shall stop such vehicle immediately prior to driving onto a sidewalk or onto the sidewalk area extending across the alleyway or driveway.

### § 169-68. Following too closely.

The driver of a vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard to the speed of such vehicle and the traffic upon and condition of the street.

**§ 169-69. (Reserved)** Editor's Note: Former § 169-69, Distance between slow-moving vehicles, was repealed 7-17-1990 by Ord. No. 293-90.

### § 169-70. Care in starting, stopping, turning or backing. [Amended 3-2-1971 by Ord. No. 84-71]

The driver of any vehicle, before starting, stopping, turning from a direct line or backing shall first see that such movement can be made in safety. If the operation of another vehicle should be affected by a stopping or turning movement, the driver of such vehicle shall be given a plainly visible signal, as required by statute.

### § 169-71. Prohibited U-turns.

No operator shall back or turn a vehicle so as to proceed in the direction opposite to that in which said vehicle is headed or traveling at any of the following locations.

# EXHIBIT 3(B)

MASSACHUSETTS UNIFORM CITATION

M1618281

TYPE OF CITATION: MOTOR VEH. / OPER. / OWNER

DATE CITATION WRITTEN | AGENCY CODE | OFFICER I.D. NUMBER | COURT CODE

MOTOR VEHICLE LICENSE NO. OF VIOLATOR | STATE | CLASS | CDL LICENSE ☐ YES ☐ NO | RACE | SEX | NON-INVENTORY MV SEARCH ☐ NO ☐ YES

VIOLATOR NAME (Last) | (First) | (Initial) | DATE OF BIRTH

ADDRESS | CITY/TOWN | STATE | ZIP

PLATE TYPE | MOTOR VEHICLE REGISTRATION NO. | STATE | CDL VEHICLE ☐ YES ☐ NO | HAZARDOUS MATERIAL ☐ YES ☐ NO | MAKE AND TYPE | YEAR | COLOR

DATE OF OFFENSE | LOCATION OF OFFENSE | TIME OF OFFENSE ☐ AM ☐ PM | ACCIDENT ☐ YES ☐ NO

CH/SEC/SUB | ☐ CRIM ☐ CIVIL | DESCRIPTION OF OFFENSE | ASSESSMENT | JUDGMENT | JUDGMENT DATE | COMMENT

SPEEDING ☐ 90/17 ☐ 90/18 | CIVIL | MPH IN MPH ZONE | ☐ POSTED ☐ NOT POSTED ☐ LIDAR | ☐ CLOCKED ☐ RADAR ☐ ESTIMATED

SPEEDING ASSESSMENTS INCLUDE A $5 HEAD INJURY SURCHARGE | TOTAL DUE | DOCKET NUMBER

OFFICER'S CHECK ONE ONLY: ☐ ALL CIVIL INFRACTIONS (See Instruction A on back) ☐ CRIMINAL APPLICATION (See Instruction B on back) ☐ ARREST ☐ WARNING (No action required by violator) | COURT ADDRESS

OFFICER CERTIFIES: ☐ IN HAND TO VIOLATOR ☐ MAILED TO VIOLATOR ☐ IN HAND TO VIOLATOR'S AGENT

AGENT NAME

VIOLATOR/AGENT ACKNOWLEDGES RECEIPT OF CITATION X

AGENT'S LICENSE NUMBER & STATE

RMV COPY (IF CIVIL) OR COURT COPY (IF CRIM.)

"PRESS HARD — You are making 5 copies."

# EXHIBIT 3(C)

Printed on
1/09/2004

Fitchburg Police Department

**Arrest Number: 04-37592-AR**

Matthew A Marsh Arrested on: 11/09/2004 Time: 1917

Page Number
1 of 1

## Property

| Searched By | Searched Date | Time |
|---|---|---|
| Patrolman JAMES C FARRELL | 11/09/2004 | 1917 |
| Released To | Released Date | Time |
| --- | --- | --- |
| Returned To | Returned Date | Time |
| --- | --- | --- |

**WALLET** **NOSE RING**

**BELT**

SIGN: ______________ DATE: __________ TIME: __________
The above list is my property

SIGN: ______________ DATE: __________ TIME: __________
I have received the above property

TO FDC BY DAIGLE - DEACON
11/10/04 0915

| Printed on | Fitchburg Police Department | Page Number |
|---|---|---|
| /09/2004 | **Arrest Number: 04-37592-A-AR** | 1 of 1 |
| | Nydias S Bernabel Arrested on: 11/09/2004 Time: 1923 | |

