UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Crim. No. 4:05-cr-40025-FDS |
| MATTHEW MARSH,<br>      Defendant. | ) ) ) ) | |

## TRIAL BRIEF OF THE UNITED STATES

The United States of America, by its undersigned attorneys, respectfully submits this trial brief to identify relevant issues in accordance with the Court's pretrial order. The trial of this matter is scheduled to begin on **September 11, 2006**.

### I.   THE INDICTMENT

Count One of the indictment alleges a violation of 21 U.S.C. § 846. Under 21 U.S.C. § 846:

> [a]ny person who attempts or conspires to commit any offense defined in [Title 21] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

The elements of 21 U.S.C. § 846, conspiracy to distribute cocaine base, are:

One: that the conspiracy – or agreement – charged in the indictment existed between the defendant, Matthew Marsh, ("MARSH") and at least one other person;

Two: that MARSH knowingly and intentionally joined the conspiracy; and

Three: that MARSH intended to effectuate the object of the conspiracy.

The defendant need not have had the intent personally to commit the substantive crime.

1

Counts Two and Three of the indictment allege violations of 21 U.S.C § 841(a)(1).  Under 21 U.S.C § 841(a)(1):

> ...it shall be unlawful for any person knowingly or intentionally...to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance...

The elements of 21 U.S.C. § 841(a)(1), distribution of cocaine base, a controlled substance, are:

<u>One</u>: that MARSH, on or about the date alleged, transferred cocaine base, also known as "crack cocaine" to another person, or possessed cocaine base with the intent to transfer it to another person;

<u>Two</u>:  that MARSH knew that the substance was a controlled substance, and

<u>Three</u>:  that MARSH acted intentionally, that is, that it was his conscious object to transfer the controlled substance to another person.

## II.    SUMMARY OF THE GOVERNMENT'S CASE

### A)    BACKGROUND

This investigation focused on cocaine base, also known as "crack cocaine," transactions of Nydia Bernabel a/k/a "Nonni," a/k/a "Nanni" ("Bernabel") and defendant MARSH, who were distributing crack cocaine in the Fitchburg area.  The alleged conspiracy to distribute at least 5 grams of "crack cocaine" began on or about October 2004 and lasted until at least November 9, 2004.  MARSH was involved with Bernabel on two transactions, both occuring on November 9, 2004.

The United States Drug Enforcement Administration ("DEA") began to focus on Bernabel in or about October 2004, when a confidential witness ("CW-1") identified her as a significant source of "crack cocaine" in the Fitchburg, Massachusetts area.  On November 3,

2004, members of the DEA's Mobile Enforcement Team ("MET") met with CW-1, who told the agents that Bernabel controlled and directed one of the most significant and consistent sources of supply of "crack cocaine" in the Fitchburg area. CW-1 also told the agents the cell phone number Bernabel used to arrange "crack cocaine" transactions. Investigation revealed this cell phone number was subscribed to Karen Iovanne, 77 Forest Street, Fitchburg, Massachusetts. CW-1 also reported that Bernabel used rental cars and other falsely registered vehicles for her organization's couriers to use when delivering "crack cocaine" to customers.

**B)    EVIDENCE**

The two transactions underlying Counts Two and Three took place in Fitchburg, Massachusetts, on November 9, 2004.

### (1)    The 1.7-Gram Crack Transaction

The first transaction occurred at approximately 5:50 p.m., at which time an undercover agent employed by the Drug Enforcement Administration ("UC-1") purchased 1.7 grams of crack cocaine from the defendants. In sum, at approximately 5:00 p.m., Bernabel agreed to meet UC-1 on Leighton Street in Fitchburg to sell him $320 worth of crack cocaine. UC-1 drove an undercover vehicle to the intersection of Leighton and Kimball Streets, where he waited for Bernabel to arrive. At approximately 5:50 p.m., a 1996 Jeep Cherokee bearing MA License No. 6815MX pulled up next to UC-1's undercover vehicle. UC-1 observed Bernabel in the driver's seat and a heavy set male, who was subsequently identified as MARSH, in the passenger seat. When UC-1 asked Bernabel how the crack cocaine rocks looked, MARSH handed a package to Bernabel, who displayed it to UC-1. UC-1 then handed $300 in serialized funds to Bernabel, who passed it to MARSH, who immediately began counting the money. After completing the sale, Bernabel and MARSH sped away in the Jeep Cherokee at a high rate of speed. DEA sent

the substance to a laboratory, which confirmed that Bernabel and MARSH sold 1.7 grams of cocaine base to UC-1.

