**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Crim. No. 05-40025-FDS |
| ) | |
| MATTHEW MARSH, *et al*, ) | |
| Defendants. ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE**
**TO ESTABLISH AN ORDER OF PROOF FOR THE CONSPIRACY CHARGE**

The United States of America (the "government") hereby files its Opposition to the *Motion in Limine to Establish an Order of Proof for the Conspiracy Charge* filed by the defendant Matthew Marsh ("Defendant" or "Marsh") on August 1, 12006. For all of the reasons set forth below, Defendant's motion should be denied.

**I.   RELEVANT FACTS**

Marsh and his co-defendant Nydia Bernabel, a/k/a "Nonni," a/k/a "Nanni," ("Bernabel") are charged with conspiracy to distribute at least 5 grams of cocaine base, also known as "crack cocaine," in violation of 21 U.S.C. § 846 (Count One) and two substantive counts of distributing cocaine base, also known as "crack cocaine," in violation of 21 U.S.C. §841(a)(1) (Counts 2 and 3). With respect to the conspiracy charge, the government intends to establish that Marsh knowingly and voluntarily agreed to assist Bernabel in distributing crack cocaine in the greater Fitchburg area in order to feed his own crack cocaine habit. The evidence will show that Marsh played a substantial role in their drug distribution activities, including: (i) driving Bernabel (who did not have a valid driver's license) to deliver controlled substances to customers throughout the Fitchburg area, (ii) handling the packages of drugs during their joint deliveries, and (iii) counting and/or holding the money they received from customers during their drug transactions. The evidence will

also show that Marsh received crack cocaine for his personal use in exchange for his role in the conspiracy.

The conspiracy involved participants other than Marsh and Bernabel. A mutual friend named Karen Iovanne, for example, allowed Marsh and Bernabel to live with her at various points before and during the conspiracy. Iovanne, who used crack cocaine along with Marsh, allowed Bernabel and Marsh to use her cell phone and 1996 Jeep Cherokee to further their drug dealing activities. Like Marsh, Iovanne would receive crack cocaine in exchange for her role in the conspiracy.

On October 21, 2004, an undercover agent employed by the Drug Enforcement Administration ("UC-1") was introduced to Bernabel, who sold 3.3 grams of crack cocaine to UC-1 in exchange for $300. Bernabel used the cell phone subscribed to Iovanne – (978) 580-6051 – to arrange this drug transaction. She told UC-1, however, that she was not "working" that night, so she would send somebody else to deliver the crack cocaine for her. UC-1 met Bernabel's couriers on Leighton Street in Fitchburg, where he gave the couriers $300 in exchange for the crack.

With respect to Count Two, the government will prove that Marsh and Bernabel delivered crack cocaine to UC-1 on a second occasion at that same location – Leighton Street in Fitchburg. Specifically, the government will show that at approximately 5:00 p.m., Bernabel (who UC-1 contacted at the same cell phone used to arrange the October 21st deal discussed above) agreed to meet UC-1 on Leighton Street to sell him $320 worth of crack cocaine. UC-1 drove an undercover vehicle to the intersection of Leighton and Kimball Streets, where he waited for Bernabel to arrive. At approximately 5:50 p.m., a 1996 Jeep Cherokee bearing MA License No. 6815MX (which was registered to Iovanne) pulled up next to UC-1's undercover vehicle.

UC-1 observed Bernabel in the driver's seat and a heavy set male, who was subsequently identified as Marsh, in the passenger seat. Before they discussed the crack deal, Bernabel received a call on her cell phone, which she quickly concluded. UC-1 then asked Bernabel how the crack cocaine rocks looked, at which point Marsh handed a package of crack to Bernabel, who displayed it to UC-1. UC-1 then handed $300 to Bernabel, who passed it to Marsh, who immediately began counting the money. Bernabel received two more cell phone calls while Marsh was counting the money. UC-1 then asked if all eight (referring to the eight .4-gram packages he had requested) were there. Bernabel responded, "no, there's $300 worth there." The sale was then complete and Bernabel and Marsh sped away in the Jeep Cherokee at a high rate of speed.

