UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | CRIMINAL NO: 05-40025-02-FDS |
| | : | |
| MATTHEW MARSH | : | |

**DEFENDANT'S SENTENCING MEMORANDUM AND
MOTIONS FOR DOWNWARD DEPARTURE**

Matthew Marsh appeared before Your Honor on October 23, 2006, and pleaded guilty to all counts of a 3-count Indictment that charge him with: (CT 1) Conspiracy to Possess and Distribute Cocaine Base in violation of 21:USC §846; (CTs 2 &3) Distribution of Cocaine Base in violation of 21:USC §841.

The total amount of cocaine base accountable to Marsh is 6.4 grams, an amount that carries a mandatory minimum penalty of 5 years. The government has filed a motion under Title 21 U.S.C. §851 advising that Marsh committed the instant offense after sustaining one prior conviction for distribution of a controlled substances. This action doubles the penalty from 5 – 40 years, to 10 years – Life. Consequently, regardless of any guideline calculations, Matthew Marsh must be sentenced to at least 10 years in prison.

**Guideline Calculations**

The Presentence Report (PSR) calculates Marsh's Offense Level at 23. Notwithstanding that offense level, Marsh was determined to be a Career Offender under the guidelines by virtue of at least two qualifying prior convictions. Marsh's PSR technically shows three qualifying predicates at ¶¶ 87, 88, and 91. The resultant effect of the Career Offender provision raises the

1

offense level from 23 to 34 according to the presentence report. On November 14, 2007 Judge Andrew Mandell allowed defendant's motion to vacate two of the three qualifying predicates at 88 and 91; these are the two convictions for resisting arrest in 1999 and 2004 in Leominster and Fitchburg District Court. The defendant currently has only one predicate drug conviction. This is not enough to qualify him for career offender status.

### Downward departure for abuse and mental health history

The defendant has raised several objections to the PSR. Rather than repeat the objections, reference is made to the defendant's objection to the Presentence Report with a request that the Court resolve the issues.

In addition to the objections already submitted to the Court, the defendant wishes to point out that at the time the defendant submitted his objections, he did not have the benefit of a Psychological evaluation conducted by Dr. Richard Ebert and Dr. Jeffery S. Long. (attached) To the extent that the evaluation concludes that the defendant's mental health issues "significantly reduced his mental capacity and substantially contributed to the commission of the offense," the defendant requests that Court consider to what extent the defendant's mental condition contributed to the offense of conviction. The Sentencing Commission's policy statement at §5K2.13 <u>Diminished Capacity</u> encourages a downward departure if the defendant: (1) committed a non-violent offense; (2) was suffering at the time from significantly reduced mental capacity not resulting from the voluntary use of drugs or other intoxicants; and (3) does not have a criminal history indicating a need for incarceration to protect the public. In the case of Matthew Marsh, it is clear that his use of drugs was not a voluntary use, but was an ongoing effort to combat his mental demeans. As Dr. Ebert points out, "Mr. Marsh has battled alcohol and drug addiction throughout adulthood, often using substances as a way to mask intense emotional

pain…[He] has participated in treatment several times and has been able to remain sober for short periods; however, because his Bipolar Disorder and PTSD [Post Traumatic Stress Disorder] remain under-treated, he eventually returns to alcohol and drug use in order to self-medicate."  As for protecting the public from the defendant, he will be incarcerated for at least ten years, during which it is anticipated that Marsh will receive treatment both for his mental health issues and his drug addiction. *See United States v Gorsuch,* 404 F.3d 543 (1st Cir.2005) (The district court judge departed under §5K2.13 for a mentally disturbed bank robber.  The district court explicitly found there was no ongoing need to protect the public so long as Gorsuch continued to take her medication.)

Since the January, 2005 Supreme Court decision, *United States v Booker,* 125 S.Ct. 738 (2005) the district court must calculate the Sentencing Guidelines and treat them as advisory. *Booker* requires that in addition to considering the final advisory guideline calculation (after guideline departures), the sentencing court is mandated to apply the statutory sentencing factors at 18 U.S.C. §3553(a) among which are (a)(1), the nature and circumstances of the offense and the history and characteristics of the defendant.   As the circumstances of the offense and the defendant's personal history are intricately intertwined, we shall deal with them together.

### Nature and Circumstances of the Offense and Matthew Marsh's Personal History and Characteristics

The background into the investigation of Matthew Marsh and Nydia Bernabel's drug dealing revealed that Bernabel was a significant source of crack cocaine in the Fitchburg area. She and the defendant were high school friends in Fitchburg.  According to Bernabel, Marsh was a good kid until he got mixed up with the wrong group of friends.  Those friendships led to Marsh traveling to Jamaica and attempting to import crack cocaine hidden in his body cavity.