## Property

| Searched By | Searched Date | Time |
|---|---|---|
| Patrolman KENNETH W GAETZ JR | 11/09/2004 | 1927 |
| **Released To** | **Released Date** | **Time** |
| --- | --- | --- |
| **Returned To** | **Returned Date** | **Time** |
| --- | --- | --- |

8 570 purse

**EARRINGS** **JEWELRY**

SIGN: ______ DATE: ______ TIME: ______
The above list is my property

SIGN: ______ DATE: ______ TIME: 11-9-04
I have received the above property

# EXHIBIT 3(D)



Fitchburg Police Department
Arrest Report



Arrest #: 04-37592-AR
Call #: 04-37592

Date/Time Reported: 11/09/2004 @ 1904
Arrest Date/Time: 11/09/2004 @ 1917
Booking Date/Time: 11/09/2004 @ 1917
**OBTN: TFIT200430887**
Reporting Officer: Patrolman KENNETH GAETZ
Assisting Officer: Detective JAMES GILBERT
Booking Officer: Lieutenant KEVIN O'BRIEN
Approving Officer: Lieutenant KEVIN O'BRIEN
Signature: ______________________________



| # | DEFENDANT(S) | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|
| 1 | **MARSH, MATTHEW A**<br>118 MYRTLE AVE<br>FITCHBURG MA 01420 | M | W | 29 | [redacted] | 978-252-0902 |

HEIGHT: 509 WEIGHT: 245 HAIR: BLOND OR STRAWBERRY EYES: BROWN
BODY: HEAVY COMPLEXION: LIGHT
DOB: 07/02/1975 PLACE OF BIRTH: FITCHBURG
LICENSE NUMBER: NOT AVAIL. ETHNICITY: UNKNOWN

[APPEARANCE]

GENERAL APPEARANCE: ORDERLY
GLASSES WORN: NO

[FAMILY/EMPLOYMENT INFORMATION]

MARITAL STATUS: SINGLE
FATHER'S NAME: MARSH, KEN
MOTHER'S NAME: HOWE, KAREN

OCCUPATION: UNEMPLOYED

[RIGHTS/BOOKING CHECKS]

RIGHTS ADVISED BY: Lieutenant KEVIN M O'BRIEN DATE/TIME: 11/09/2004 @ 1917
PHONE USED: Y PHONED DATE/TIME: 11/09/2004 & 1917
ARRESTEE SECURED: N 11/09/2004 1917
ARRESTEE CELL #: 3

FINGERPRINTED: N
PHOTOGRAPHED: N
SUICIDE CHECK: Performed
PERSONS: State&Federal
WANTED BY: FDC FOR WARRANT
NCIC VEHICLE CHECK: Not Performed
INJURY OR ILLNESS: N

| # | OFFENSE(S) | A/C | STATE LAW |
|---|---|---|---|

LOCATION TYPE: Highway/Road/Alley/Street Zone: Crew 6
LAWRENCE ST @ GOODRICH ST
FITCHBURG MA 01420

Fitchburg Police Department
Arrest Report

Arrest #: 04-37592-AR
Call #: 04-37592

| # | OFFENSE(S) | A/C | STATE | LAW |
|---|---|---|---|---|
| 1 | WARRANT INTOWN<br>OCCURRED: 11/09/2004 1918 | C | 1 | 1 |
| 2 | UNLICENSED OPERATION OF MV<br>OCCURRED: 11/09/2004 1919 | C | 90 | 10 |



**Fitchburg Police Department**
**Arrest Report**

**Arrest #: 04-37592-A-AR**
**Call #: 04-37592**

Date/Time Reported: 11/09/2004 @ 1904
Arrest Date/Time: 11/09/2004 @ 1923
Booking Date/Time: 11/09/2004 @ 1923
**OBTN: TFIT200430888**
Reporting Officer: Patrolman KENNETH GAETZ
Assisting Officer: Detective JAMES GILBERT
Booking Officer: Lieutenant KEVIN O'BRIEN

| # | DEFENDANT(S) | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|
| 1 | BERNABEL, NYDIAS S<br>77 FOREST ST<br>FITCHBURG MA 01420 | F | B | 31 | NOT AVAIL | 978-343-8337 |

HEIGHT: 508 WEIGHT: 180 HAIR: BLACK EYES: BLACK
BODY: HEAVY COMPLEXION: DARK
DOB: 12/27/1972 PLACE OF BIRTH: WORCESTER
LICENSE NUMBER: MA S13589177 ETHNICITY: NOT HISPANIC

**[APPEARANCE]**

GENERAL APPEARANCE: ORDERLY
GLASSES WORN: NO

SCARS: SC R HIP(LETTER J)
TATTOOS: TAT R ANKL(ANGEL), TAT L BRST(HEART,NANIE)