### (2)   The 4.7-Gram Crack Transaction

The second transaction took place approximately 40 minutes later on Birch Street in Fitchburg, near St. Anthony's School. In short, at approximately 6:30 p.m., a second undercover DEA agent ("UC-2"), who was working with a confidential witness ("CW"), purchased 4.7 grams of crack cocaine from the defendants. Once again, the defendants arrived in a dark colored Jeep Cherokee bearing MA License No. 6815MX, which they pulled up alongside the undercover vehicle. This time, MARSH was driving the Jeep and Bernabel was riding in the passenger seat. After the CW introduced UC-2 to Bernabel, she handed a package of crack cocaine to UC-2, who handed her $600 in serialized funds in return. MARSH then drove the Jeep Cherokee away from the area.

Both of the foregoing transactions were audio-recorded, video-recorded, and observed by numerous surveillance agents, including both DEA agents and local Fitchburg Police Officers, who were working collaboratively with DEA as DEA "Task Force Agents" ("TFA's"). DEA sent the substance to a laboratory, which confirmed that Bernabel and MARSH sold 4.7 grams of cocaine base to UC-2.

### 3)   November 9, 2004 Arrests

Shortly after the second transaction concluded, a Fitchburg Police Officer pulled the Jeep Cherokee over for a traffic violation. During the car stop, both defendants produced identification to the officer, who issued a citation to MARSH, who was driving the Jeep, for Operating an Unregistered Motor Vehicle in violation of Mass. Gen. L. c. 90, § 9. The officer then asked the FPD dispatcher to run the identifications on MARSH and Bernabel to check for

outstanding warrants. The dispatcher did so, and informed the officer that both individuals had outstanding warrants for their arrests.

At this point, MARSH and Bernabel were placed under arrest on the outstanding warrants. They were then separated and transported back to the Fitchburg Police station for booking. During the booking process, (i) a wallet, nose ring, and belt were seized from MARSH, and (ii) jewelry and $570 U.S. currency were seized from Bernabel. After the booking process was complete, one of the Fitchburg TFAs working with DEA traveled to the Fitchburg police station to view the items seized from MARSH and Bernabel. Upon learning that numerous U.S. currency bills were seized from Bernabel's person, the TFA cross-referenced the serial numbers of Bernabel's currency to the serial numbers of the currency used in the undercover crack transactions described above. This cross-referencing confirmed that 18 of Bernabel's bills, totaling $400, matched the bills used by UC-2 in the undercover 4.7-gram crack transaction described above.

    C)    **LEGAL ISSUES**

        1)    **Conspiracy Period**

Count One of the Indictment alleges that beginning in or about October 2004 and continuing thereafter until in or about January 2005, Bernabel and MARSH conspired to possess with intent to distribute at least 5 grams of cocaine base, also known as "crack cocaine" in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii) and 21 U.S.C. § 846. The evidence will show that the conspiracy period ended in or about November 9, 2004, at which time Bernabel and MARSH were arrested.

      **2)**      **Drug Weight**

Count One charges a conspiracy involving at least 5 grams of cocaine base, also known as "crack cocaine."  In order to meet this 5-gram threshold, the government must aggregrate the drug weights for the two transactions charged in Counts Two and Three.  Accordingly, the scope and extent of the conspiracy is a legal and factual issue in the trial.  The government will produce evidence sufficient to establish that this drug weight.

**III.**    **PROPOSED STIPULATIONS OF FACT**

Any stipulations reached between the parties will be filed with the Court before trial.

**IV.**    **ANTICIPATED EVIDENTIARY ISSUES**

There are no evidentiary issues known to the government at this time.

**V.**    **JURY VOIR DIRE QUESTIONS**

The government's proposed jury voir dire questions were filed with the Court on July 28, 2006.  See Docket Entry No. 59.

**VI.**    **PROPOSED JURY INSTRUCTIONS**

The government's proposed jury instructions were also filed with the Court on July 28, 2006.  See Docket Entry No. 60.

**VII.**    **SPECIAL ARRANGEMENTS**

The government is not making any requests for special arrangements for trial at this time. The government notes, however, that if the parties do not reach a stipulation regarding the

controlled substances at issue in this case, the government will call two witnesses from the DEA Northeast Laboratory, who will be traveling from New York to appear at this trial.

                              Respectfully submitted,

                              MICHAEL J. SULLIVAN
                              United States Attorney

                       By:  */s/ Lisa M. Asiaf*
                              LISA M. ASIAF
                              Assistant U.S. Attorney

Dated: August 1, 2006

## CERTIFICATE OF SERVICE

   I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 1, 2006.

                              */s/ Lisa M. Asiaf*
                              LISA M. ASIAF