With respect to Count Three, the evidence will show that a second transaction took place on November 9, 2004, approximately 40 minutes later on Birch Street in Fitchburg, near St. Anthony's School. At approximately 6:30 p.m., a second undercover DEA agent ("UC-2"), who was working with a confidential witness ("CW"), purchased 4.7 grams of crack cocaine from the defendants. Once again, the defendants arrived in the 1996 Jeep Cherokee registered to Iovanne, which they pulled up alongside the undercover vehicle. This time, Marsh was driving the Jeep and Bernabel was riding in the passenger seat. After the CW introduced UC-2 to Bernabel, she handed a package of crack cocaine to UC-2, who handed her $600 in serialized funds in return. Marsh then drove the Jeep Cherokee away from the area.

Both of the foregoing transactions were audio-recorded, video-recorded, and observed by numerous surveillance agents, including both DEA agents and local Fitchburg Police Officers, who were working collaboratively with DEA as DEA "Task Force Agents" ("TFA's"). Shortly after the second transaction, Fitchburg Patrol Officer Kenneth W. Gaetz, Jr., received a call from one of the Fitchburg Police Officers assigned to the undercover Drug Task Force. The TFA asked Officer

Gaetz for assistance in locating and stopping the Jeep Cherokee. After locating the Jeep Cherokee and observing two traffic violations, Officer Gaetz performed a car stop. After receiving identification from the driver (Marsh) and the passenger (Bernabel), Officer Gaetz discovered that both individuals had outstanding arrest warrants. Both defendants were then arrested and searched. Officers discovered $400 on Bernabel which came from the DEA serialized drug money used by UC-2 during the 4.7-gram crack deal described above.

## II.   ARGUMENT

As acknowledged in Defendant's motion, under United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977), a preponderance-of-the-evidence standard governs this Court's preliminary determination of the admissibility of a co-conspirator's statements. Here, the government seeks to admit statements made by Bernabel during the crack cocaine transactions discussed above against the defendant Marsh pursuant to Fed.R.Evid. 801(d)(2)(E). Under Rule 801(d)(2)(E), co-conspirator statements are not hearsay if "made by a coconspirator of a party during the course and in furtherance of the conspiracy." Because a preponderance of the evidence which the government expects to introduce at trial will demonstrate that: (1) Marsh knowingly and intentionally participated with Bernabel in the conspiracy with which they are charged in Count One of the indictment; and, (2) all of the co-conspirator statements whose admission the government is seeking to introduce were made during the course and in furtherance of that conspiracy, the co-conspirator statements are properly admissible against Marsh.

### A.   Legal Standard for Admissibility of Co-Conspirator Statements

Federal Rule of Evidence 801(d)(2)(E) defines a coconspirator statement as "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." The admissibility of such statements is governed by Petrozziello, which requires that the government

prove the existence of the conspiracy and the defendant's membership in it by a preponderance of the evidence. Petrozziello, 548 F.2d at 23.

In United States v. Ciampaglia, 628 F.2d 632 (1st Cir. 1980), the Court outlined the procedures to be employed when co-conspirator statements are offered into evidence:

> if the government attempts to introduce a statement under Fed.R.Evid. 801(d)(2)(E), the Court, upon proper objection, may, if it so chooses, admit the declaration subject to it being "connected up." At that time the court should inform the parties out of the hearing of the jury that: (a) the prosecution will be required to prove by a preponderance of the evidence that a conspiracy existed, that the declarant and defendant were members of it at the time that the declaration was made, and that the declaration was in furtherance of the conspiracy, (b) that at the close of all the evidence the court will make a final Petrozziello determination for the record, out of the hearing of the jury; and, (c) that if the determination is against admitting the declaration, the court will give a cautionary instruction to the jury, or, upon an appropriate motion, declare a mistrial if the instruction will not suffice to cure any prejudice.

Ciampaglia, 628 F.2d at 638 (footnotes omitted) (emphasis added). In determining the admissibility of co-conspirator statements, the Court may consider any relevant evidence, including the statement sought to be admitted. See, e.g., Bourjaily v. United States, 483 U.S. 171, 181 (1987); United States v. Rivera-Santiago, 872 F.2d 1073, 1092-93 (1st Cir. 1989). Standing alone, however, a co-conspirator statement cannot establish by a preponderance of the evidence the existence of a conspiracy embracing both the declarant and the defendant. See United States v. Sepulveda, 15 F.3d 1161, 1182 (1st Cir. 1993).