3

This ill-conceived offense ultimately resulted in Marsh's five-year sentence in Federal Court. Bernabel opines that Marsh was "a completely different person when he came out of prison." PSR ¶56. They spent time together "clubbing" on weekends and doing cocaine together. Bernabel got involved in selling drugs when she left her husband and began selling drugs to his customers. Bernabel, whose driver's license had been suspended, used several drivers to assist in her drug distribution business. She knew that the Marsh was heavily addicted to crack cocaine and called on him to drive her around in exchange for personal use amounts of crack cocaine; however, the seeds for the instant offense were sown years before.

Marsh's substance abuse is well documented in the PSR and the Psychological Evaluation submitted by Drs. Ronald Ebert and Jeffery Long on 2/27/2007. It is safe to conclude that the defendant has been using alcohol, cocaine, and controlled substances on a regular, if sometimes intermittent, basis since he was 16 years old. Not surprisingly, Marsh's parents were both alcoholic, and "the marriage was emotionally and physically abusive." *Id* (Eval.) On occasion, the father's violence against his wife included violent acts against the defendant. "His father knocked him out of the way during an argument, causing him to 'crack' his head on a heater. In another incident, police officers observed that Mr. Marsh had sustained 'extreme bruises and lacerations; during a physical altercation with his father." *Id.*

Marsh's tumultuous home life was exacerbated by an older male cousin who sexually abused Marsh by fondling him and playing with him inappropriately. The defendant's early experience with violence carried over to his own behavior. While in kindergarten and first grade, Marsh was known to be aggressive and violent toward his peers and even teachers. Even as he was seen by school psychologists, Marsh was never properly diagnosed or placed on medication to curb his behavior. Marsh's behavior, as he explains, was a plea for someone to

4

take notice. As an only, child, Marsh had no siblings with whom to share experiences and draw strength. He was left on his own to struggle through the perils of his childhood. Although the defendant's mother made several abortive attempts to leave the father and take the defendant with her, these episodes never resulted in separation from the father or protection for the defendant. Marsh's hyperactive and rambunctious behavior affected the continuity of his education as he was suspended from school several times. As he approached middle school, the defendant found solace in food and by the 8th grade he reached nearly 300 pounds. By high school, he got his weight under control, became sexually active and was openly gay throughout high school. His home life continued to plague him as he acted out at school and began to drink and use drugs.

Moreover, it appears that Marsh suffered with "rapid cycle bipolar disorder" diagnosed in 2000 while in treatment at Gosnold for substance abuse treatment. This diagnosis, is supported in the Psychological Evaluation:

> In my clinical opinion, Mr. Marsh displays several mental health issues that seriously impair his judgment and affect his overall functioning. He meets criteria for a diagnosis of Bipolar Disorder, which in his case emerges as emotional instability with rapid vacillation between depression, agitation, mania, and irritability. Even as a child well before his alcohol/drug use, Mr. Marsh displayed episodes of manic behavior such as attacking his vice principal with a microphone stand and stealing his band teacher's car. This mood instability has existed for such a long time that Mr. Marsh now views it as a central part of his personality and thus he cannot envision himself as being emotionally stable. (Ebert pg 6)

While at Gosnold, the defendant was also diagnosed with Post Traumatic Stress Disorder. This assessment is also supported by Dr.Ebert in the recent Psychological Evaluation:

> Additionally, Mr. Marsh displays symptoms of Post Traumatic Stress Disorder, due to a combination of early traumatic experiences. From the start, his parents' alcoholism and violence left a devastating imprint, such that even as a young child, he was perpetually on edge, bracing himself for having to flee the house or for being beaten by his father. At

the same time, he was being molested by an older cousin, which resulted in precocious sexual interest and subsequent sexual confusion…

Emerging from his mental illness and history of trauma, Mr. Marsh has battled alcohol and drug addiction throughout adulthood, often using substances as a way to mask intense emotional pain. Many of his behavior problems have resulted from his attempts to obtain drugs or from volatile behavior resulting from intoxication. Mr. Marsh has participated in treatment several times and has been able to remain sober for short periods; however, because his Bipolar Disorder and PTSD remain under-treated, he eventually returns to alcohol and drug use in order to self medicate. (Ebert pg 7)

Dr. Ebert opines that the combination of the mental health issues--Bipolar Disorder, PTSD, and alcohol and cocaine dependence--have "caused severe deficits in his functioning. Jointly, these problems cause him to engage in self-destructive, self-sabotaging behaviors and to be vulnerable to the influence of others." It is noted that in addition to addictive self-destructive behavior, Marsh has, on at least one occasion, attempted suicide. Furthermore, Dr. Ebert concludes that "based on combination of the above mental health issues, Mr. Marsh's involvement in the extant crime was due to his chronic Bipolar Disorder and Posttraumatic Stress Disorder, which propelled his involvement in selling (and using) cocaine…these problems significantly reduced his mental capacity and substantially contributed to the commission of the offense." (Ebert pg 8).