**[FAMILY/EMPLOYMENT INFORMATION]**

MARITAL STATUS: SEPARATED
SPOUSE'S NAME: BERNABEL, JOSE
FATHER'S NAME: VENTURA, CARLOS
MOTHER'S NAME: DIAZ, CARMEN

EMPLOYER/SCHOOL: SSI / DISABLITY PSTD

OCCUPATION: NONE

**[RIGHTS/BOOKING CHECKS]**

RIGHTS ADVISED BY: Lieutenant KEVIN M O'BRIEN DATE/TIME: 11/09/2004 @ 1926
PHONE USED: Y PHONED DATE/TIME: 11/09/2004 & 1927
ARRESTEE SECURED: N 11/09/2004 1927
ARRESTEE CELL #: F-3

FINGERPRINTED: N
PHOTOGRAPHED: Y
SUICIDE CHECK: Not Performed
PERSONS: State&Federal
WANTED BY: LEOM D.C FOR WARRANT
NCIC VEHICLE CHECK: Not Performed
INJURY OR ILLNESS: N

Fitchburg Police Department
Arrest Report
Page: 2
11/09/200

Arrest #: 04-37592-A-AR
Call #: 04-37592

| # | OFFENSE(S) | A/C | STATE | LAW |
|---|---|---|---|---|
| | LOCATION TYPE: Highway/Road/Alley/Street Zone: Crew 6<br>LAWRENCE ST @ GOODRICH ST<br>FITCHBURG MA 01420 | | | |
| 1 | WARRANT OUT OF TOWN<br>OCCURRED: 11/09/2004 1924 | C | 1 | 1 |

128

NARRATIVE FOR PATROLMAN KENNETH W GAETZ JR

Ref: 04-37592-A-AR

Entered: 11/09/2004 @ 2254 Entry ID: 118
Modified: 11/09/2004 @ 2254 Modified ID: 118

On the above date and time, I Officer Gaetz, while on routine patrol observed a dark motor vehicle bearing Mass reg. 6815MX make an abrupt left hand turn onto Boutelle Street from Summer Street. At this time I followed this vehicle down Boutelle Street and observed the vehicle make another quick turn onto Goodrich Street. I then activated the cruisers emergency lights and pulled the vehicle over on Lawrence Street. I radioed dispatch to run Mass reg. 6815MX, which came back unregistered and uninsured. I also asked both occupants for identification, which they produced. At this time I had dispatch check warrants on Matthew Marsh (7-2-75) and Nydia Bernabel (12-27-72). Dispatch then informed me that both parties had outstanding warrants, I then placed them both under arrest. Officer Farrell arrived on scene and transported Mr. Marsh to 20 Elm Street for booking. After the vehicle was towed by Pride I transported Nydia Bernabel to 20 Elm where both suspects were booked by Lt. O'Brien. No further information at this time.

# EXHIBIT 4

U.S. Department of Justice
Drug Enforcement Administration

Read Instructions on Reverse Before Completing

# ACQUISITION OF NON-DRUG PROPERTY AND REGULATORY SEIZURES

1. BASIS
[X] EVIDENCE
[ ] FORFEITURE
[ ] TEMPORARY CUSTODY
[ ] Safekeeping
[ ] Transfer to Another Agency

2. TYPE OF PROPERTY
[ ] MONEY
[ ] Recovered
[ ] Seized
[ ] REGULATORY
[ ] FILM/FINGERPRINTS
[X] OTHER

3. FILE NO. [redacted]

4. G-DEP IDENTIFIER [redacted]

5. FILE TITLE [redacted]

6. CUSTOMS ORIGINATED CASE
[ ] Case No. OR [ ] Seizure No.
No. N/A

7. DATE PREPARED 11-12-2004

8. PROGRAM CODE MET100

| 9. EXHIBIT | 10. NAME AND DESCRIPTION OF ARTICLES | 11. COND. CODE | 12. VALUE |
|---|---|---|---|
| N-102 | One (1) copy of a DEA 6a money list of the OAF utilized during the purchase of Exhibit 39, and a phototcopy of US Currency possessed by Nydia BERANBEL that matches money on the DEA 6a money list for Exhibit 39. | | 0.00 |

13. REMARKS
Exhibit N-102, is described above. The DEA 6a money list was created by S/A Ed Sarabia and S/A Dan Genese prior the purchase of Exhibit 39. The photocopy of the eight (8) $50 bills acquired by Det. Perry Pappas following the arrest of Arnaldo ORTIZ-GONZALEZ. Both items transfed to S/A Paul Karamourtopoulos. S/A Karamourtopoulos processed the exhibit into evidence and maintained custody of the exhibit until it was transferred to the Boston Non-Drug Evidence Custodian.