Once a given defendant joins a conspiracy, the statements of his co-conspirator statements are admissible against him regardless of when his involvement began. See United States v. Masse, 816 F.2d 805, 811 (1st Cir. 1987) ("statement made by a co-conspirator . . . in furtherance of the conspiracy . . . admissible against the defendant even if made prior to the defendant's involvement in the conspiracy"); see also United States v. Reynolds, 828 F.2d 46, 47 (1st Cir. 1987) (same). As the First Circuit explained in United States v. Baines, 812 F.2d 41, 42 (1st Cir. 1987), "a conspiracy

5

is like a train. When a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight -- or conduct -- regardless of whether he is aware of just what it is composed." The Court concluded that "verbal acts in furtherance of the conspiracy should (not] be treated differently from physical ones." Id.

Nor is it necessary for the government to prove that each co-conspirator knew of or had contact with all other members, or that they knew all of the details of the conspiracy or participated in every act in furtherance of it. "The [finder of fact] may infer an agreement circumstantially by evidence of, inter alia, a common purpose (such as a purpose to sell illicit drugs), overlap of participants, and interdependence of various elements in the overall plan. United States v. Martinez-Medina, 279 F.3d 105, 113-114 (1st Cir.2002). See also United States v. Marino, 277 F.3d 11, 25 (1st Cir. 2002) ("[a]s long as it is shown that a party, having joined a conspiracy, is aware of the conspiracy's features and general aims, statements pertaining to the details of plans to further the conspiracy can be admitted against the party even if the party does not have specific knowledge of the acts spoken of.") (internal citations omitted).[1]

To conclude that the government has satisfied its burden under Petrozziello, the Court need go no further than the testimony of the two undercover DEA agents who personally conducted the crack transactions with Bernabel and Marsh on November 9, 2004. As set forth above, both UC-1 and UC-2 arranged the crack transactions with Bernabel, who showed up at the agreed-upon location with Marsh assisting in the deals. Both UC's will testify about Marsh's role in the November 9th

---

[1] Under Fed. R. Evid. 801(d)(2)(E), if a preponderance of the evidence establishes that a conspiracy embracing the declarant and the defendant existed, statements made by the co-conspirator during and in furtherance of the conspiracy are admissible against each co-conspirator regardless of whether the declarant is even named in the indictment or charged with conspiracy. See United States v. Zipperstein, 601 F.2d 281 (7th Cir. 1979). C.f. United States v. Smith, 596 F.2d 319 (8th Cir. 1979); United States v. Scavo, 593 F.2d 837 (8th Cir. 1979); United States v. Durland, 575 F.2d 1306 (10th Cir.-1978).

transactions, including (i) passing the package of crack to Bernabel when UC-1 asks if the rocks look good, (ii) receiving the money from Bernabel, which she received from UC-1 after handing him the package of crack, (iii) counting the money received from UC-1, and (iv) driving Bernabel to the crack transaction with UC-2.  These actions by Marsh clearly demonstrate that he understood the nature of the transactions and took numerous steps to further the conspiracy.

In addition, separate and apart from any statements that Bernabel made during the course of the conspiracy, Bernabel will testify about the general nature of her relationship with Marsh, their prior drug dealing activities, and Marsh's role in the conspiracy charged in the indictment.  This testimony, combined with the testimony of the UC-1 and UC-2, as well as the other evidence described above (including testimony of surveillance agents, Officer Gaetz, and records showing Marsh and Bernabel's use of Iovanne's cell phone and Jeep), clearly satisfies the government's burden under Petrozziello without any reliance on Rule 801(d)(2)(E) evidence.  Because the ongoing nature of the drug relationship between Marsh and Bernabel is confirmed by evidence other than the co-conspirator statements that Marsh seeks to exclude, the government's initial burden under Petrozziello is easily satisfied.  E.g., United States v. Geronimo, 330 F.3d 67, 76 (1st Cir. 2003) (affirming Petrozziello finding based on numerous phone calls among the conspirators and statements made during drug related meetings and deliveries); United States v. Newton, 326 F.3d 253, 259 (1st Cir. 2003) (uncontradicted statements describing activity included in the conspiracy sufficient to uphold Petrozziello finding); United States v. Portela, 167 F.3d 687, 703 (1st Cir. 1999) (phone records and phone book entry containing co-conspirator's number held to constitute adequate corroborating evidence, extrinsic to Rule 801(d)(2)(E) admissions, that defendant was a party to the conspiracy).