The facts of Marsh's entire criminal history as well as the instant offense demonstrate a defendant confused, unstable, and out of control. Indeed, it appears that Marsh has been suffering from diminished capacity from an early age. Whether the Court considers a departure from the guideline range of 262-327 because the Career Offender provision overstates the seriousness of the defendant's past behavior; or because the instant offense was committed while Marsh was suffering from a significantly reduced mental capacity; or as a non-guideline variance

based on the fact that the defendant clearly suffers from diminished capacity, the defendant requests that the Court sentence him to a period no greater than 10 years.

## Meeting the Purposes of this Sentence

As Matthew Marsh stands now before the Court, the Court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in the statute at 18 U.S.C.§3553(a)(2) i.e., (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. (B) to afford adequate deterrence to criminal conduct. (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

To be sure, Marsh's offense deserves a sentence that provides punishment. Even so, without minimizing the need to remove the defendant from the community, the offense of conviction must be kept in perspective. The instant offense is not among the most serious drug trafficking offenses. Marsh's role involved assisting his friend, Bernabel by driving her around to her customers. He did this to sustain his own addiction to crack cocaine, not to enrich himself. There were no guns or violence attendant to the defendant's offense. Obviously, the defendant's past criminal behavior is driving the guideline sentence more than the offense itself.

A 10-year sentence adequately reflects the seriousness of this offense and also provides just punishment for the offense. Furthermore, a 10-year term for this offense sends a message to the community that drug dealing, no matter how small, will be treated severely.

Protecting the community from further crimes of the defendant implicates the need for educational and vocational training as well as drug and mental health treatment. There is adequate time in a 10-year sentence to treat the defendant for his substance abuse and to assist

him in securing a skill that will be useful when he returns to the community.  As Doctor Ebert advises, Mr. Marsh requires continued treatment for Bipolar Disorder, Post Traumatic Stress Disorder, and Alcohol/Substance Abuse.  All three of these issues will require long-term treatment to ensure lasting improvement in his functioning.   If the Bureau of Prisons provides the defendant with the opportunity to participate in the 500 hour residential drug treatment program, as well as vocational training and mental health counseling, there is a good chance that in 10 years, the defendant will be able to sustain himself in the community.  There are some encouraging signs that Marsh wants to rehabilitate himself.  The defendant reported to Probation that "feels better now that he is no longer using substances and that he believes he would benefit from any available substance abuse treatment." PSR ¶140.

There is no evidence to support any claim that a longer sentence will serve the ends of justice any more favorably than a 10-year sentence.  The government may suggest that a longer sentence is better than 10 years because it will keep Marsh off the streets that much longer.  But in the end, even the government must concede that at some point in time, the defendant must be released to the community.  By then he would be at an age with little chance for finding meaningful work and with few, if any, ties to the community.  Remaining in custody longer than required could well have a deleterious effect on Marsh's ability to re-enter the community.  In the end, the issue for the Court is to attempt to predict whether a 10-year sentence will be sufficient to bring about a change in Mr. Marsh.  In this regard, the defendant asks the Court to keep in mind that a lengthy period of Supervised Release will follow the jail sentence.  Marsh will be required to continue in drug and mental treatment and will be supervised by experienced officers who will attend to maintaining Marsh in the community.

Further, the sentence should not create unwarranted disparity among defendants with similar records who have been found guilty of similar conduct. The defendant's drug offense is less serious than his co-defendant's, Bernabel. She received a 70-month sentence, while her supplier, Dinikue Brown was sentenced to 60 months. Admittedly, there are some important differences among the three defendants' personal histories and cooperation with the government. The defendant had no information to offer the government because of his low-level involvement.

Finally, the defendant objects to the use of the guidelines in anyway other than the advisory capacity allowed in *United States v. Booker*, 543 U.S. 220 (2005). The defendant objects to any presumption of reasonableness, any substantial weight given to the guidelines or even using them as a starting point, in which the defendant must show reasons why to deviate from them. The use of the guidelines in this fashion is violative of the Sixth Amendment to the United States Constitution. This issue is currently being decided by the United States Supreme Court in two cases, which were argued on February 20, 2007. *Rita v. United States*, Supreme Court Docket Number 06-5754 (Decision Below: 177 Fed. Appx. 357; 2006 U.S. App. Lexis 10850 (4th Cir. 2006); *and Claiborne v. United States,* Supreme Court Docket Number 06-5618 (Decision Below: 439 F.3d 479 (8th Cir. 2006). in which cert was allowed on both of them on November 2, 2006.