14. SUBMITTED BY SPECIAL AGENT/INVESTIGATOR (Signature)
S/A Paul Karamourtopoulos

15. APPROVED BY (Signature & Title)
G/S Richard Guerard

## RECEIPT REPORT

16. NO. PACKAGES 1

17. RECEIVED FROM (Signature & Date) 11-15-04

18. Print or Type NAME and TITLE S/A Paul Karamourtopoulos

19. SEAL [ ] Broken [X] Unbroken

20. RECEIVED BY (Signature & Date) 11/15/04

21. Print or Type NAME and TITLE [signature]

## DISPOSITION (FOR EVIDENCE CUSTODIAN USE ONLY)

| 22. Date DEA-48 | 23. Exhibit | 24. Authorizing Name | 25. Means of Disposition | 26. Name |
|---|---|---|---|---|
| | | | | |

27. REMARKS

| 28. ANALYST (Signature) | 29. DATE | 30. APPROVED BY (Signature) | 31. DATE |
|---|---|---|---|
| | | | |

100

REPORT OF INVESTIGATION

1. File No. [redacted] 2. G-DEP Identifier [redacted]

Page 1 of 1

3. File Title [redacted]

Program Code MET-100

6. Date Prepared 11-09-2004

1. The following Official Authorized Funds were used to purchase exhibit 39 from NYDIA BERNABEL on 11-09-2004

2. All of the bills listed below are U.S. currency unless otherwise noted

| Denom. | Serial # | Year |
|---|---|---|
| 100 | DL36533568A | 03 |
| 100 | CD13304759A | 01 |
| 50 | AL70120028A | 96 |
| 50 | AF01964127A | 96 |
| 20 | EC76139644A | 04 |
| 20 | CK33685806B | 01 |
| 20 | AH71755775A | 96 |
| 20 | AF69198303C | 96 |
| 20 | EB41795746C | 04 |
| 20 | CG83432849A | 01 |
| 20 | CG29397287D | 01 |
| 20 | CB25482138C | 01 |
| 20 | BG85987124A | 99 |
| 20 | AE32062303D | 96 |
| 20 | EA34762574D | 04 |
| 20 | BF62385523C | 99 |
| 20 | AA36187381F | 96 |
| 10 | BA42004318A | 99 |
| 10 | DB03478978A | 03 |
| 10 | H23773137A | 99 |
| 10 | DG45525410A | 03 |

TOTAL: $600.00

Prepared By: [signature] 11-09-04 Total $600.00
Witnessed By: [signature]

DEA Form -6a (Aug. 1994)

DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 5/80 may be used.

N-102
[initials] 11/9/04



CG 29397287 D
G7
THIS NOTE IS LEGAL TENDER FOR ALL DEBTS, PUBLIC AND PRIVATE
SERIES 2001
CG 29397287 D
TWENTY DOLLARS

N-102

FEDERAL RESERVE NOTE
THE UNITED STATES OF AMERICA
CG 83432849 A
G7
THIS NOTE IS LEGAL TENDER FOR ALL DEBTS, PUBLIC AND PRIVATE
SERIES 2001
CG 83432849 A
TWENTY DOLLARS

FEDERAL RESERVE NOTE
THE UNITED STATES OF AMERICA
CD 13304759 A
D4
THIS NOTE IS LEGAL TENDER FOR ALL DEBTS, PUBLIC AND PRIVATE
SERIES 2001
CD 13304759 A
ONE HUNDRED DOLLARS

11-9-04

AH 71755775 A
H8
THIS NOTE IS LEGAL TENDER FOR ALL DEBTS, PUBLIC AND PRIVATE
TWENTY DOLLARS
CK 33685806 B
K11
EC 76139644 A
C3
AE 32062303 D
E5
BG 85987124 A
CB 25482138 C
B2

DB15047429A
B2
BB87085847B
B2
EA39762574B
A1
AA36188381F
A1
BE62385523C
CB53305575E
B2

FEDERAL RESERVE NOTE
THE UNITED STATES OF AMERICA
BA 42004318 A
A1
THIS NOTE IS LEGAL TENDER FOR ALL DEBTS, PUBLIC AND PRIVATE
SERIES 1999
TEN DOLLARS
DB 03475698 A
B2
SERIES 2003
H23773137 A
WASHINGTON, D.C.
SERIES 1995
CG 15861214 B
DB 53904462 A

FEDERAL RESERVE NOTE
THE UNITED STATES OF AMERICA
DG 45525410 A
TEN DOLLARS