7

**B.     All of Bernabel's Statements Were Made in Furtherance of
        and During the Charged Conspiracy**

The only remaining issue surrounding admissibility is whether the challenged statements at issue were made "during" and "in furtherance of" the conspiracy charged in Count One of the Indictment, *i.e.*, the conspiracy to distribute crack cocaine in effect as of October 2004. See Fed. R. Evid. 801(d)(2)(E). To be deemed "in furtherance," a statement "need not be necessary or even important to the conspiracy, or even made to a co-conspirator, as long as it can be said to advance the goals of the conspiracy in some way." United States v. Martinez-Medina, 279 F.3d 105, 117 (1st Cir.), cert. denied, 536 U.S. 932 (2002). A preponderance standard governs this finding as well. E.g., United States v. Perez-Ruiz, 353 F.3d 1, 11 (1st Cir. 2003).[2]

The evidence here plainly meets this test. All of the statements at issue are set forth in DEA investigative reports, which were produced to Marsh during automatic discovery. Those statements are summarized in the "Relevant Facts" section set forth above. All of the statements were made between October 21, 2004 (UC-1's introduction and first crack transaction with Bernabel) and November 9, 2004 (when Marsh and Bernabel were arrested after selling crack cocaine to UC-1 and UC-2), well within the period of the conspiracy alleged in the indictment. All of the statements also involved Bernabel's efforts to negotiate, set up, or consummate specific crack cocaine deals with crack cocaine customers in the Fitchburg area, including UC-1 and UC-2. Because that was the

---

[2] The "in furtherance" requirement provides a limited exception to the admissibility of co-conspirator statements that is intended to keep out "idle conversations among criminal partners," as well as for statements clearly intended to foil rather than facilitate the criminal enterprise. Martinez-Medina, 279 F.3d at 117, citing 5 Weinstein, Federal Evidence § 801.34 (2d ed. 2001). Recognizing the narrow reach of the "in furtherance" limitation, the First Circuit has recognized that a statement made by a co-conspirator need not be necessary or even important to the conspiracy, or even made to a co-conspirator, as long as it can be said to advance the goals of the conspiracy in some way. Id. See also United States v. Piper, 298 47,54 (1st Cir. 2002) ("a coconspirator's statement is considered to be in furtherance of the conspiracy as long as it tends to promote one or more of the objects of the conspiracy").

8

essence of the conspiracy that the government has alleged, each of the statements was also made in furtherance of the charged conspiracy and is therefore admissible against Marsh under Fed.Rule.Evid. 801(d)(2)(E). See United States v. McCarthy, 961 F.2d 972, 978 (1st Cir. 1992) (conversation regarding details of proposed drug deal held to be in furtherance of conspiracy); United States v. Ammar, 714 F.2d 238, 252 (3d Cir.1983) ("[s]tatements between the conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy further the ends of the conspiracy and are admissible so long as the other requirements of Rule 801(d)(2)(E) are met."); United States v. Huber, 2 F.3d 304, 305 (8th Cir. 1993) (conversations including negotiations to purchase cocaine, knowledge of earlier negotiations and plans to sell drugs all found to be "in furtherance of drug conspiracy); United States v. Arambula-Ruiz, 987 F.2d 599, 608 (9th Cir.1993) (statements which induce participation or prompt further action in the conspiracy are admissible under 801(d)(2)(E)). See generally, Weinstein, supra at 801.34[5] (Many courts construe the in furtherance requirement so broadly that even casual relationships to the conspiracy suffice to satisfy the exception").[3]

---

[3] Authorities cited for this proposition by Weinstein include United States v. Goldberg, 105 F.3d 770 (1st Cir. 1997) and United States v. Flores-Rivera, 56 F.3d 319, 329-30 (1st Cir. 1995).

### III. CONCLUSION

For all of the foregoing reasons, Defendant Matthew Marsh's the *Motion in Limine to Establish an Order of Proof for the Conspiracy Charge* should be denied.

Dated: August 24, 2006                     Respectfully submitted,

                                                                    MICHAEL J. SULLIVAN
                                                                    United States Attorney

By:     */s/ Lisa M. Asiaf*
        LISA M. ASIAF
        Assistant U.S. Attorney
        Tel:  (617) 748-3268

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 23, 2006.

                                              */s/ Lisa M. Asiaf*
                                              LISA M. ASIAF