## Almendarez-Torres v. United States

The defendant is arguing that the government's failure to prove the facts of his prior convictions to a grand jury and then to a jury beyond a reasonable doubt violated his Sixth Amendment rights. The defendant is challenging the District Court's use of Marsh's prior convictions to enhance his sentence under Title 21 U.S.C. Section 851 which enhances the

sentence for the defendant to a minimum 10-year term of imprisonment when the defendant has one prior conviction for drugs. 21 U.S.C. 851.

The defendant is aware of the 1st Circuit's decision in *United States v. Ivery*, 427 F.3d 69, 74-75 (1st Cir. 2006). Further the defendant is aware of the disdain that court seems to hold for this argument. Id. The First Circuit has stated that "We have ruled with a regularity bordering on the monotonous that given the explicit exception and force of *Almendarez-Torres Almendarez-Torres v. United States*, 523 U.S. 224 (l998), the rationale of *Apprendi* does not apply to sentence-enhanced provisions based upon prior criminal convictions." *Id.* Citing *United States v. Moore,* 286 F.3d 47, 51 (1st Cir. 2002).

In spite of the First Circuit's disdain for this argument, as long as Justice Thomas continues to invite the Supreme Court to overturn *Almendarez-Torres* (See *United States v. Shepard,* 544 U.S. 1059, 1263-1264 (2005); and *Rangel-Reyes, Shuman and Banegas-Hernandez v. United States*) 2006 Lexis 4513, 2-5, where Justice Thomas in a recent certiori denial reiterated his position in Shepard and stated that "Petitioners, like many other criminal defendants, have done their part by specifically presenting this Court with opportunities to reconsider *Almendarez-Torres*. It is time for this Court to do its part." *Id* at 4. Further, as long as Justice Thomas states that the court no longer has a majority to uphold *Almendarez-Torres*, appellate attorneys have a responsibility to keep on raising this argument. *Id.* at 2-5.

*Apprendi v. New Jersey,* 530 U.S. 466 (2000); *Blakely v. Washington*, 542 U.S. 296 (2004); and *United States v. Booker*, 542 U.S. 953 (2004), in total stand for the proposition that any person accused of a crime is entitled to a trial by an impartial jury and an indictment by a grand jury. The above three cases and current constitutional jurisprudence on this issue stand for the proposition that a crime includes every fact that is by law a basis for imposing or increasing

punishment. *Apprendi v. New Jersey,* 530 U.S. 466, 478-490, 501 (2000). As discussed above, the Supreme Court has qualified these constitutional protections by limiting the above to every fact other than the fact of a prior conviction. *Almendarez-Torres Almendarez-Torres v. United States,* 523 U.S. 224 (l998). However, in light of the new jurisprudence and ever continuing expansion of the *Apprendi* principles, defendant would object to the use of his prior drug conviction used as a predicate under 21 U.S.C. 851 without these priors being proven to a jury beyond a reasonable doubt.

## Conclusion

The defendant respectfully requests the Court to sentence to him to 10 years in the custody of the Bureau of Prisons. The defendant asks the Court to recommend that he participate in the 500 hour residential drug treatment program; that he also receive mental health counseling and psychiatric treatment for his Bipolar Disorder; that he receive vocational training that will assist him in the community in attaining meaningful employment.

THE DEFENDANT

By:  /s/ Alan J. Black
     Alan J. Black
     1383 Main Street
     Springfield, MA 01103
     (413) 732-5381
     BBO#553768

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to Lisa Asiaf, AUSA on this 15th day of March 2007.

/s/ Alan J. Black



# PSI

Psychological Services, Inc.

**John Daignault, Psy.D.**                                                                                       **Ronald Ebert, Ph.D.**

## CONFIDENTIAL

**Name:** Matthew Marsh
**Date of Birth:** 7/2/75
**Examiners:** Ronald Ebert, Ph.D.; Jeffery S. Long, Ph.D.
**Date of Report:** 3/5/07
**Identifying Information:**

Matthew Marsh is a 31 year-old, Native American male who is presently being held at Plymouth County House of Correction. On 10/23/06, Mr. Marsh pled guilty in U.S. District Court for the District of Massachusetts to two counts of Distribution of Cocaine Base and one count of Conspiracy to Distribute Cocaine Base. His attorney, Alan J. Black, has requested an evaluation of his current functioning and a review of his history to aid in sentencing.
**Warning of Limits of Confidentiality:**

During the interview, I informed Mr. Marsh that I am a forensic psychologist and that I wanted to examine him at the request of Attorney Black for the purpose of gathering information that the Court could use in addressing issues relevant to sentencing and treatment. I explained that my observations and the information he provided would not be held confidential, but could be included in a written report that I would submit to his attorney. I told him that he did not have to participate in the evaluation at all, that he could answer questions selectively, and that he could stop the interview at any time. I then asked Mr. Marsh to repeat the substance of the warning described above. He responded he understood the limits of confidentiality and that he had no questions. He then consented to the interview.

**Sources of Information:**
- Interviews with Mr. Marsh on 2/1/07 and 2/23/07.
- Millon Clinical Multiaxial Tnven?ory–3rd Edition (MCMI-III) administered 2/1/07.
- Review of Pre-sentence Report by Jennifer D. Sinclair, Senior U.S. Probation Officer, dated 1/4/07.
- Review of Medical Records from Health Alliance Hospital, dated 12/18/95 through 6/2/00.

222 Forbes Road, Suite 105, Braintree, MA 02184
Telephone (781) 843-8100 ° Facsimile (781) 843-3111

Psychological Services, Inc.

### Mental Status Examination and Current Level of Functioning:

Mr. Marsh is of average height, is overweight, and appears his stated age. No difficulties of gait, speech articulation, or fine motor coordination are noted. He is cooperative and well-spoken throughout the interview, seeming to answer questions in a candid manner.

Mr. Marsh knows who he is, where he is, the date, and the day of the week. He reports difficulties with his concentration, particularly with tasks requiring sustained attention, such as reading. He reports he becomes impatient during casual interactions, often overrunning or monopolizing conversations. He states he had difficulty in school because he could not sit still. Mr. Marsh reports his memory is "good—sometimes uncanny." However, his recall of events, both past and present, appears somewhat incomplete. Conversationally, his intelligence appears at least average based on his working vocabulary and the complexity of his thoughts.

Mr. Marsh reports his mood fluctuates, depending on his immediate circumstances. He says others often find him "unbearable to live with" because he is so unpredictable. He explains, "I try to keep positive, but I'm nitpicky and nasty. Argumentative. I am pleasant and nice to be with, but my mood can change at the drop of a dime. It can be something trivial or something stupid. I make it bigger." He adds that his mood is primarily "irritable—I keep myself irritable to keep from being depressed. Others say, `You must like to argue'." He reports experiencing "manic highs," which occur both when he is using drugs and when he is sober, as in jail. He states, "When the mood ends, I feel exhausted. I'm so tired. I want to nap." He further says, "I go from zero to 100 in two seconds—it's just `WHAM!" Notably, throughout the interview, his expressed emotion appears intense.

Mr. Marsh's thought processes appear relatively logical and goal-directed, although he occasionally becomes tangential and offers unnecessary elaboration. He reports that his thinking often "speeds up," such that "I talk so fast that my mouth talks faster than my head, and I skip words." Mr. Marsh denies any special powers, but states he occasionally believes he is psychic. He denies any auditory or visual hallucinations, but reports he periodically smells "acetone or gas" for no apparent reason. He denies any history of seizures. He denies any suicide ideation, but reports he previously engaged in superficial self-harm in which he slit his wrists. He denies any homicide ideation. He reports his sleep varies and that he has periods of insomnia, "depending on what's going on around me." Mr. Marsh reports he has been diagnosed with Bipolar Disorder in the past, treated with lithium. He states he discontinued his medication because he found the medication to be too sedating, which affected his ability to attend to his environment. When asked if the medication was helpful, he responds, "At times, yes. I don't know what the medication should do for you. I don't know what normal is. But the manic part can be crazy." When asked whether he agrees with a diagnosis of Bipolar Disorder, he responds, "No. I've seen people diagnosed with bipolar. Do I think something's going on? Yes. But I don't know what the label is." Accordingly, Mr. Marsh's insight into his

**Psychological** Services, Inc.

situation appears somewhat limited. His judgment appears poor, compromised by his mood.

The clinical impression is of a young man who is erratic and emotionally labile. He reports a history of emotional instability and intensity, excess energy, and disorganized thinking, consistent with Bipolar Disorder. Although he is aware that his emotional problems cause him difficulty, he demonstrates limited insight into the severity of his problems or of his continued need for treatment.

**Relevant History:**

The following information is taken from an interview with Mr. Marsh and a review of his records.

Mr. Marsh is the only child of Kenneth Marsh and Karen House. He was born and reared in Fitchburg, Massachusetts. He states his parents were both alcoholic, and the marriage was emotionally and physically abusive. Mr. Marsh states, "My father beat my mom as if she was a man. When my mom and dad fought, my morn would sneak into my room and ask me to pack my bag and leave. It became automatic. When they fought, I'd pack my bag." Records indicate on one occasion, his father knocked him out of the way during an argument, causing him to "crack" his head on a heater. In another incident, police officers observed that Mr. Marsh had sustained "extreme bruises and lacerations" during a physical altercation with his father. Mr. Marsh reports his mother died in 1996 from hepatitis, gastritis, and sclerosis related to chronic alcoholism.

Mr. Marsh describes himself as a "hyperactive, rambunctious kid." He recalls attending Kindergarten at the YMCA, where he was placed in a smaller class "because of violence— I was beating up the other kids." During first grade, he was required to "go to another class to do exercises to blow off steam" because he had so much energy. He was suspended from an after school program because he was too aggressive toward his teachers and peers. Mr. Marsh reports he saw a psychologist several times, but denies being placed on medication. By second grade, "I stopped being affected by what was going on at home. I came to accept it, or I realized what my limitations were."

Mr. Marsh states that throughout elementary school, he was molested by an older male cousin, who frequently watched him after school and during school vacations. He reports the sexual abuse consisted primarily of fondling and occasional oral sex. He states he told no one because he was "accustomed to it and I didn't know it was wrong. But it's one more thing on my plate to deal with." Mr. Marsh comments that as an adult, this man was convicted of sexually molesting his foster children and is now serving a sentence in California.

Mr. Marsh says his behavior difficulties continued during middle school, which he now sees as "a red flag—through acting out, I hoped someone would notice. But I assume no

**PSI**

**Psychological** Serlces, Inc.

one noticed." He recalls one incident in which he tried to hit the vice principal with a microphone stand. He reports his behavior gradually improved as he became involved in band, discovering that he was musically proficient. He states he became "a social butterfly," but had few true friends. He also developed a weight problem, weighing almost 300 pounds by the 8th grade. He comments, "I found solace in food—my metabolism was all screwed up because I wasn't active." He then decided he was not going to enter high school as "a fat freshman," so he intentionally dropped his weight to 175 pounds. Despite a sense of accomplishment, he remained unhappy because of continued conflict at home and sexual confusion, which he attributes to the sexual abuse. Further, he says his self-esteem suffered greatly as a result of the taunting he experienced during middle school.

Mr. Marsh attended Fitchburg High School, where he became involved in a variety of extracurricular activities including band, theater, and cheerleading. He reports becoming sexually active at an early age and was openly gay throughout high school. However, he says there was not a gay community in Fitchburg, which contributed to his sense of alienation, even though on the surface he appeared popular and accepted. During his sophomore year, Mr. Marsh stole his band director's car, taking several of his friends with him to New York City. He reports he had never driven a car before, and in teaching himself how to drive, he smashed several mirrors from parked cars. He was arrested after getting involved in an accident and was charged with "Use Without Authorization." He was initially expelled, but his mother convinced school officials to take him back. Because he missed his finals, Mr. Marsh was required to make up his sophomore work during his junior year. He reports his senior year was uneventful and that he graduated in 1993.

During the following summer, Mr. Marsh began to drink and use drugs. He enrolled in a nursing program at Mount Wachusett Community College, but quickly dropped out. He then moved in with a friend, whose boyfriend sold drugs. Through this couple, he made connections in the drug community. In 1995, Mr. Marsh was convicted of smuggling cocaine from Jamaica and was sentenced to 48 months at FPC-Allenwood. While in prison, a fellow inmate who was HIV-positive raped Mr. Marsh, who has since tested negative. After his release in 1999, he went to Coolidge House, but was arrested after one month for violating his supervised release due to public intoxication. Approximately three months later, he violated supervised release again after testing positive for cocaine, which precipitated his admission to the Gosnold Treatment Facility in Falmouth. While there, he was diagnosed with rapid-cycle Bipolar Disorder and was treated with a variety of mood-stabilizing medications including Tegretol and Depakote. He states the medications did little to improve his mood, but they were overly sedating and caused significant weight gain. However, he adds, "I don't know what it was like to be normal because I've been on drugs for such a long time."

After graduating from Gosnold, Mr. Marsh attended cosmetology school for six months, but violated the conditions of his release because of failure to show up for scheduled



**PSI**

**Psychological** Services, **Inc.**

counseling appointments. After completing his sentence, he was able to maintain sobriety for 1-1/2 years, but began drinking again to the point of blacking out. He moved in with a friend in Fitchburg who was selling cocaine, at which time he began to assist her in selling drugs, receiving cocaine in return as payment for driving her around. He has been incarcerated since November 2004 on his present charges. He reports his behavior problems prompted his transfer to Plymouth House of Correction, and he decided to discontinue his medications because he wanted to be "alert" while in prison.

**Additional Records:**

In a pre-sentence report dated 1/4/07, Jennifer D. Sinclair, Senior U.S. Probation Officer, interviewed Nydia Bernabel, Mr. Marsh's co-defendant who had known him since high school. Ms. Bernabel reported that Mr. Marsh was a "good kid," but became "a completely different person" after going to prison on his first drug charge. After he was released from prison, he was frequently intoxicated to the point of blacking out and was intermittently violent. Although they lived together for several months, she kicked him out because his behavior was out of control. Ms. Bernabel states that Mr. Marsh would often drive her around in exchange for cocaine.

According to the pre-sentence report, Mr. Marsh was sent to FPC-Allenwood in 1995 after being convicted of Conspiracy to Import Cocaine Base. While in custody, he participated in a number of classes and was employed as an orderly on his unit, performing his duties in an "outstanding manner." He was subsequently released to Coolidge House, where he successfully completed substance abuse counseling. He had three violations of supervised release, but continued to participate in outpatient counseling. On 10/22/99, he was arrested for disorderly person, disturbing the peace, and resisting arrest after becoming intoxicated and throwing food at a Denny's restaurant. In September 2000, his behavior began to deteriorate, and he tested positive for marijuana and cocaine, prompting his admission to the Gosnold Treatment Facility. He successfully completed this program , as well as subsequent treatment at the Miller House. However, his supervised release was revoked after he failed to show for a number of scheduled administrative and counseling appointments. On December 14, 2001, he was placed at the Wyatt Detention Facility in Central Falls, Rhode Island, where he reportedly had a number of difficulties with staff, prompting placement in segregation for two months. After he was released, he was arrested on 5/19/03 for public intoxication after he woke residents by yelling in the streets and then pulled a fire alarm and attempted to break windows at a restaurant. On 5/6/04, he was charged with disorderly conduct and resisting arrest after causing a scene at a local pub. At that time, he was described in the booking report as "extremely uncooperative, volatile, belligerent, and refused booking."

The pre-sentence report details longstanding difficulties with alcohol and substance abuse, starting in 1993. Mr. Marsh has apparently been able to maintain brief periods of sobriety, but often resumes binge-drinking and use of drugs when not in treatment. While at the Wyatt Detention Facility on the present charges, Mr. Marsh began taking a

5

Psychological Services, Inc.

variety of psychotropic medications to regulate his mood, including lithium, Paxil, and Tegretol. However, he discontinued his medications after being transferred to Plymouth County House of Correction because he did not believe medication was necessary and because he did not like the sedating properties of these medications.

Medical records from Health Alliance Hospital indicate that Mr. Marsh was taken to the Emergency Room on 8/24/99 after sustaining a head injury from being struck with a beer bottle. At the time, he had been drinking heavily. His laceration was closed with staples, and he was sent home. On 5/17/00, he was again taken to the Emergency Room after falling into a metal pole, sustaining an injury to his left eyebrow and fracturing his nose.

**Psychological Testing:**

Mr. Marsh produced a valid MCMI-III protocol, although he presented himself as emotionally vulnerable and overwhelmed. Mr. Marsh's responses suggest severe personality disorganization, resulting in chronic emotional and interpersonal problems. In general, his functioning varies considerably depending on his mood, ranging from periods of adequacy to times of extreme deterioration. He is frequently flooded by anxiety, so much so that he engages in erratic and unwise behavior in order to quell this intense emotional discomfort. He often engages in self-defeating, self-demeaning behaviors that serve to distract him from emotional pain, but ultimately cause further problems. His responses suggest the presence of severe depression in which he feels irritable, edgy, and sad much of the time. His relationships are marked by feelings of being cheated, mistreated, and misunderstood, which in turn fuels intense feelings of self-pity, bitterness, and occasional angry outbursts. Further, his relationships tend to be turbulent and conflicted, often alternating between extremes of dependency and antagonism. His unpredictability eventually causes others to distance from him, which he interprets as further proof that he is unworthy and that others cannot be trusted. Despite his efforts to improve his situation, mood fluctuations, coupled with his alcohol/substance abuse, undermine any gains he makes. Mr. Marsh reports intense trauma from certain past experiences, which causes nightmares, disturbing memories, and acting-out behaviors that replay aspects of his abuse (i.e. associating with others who inevitably mistreat him). In all, Mr. Marsh's testing indicates mood instability, alcohol/substance abuse, chronic interpersonal difficulties, self-sabotaging behaviors, and emotional trauma.

**Clinical Impressions:**

In my clinical opinion, Mr. Marsh displays several mental health issues that seriously impair his judgment and affect his overall functioning. He meets criteria for a diagnosis of Bipolar Disorder, which in his case emerges as emotional instability with rapid vacillation between depression, agitation, mania, and irritability. Even as a child well before his alcohol/drug use, Mr. Marsh displayed episodes of manic behavior such as attacking his vice principal with a microphone stand and stealing his band teacher's car.



**PSI**

Psychological Services, Inc.

This mood instability has existed for such a long time that Mr. Marsh now views it as a central part of his personality and thus he cannot envision himself as being emotionally stable.

Additionally, Mr. Marsh displays symptoms of Posttraumatic Stress Disorder, due to a combination of early traumatic experiences. From the start. his parents' alcoholism and violence left a devastating imprint, such that even as a young child, he was perpetually on edge, bracing himself for having to flee the house or for being beaten by his father. At the same time, he was being molested by an older cousin, which resulted in precocious sexual interest and subsequent sexual confusion. Taken together, these experiences left a strong imprint on the development of his personality. During elementary school, Mr. Marsh expressed his turmoil as aggression toward adults and peers; however, as he entered middle school, he progressively became depressed, confused, and grossly overweight. During adolescence, he tried to develop the semblance of normalcy by gravitating toward extracurricular activities and having a large number of acquaintances. However, after graduation, he was unable to maintain any consistent employment or educational opportunity, often sabotaging himself through erratic behavior and drug use. While incarcerated on drug charges, a fellow inmate raped him, and this event has caused a resurgence of earlier trauma and intensified his underlying emotional instability.

Emerging from his mental illness and history of trauma, Mr. Marsh has battled alcohol and drug addiction throughout adulthood, often using substances as a way to mask intense emotional pain. Many of his behavior problems have resulted from his attempts to obtain drugs or from volatile behavior resulting from intoxication. Mr. Marsh has participated in treatment several times and has been able to remain sober for short periods; however, because his Bipolar Disorder and PTSD remain under-treated, he eventually returns to alcohol and drug use in order to self-medicate.

Taken together, Mr. Marsh is a man who is severely impaired by his mental health problems. Psychological testing speaks to underlying trauma, emotional instability, continual interpersonal conflict, and alcohol/substance abuse addiction. Attempts at treatment have led to short-term successes, but Mr. Marsh frequently self-sabotages out of his belief that he is incapable of achieving and maintaining any goals. Although contributing greatly to his problems, alcohol and cocaine have remained a tried and true way of reducing and managing his intense anxiety and depression. Like many individuals with Bipolar Disorder, Mr. Marsh has difficulty tolerating the side-effects of his medications (i.e. weight gain, lethargy, sedation), although he does not appear to have participated in pharmacotherapy for any length of time. Unfortunately, his insight concerning the nature of his mental illness and his continued need for treatment appears limited.

**Psychological** Senices, Inc.

1. In my clinical opinion, Mr. Marsh suffers from Bipolar Disorder, Posttraumatic Stress Disorder, and Alcohol and Cocaine Dependence. He has profound problems with mood instability that he has tried to control with alcohol and cocaine. Further, he has a number of traumatic experiences including childhood physical and sexual abuse and being raped while incarcerated that also contribute to his longstanding interpersonal and emotional problems.

2. In my clinical opinion, Mr. Marsh's Bipolar Disorder, alcohol and cocaine addiction, and Posttraumatic Stress Disorder have caused severe deficits in his functioning. Jointly, these problems cause him to engage in self-destructive, self-sabotaging behaviors and to be vulnerable to the influence of others.

3. In my clinical opinion, Mr. Marsh has been intermittently compliant with mental health and substance abuse treatment, quickly relapsing when not involved in treatment of some sort.

4. In my clinical opinion, based on the combination of the above mental health issues. Mr. Marsh's involvement in the extant crime was due to his chronic Bipolar Disorder and Posttraumatic Stress Disorder, which propelled his involvement in selling (and using) cocaine. In my clinical opinion, these problems significantly reduced his mental capacity and substantially contributed to the commission of the offense.

5. In my clinical opinion, Mr. Marsh requires continued treatment for Bipolar Disorder, Posttraumatic Stress Disorder, and Alcohol/ Substance Abuse. All three of these issues will require long-term treatment to ensure lasting improvement in his functioning.

Respectfully submitted,

_____ LC, O-k-- _____

Long, Ph.ᵗDL-  Ronald S Ebert P .D.
Licensed Clinical Psychologist  Diplomate in Forensic Psychology, American
Director, Psychological Services, Inc.  Board of Professional Psychology
  Director, Psychological Services, Inc.
  Senior Consulting Forensic Psychologist,
  McLean Hospital
  Psychologist, Harvard Medical School

JSL/RSE/ys