## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                          )
UNITED STATES OF AMERICA                  )
                                          )
            v.                            )        Crim. No. 05-40025-FDS
                                          )
MATTHEW MARSH, *et al*,                   )
                      Defendants.         )
_____)

## GOVERNMENT'S MEMORANDUM
## REGARDING PENDING SENTENCING ISSUES

The United States of America (the "government"), by and through the undersigned Assistant

U.S. Attorney, submits this memorandum to set forth the government's position regarding the

following two issues concerning the sentencing of the defendant, Matthew Marsh ("Marsh"), which

is currently scheduled for April 9, 2007, at 3:00 p.m.:

(1)     Whether additional pre-sentencing proceedings are necessary to address the mental

        health conditions discussed in Marsh's objections to the Pre-sentence Report

        ("PSR") and in Dr. Ronald Ebert's Psychological Evaluation of Marsh dated March

        5, 2007; and

(2)     Whether an upward departure under U.S.S.G. § 4A1.3(a) is appropriate in light of

        Marsh's recent success in vacating two prior state convictions, thereby reducing his

        Guidelines Sentencing Range ("GSR") from 262-327 months under the "Career

        Offender" guidelines to 120 months under the otherwise applicable guidelines.

Each of these issues is addressed in turn.  For the reasons discussed below, the government

respectfully submits that neither issue presents an obstacle to sentencing in this case and that this

Honorable Court should, in fact, proceed with sentencing on April 9, 2007.

## I.  <u>INTRODUCTION</u>

On April 28, 2005, a federal grand jury charged Marsh and his co-defendant Nydia Bernabel, a/k/a "Nonni," a/k/a "Nanni," ("Bernabel") with conspiracy to distribute at least 5 grams of cocaine base, also known as "crack cocaine," in violation of 21 U.S.C. § 846 (Count 1) and two substantive counts of distributing cocaine base, also known as "crack cocaine," in violation of 21 U.S.C. § 841(a)(1) (Counts 2 and 3).   These charges stemmed from an agreement between Marsh and Bernabel to distribute crack cocaine in the Fitchburg area and from two crack cocaine sales to undercover DEA agents on November 9, 2005.  As set forth in the PSR, Marsh is responsible for a total of 6.4 grams of crack cocaine.

In October 2006, Marsh entered into a written Plea Agreement with the government.  <u>See</u> Plea Agreement at Docket Entry No. 85.   In the Plea Agreement, the parties agreed (*inter alia*) that:

- On Count One, Marsh faces the following mandatory minimum and maximum penalties (due to the filing of an Information under 21 U.S.C. § 851):  A <u>mandatory minimum term of imprisonment of 10 years</u>; a maximum term of imprisonment of life; a maximum fine  of $4,000,000; a term of supervised released of at least 8 years and up to life; and a mandatory special assessment of $100;

- Marsh's <u>Base Offense Level is 26</u> pursuant to U.S.S.G. § 2D1.1(c)(7) based on the drug weight attributable to him (*i.e.*, 5-20 grams of crack cocaine);

- Marsh was entitled to a <u>3-level reduction for Acceptance of Responsibility</u> (rendering a <u>Total Offense Level of 23</u>);

- As set forth in the <u>Information filed under 21 U.S.C. § 851</u>, Marsh was convicted of: (i) conspiracy to import cocaine base in violation of 21 U.S.C. § 963, (ii) importation of cocaine base in violation of 21 U.S.C. § 952, and (iii) possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) in *United States v. Matthew Marsh, et al,* Criminal Docket No. 95-10244-REK; and

- At sentencing, the <u>government would recommend a sentence at the low end</u> of the applicable GSR as determined by the Court at the time of sentencing, subject to the application of any mandatory minimum term of imprisonment.

<u>See</u> Plea Agreement (attached to PSR) at 1-4.

Pursuant to the terms of the Plea Agreement, on October 23, 2007, Marsh appeared before this Court for a Rule 11 Hearing.  See Tr. of Rule 11 Hr'g (attached hereto as **Exhibit A**).  At the hearing, the Court conducted a very thorough plea colloquy, advising and questioning the defendant as required by Fed. R. Crim. P. 11(b)(1) and ensuring that the plea was voluntary and intelligent as required by Fed. R. Crim. P. 11(b)(2).  See generally **Exhibit A**.  After taking the oath, Marsh answered all of the Court's questions without incident and pleaded guilty to the three charges alleged in the indictment.

After the Rule 11 hearing, the U.S. Probation Office ("Probation") prepared an initial PSR for the Court.  As set forth in the initial PSR, Probation determined that Marsh qualified as a "career offender" based on the following three convictions in Marsh's criminal history:

- September 6, 1996 conviction in the U.S. District Court (D. Mass.) for the cocaine importation charges discussed above;

- January 13, 2000 conviction in Leominster District Court for (i) resisting arrest and (ii) disorderly conduct; and

- May 6, 2004 conviction in Fitchburg District Court for (i) resisting arrest and (ii) disorderly conduct.

Application of the "career offender" provisions in U.S.S.G. § 4B1.1 raised Marsh's GSR from 120 months (as contemplated by the parties when reaching their Plea Agreement) to 262-327 months.

Upon receiving a copy of the initial PSR dated January 4, 2007, defense counsel moved to continue the sentencing hearing, which was originally set for February 8, 2007, in order to retain a psychiatrist to evaluate Marsh and to attempt to vacate the state convictions upon which Marsh's "career offender" status was based.  See Docket Entry Nos. 93-94.  In support of these motions, Marsh explained, inter alia:

> Upon receipt of the Probation department presentence report defense counsel first became aware of two prior state court misdemeanor convictions for resisting

arrest that will be used to invoke the provisions of the career offender guidelines. This increases the guideline range from approximately eight (8) years to twenty-two (22) years.... Due to the newly discovered potential severity of this sentence defense counsel needs more preparation time prior to sentencing. Defense counsel also needs to investigate the state convictions and possibly move to vacate these convictions. It is also clear from the presentence report that the defendant is suffering from mental disease and has been diagnosed as being bipolar therefore the defendant needs to be examined by a psychologist for purposes of sentencing to determine the severity of his documented mental illnesses and the implication towards sentencing.

See Docket Entry No. 93 at ¶¶ 6-11. Upon receiving the relief requested in these motions, Marsh

proceeded as follows:

- On February 26, 2007, Marsh submitted numerous objections to the initial PSR, challenging, *inter alia*, the applicability of the "career offender" guidelines to Marsh and arguing that if the Court finds that the "career offender" guidelines do, in fact, apply, it should downwardly depart on the ground that the resulting GSR grossly overstates the seriousness of Marsh's criminal history;

- On Marsh 5, 2007, Dr. Ebert issued a Psychological Evaluation Report, concluding, inter alia, that Marsh suffers from Bipolar Disorder, Posttraumatic Stress Disorder, and Alcohol and Cocaine Dependence;

- On March 6, 2007, Marsh submitted an additional objection to the initial PSR, challenging the use of a state misdemeanor conviction for Resisting Arrest as a predicate conviction for purposes of the "career offender" guidelines;

- On March 14, 2007, Marsh succeeded in getting his 2000 and 2004 state convictions vacated based on various arguments relating to his mental defects (see **Exhibit B** (relating to 2000 state conviction) and **Exhibit C** (relating to 2004 state conviction)); and

- On March 15, 2007, Marsh filed a final objection to the initial PSR, challenging the use of his state convictions as predicates for the "career offender" provisions on the additional ground that both convictions were vacated on March 14, 2007. That same day (March 15, 2007), Marsh filed a Sentencing Memorandum and Motion for Downward Departure, asking the Court to sentence him to term of imprisonment of 120 months.

On March 16, 2007, Probation issued a final, revised PSR. As set forth therein, all parties

agree that Marsh is now subject to the following penalties:

4

(1)  Statutory penalties:  A minimum term of imprisonment of 10 years to a maximum of life on Count One and a maximum of 30 years on Counts Two and Three; a term of supervised release of at least 8 years to life on Count One and 6 years to life on Counts Two and Three; a maximum fine of $4,000,000 on Count One and a maximum fine of $2,000,000 on Counts Two and Three; and a mandatory special assessment of $100 per count.

(2)  Guidelines: A GSR of 120 months' imprisonment (which would have been 70-87 months had there been no mandatory minimum); a term of supervised release of 8 years; and a fine from $10,000 - $8,000,000.

See PSR (March 16, 2007) at ¶¶ 178-89.

On March 23, 2007, the parties appeared before this Court for a sentencing hearing.  After resolving the various objections to the initial PSR submitted by the defendant (most of which were rendered moot when the state convictions were vacated and/or by the 120-month mandatory minimum), the Court raised two concerns with respect to sentencing.  Specifically, as set forth above, the Court noted that Marsh's recent submissions raised the following two issues:  (1) whether additional pre-sentencing proceedings are necessary to address the mental health conditions raised in Dr. Ebert's report and in Marsh's sentencing submissions, and (2) whether an upward departure under U.S.S.G. § 4A1.3(a) is appropriate in light of the recent change in Marsh's "career offender" status.  The Court continued the sentencing hearing to allow the parties to address these issue.  The government respectfully submits this memorandum in response to that directive.

## II.   DISCUSSION

### A.   Defendant's Mental Health

The legal standard for a defendant's mental competency to enter a valid guilty plea is the same as that of a defendant's competence to stand trial.  As stated in *Godinez v. Moran*, 509 U.S. 389 (1993):

> The competency standard for pleading guilty or waiving the right to counsel is the same as the competency standard for standing trial:  whether the defendant has

5

> "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him."

*Moran*, 509 at 389 (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (*per curiam*)) (emphasis added). Congress has promulgated certain procedures to assist courts in making this determination. Specifically, according to 18 U.S.C. § 4241:

> At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

18 U.S.C. § 4241(a) (emphasis added). If the Court determines that such reasonable cause exists, it may order a psychological examination of the defendant, then hold a mental competency hearing. See 18 U.S.C. § 4241(b), (c). The "[d]etermination of whether there is 'reasonable cause' to believe a defendant may be incompetent rests in the discretion of the district court." *United States v. Vamos*, 797 F.2d 1146, 1150 (2d Cir. 1986).

The First Circuit's decision in *United States v. Morrisette*, 429 F.3d 318 (1st Cir. 2005) is instructive. In *Morrisette*, the defendant appealed his conviction and sentence for distributing cocaine base, arguing (*inter alia*) that his guilty plea was neither knowing or voluntary because of his mental health and substance abuse problems. *Id.* at 321. At the time of the Rule 11 hearing, the court asked the defendant if he was under psychiatric care and whether he was taking any medication. *Id.* at 321. The defendant responded that he was taking Thorazine for anxiety, but responded negatively when the court asked him if this anxiety medication prevented him from understanding what was happening during the plea hearing. *Id.* Before accepting the defendant's

guilty plea, the court stated that it had observed the defendant's demeanor and attitude throughout the hearing and found that he was not under the influence of any substance that would impair his judgment.  *Id.*

On appeal, the defendant argued that his plea was neither knowing nor voluntary due to his mental health problems and that the court should have ascertained whether he understood what transpired at the Rule 11 hearing.  *Morrisette*, 429 F.3d at 321.  The court rejected the defendant's argument and upheld the guilty plea.  The court considered the following circumstances in reaching this decision:

- "since Morrisette raised no issue concerning his competency until *after* the change of plea hearing, the district court never learned of Morrisette's medical diagnosis until *after* it had accepted the guilty plea, and therefore it cannot have ignored any red flags"

- "the court specifically inquired whether the medication (*viz.*, Thorazine) prevented Morrisette from understanding what was happening during the hearing, and Morrisette responded 'no.'

- "Given the facts available to the district court at th time, its inquiry was not plainly inadequate: Judges are not pharmacists or doctors.  Occasionally the aid of an expert may be necessary to explain the likely or actual effects of a particular drug.  However, practical judgments can usually be made.  Courts have commonly relied on the defendant's own assurance (and assurances from counsel) that the defendant's mind is clear."

- "Further, the defendant's own performance in the course of a colloquy may confirm, or occasionally undermine, his assurances."

- "Neither Morrisette nor defense counsel advised the court *either* that the Thorazine had the potential seriously to affect Morrisette's cognitive abilities, *or* that the Thorazine was not effectively ameliorating the symptoms associated with schizophrenia and substance abuse."

- "The district court asked Morrisette a series of questions regarding his understanding of the terms of the plea agreement, to which Morrisette provided cognizant and coherent responses.... Finally, after observing Morrisette's demeanor first hand, the district court made an explicit finding that Morrisette was competent to enter the guilty plea."

*Morrisette*, 429 F.3d at 322-23.  The court concluded that these circumstances prevented Morrisette

from demonstrating plain error and affirmed the guilty plea.  *Id.* at 323.

The First Circuit's decision in *United States v. Dedrick*, 16 Fed.Appx. 10 (2001) is also

instructive.  In *Dedrick*, the defendant appealed his conviction and sentence entered upon his plea

of guilty to two counts of distributing crack cocaine.  One of his arguments on appeal was that the

district court erred in failing to hold a mental competency hearing before accepting his plea.

*Dedrick*, 16 Fed.Appx. at 12.  In support of his argument, Dedrick argued that the district court (i)

"knew that he had a 'de facto' fifth-grade education," (ii) knew that he "may be 'borderline

retarded," and (iii) "observed his confusion when asked whether he wished to change his plea."  *Id.*

at 13-14.

After discussing the mental competency provisions in 18 U.S.C. § 4241, the court rejected

Dedrick's arguments.  In doing so, the court noted the following:

- "When counsel advised the court that Dedrick may be borderline retarded, the judge allowed counsel to consult with him.  Counsel then returned with Dedrick and without further discussion, the plea colloquy proceeded."

- "While at one point, Dedrick showed confusion over whether he wished to change his plea, after conferring with counsel, he continued with the colloquy and responded appropriately to the court's questions."

- "We are satisfied that the district judge, after having been assured by Dedrick's counsel that 'I don't think he is retarded to a degree that he does not understand the proceedings here,' did not abuse her discretion in accepting the plea as knowing and voluntary and not ordering a competency hearing."

*Id.* at 13-14.  Upon reaching this decision, the court also noted that "a mentally retarded person may

be capable of understanding the nature and consequences of the proceedings against him and yet be

unable to assist properly in his defense.  There is no evidence that this is such a case."  *Id.* at 14.

Here, like the circumstances surrounding the plea hearings in *Morrisette* and *Dedrick*

8

discussed above, there are simply no facts indicating that Marsh's plea was not knowing, voluntary and/or competently rendered. In fact, like the district courts in *Morrisette* and *Dedrick*, this Court took pains to ensure that Marsh understood the proceedings against him and that his rights were protected. The Court asked Marsh numerous questions throughout the Rule 11 hearing, which Marsh answered quickly, coherently and thoroughly. With respect to Marsh's competency, the following exchange took place:

THE COURT: Have you been treated recently for any mental illness, or psychiatric, or psychological problem of any kind?

THE DEFENDANT: Yes, I have.

THE COURT: What is that?

THE DEFENDANT: Rapid cycle bipolar disorder.

THE COURT: I'm sorry. Bipolar disorder?

THE DEFENDANT: Yes, sir.

THE COURT: And I didn't catch the first part of your answer.

THE DEFENDANT: Rapid cycle bipolar disorder. It's a form of bipolar. It's just it's a rapid cycle, rather than the normal cycle, I guess.

THE COURT: Rapid cycle?

THE DEFENDANT: Yes.

THE COURT: And are you on any medication for that?

THE DEFENDANT: No, sir.

THE COURT: Are you receiving any treatment for that at all?

THE DEFENDANT: Yes, I am.

THE COURT: What treatment are you receiving?

9

THE DEFENDANT: Monthly counseling appointments with a psychologist in the facility that I'm at.

THE COURT: I'm sorry. What was that? I didn't catch the ending.

THE DEFENDANT: I have monthly psychology appointments at the institution that I'm at. I'm supposed to be on medication, but I'm actually not on medication, because of the adverse effects I have on that. So I decline the medication.

THE COURT: So you've tried the medication, and you didn't like it, because of the adverse effects?

THE DEFENDANT: Yes, sir.

THE COURT: So you're presently unmedicated?

THE DEFENDANT: Yes.

THE COURT: All right. And does your disorder interfere in any way with your ability to understand what's going on here today?

THE DEFENDANT: No, sir.

THE COURT: Is there any doubt in your mind at all that you understand what we're about to do here?

THE DEFENDANT: No, sir.

THE COURT: All right. Mr. Black, is there any reason you're aware of why we should not continue?

MR. BLACK: Not at all. I have been aware of his mental illness for quite some time, and I have never had any trouble being understood by him, understanding him, communicating with him in any way, including up until today.

THE COURT: Okay. Mr. Marsh, have you been treated recently for any drug problem, or alcohol problem, or addiction of any kind?

THE DEFENDANT: No, sir.

THE COURT: As you sit here today, are you under the influence of any drug, or medication, or alcoholic beverage of any kind?

THE DEFENDANT: No, sir.

10

See **Exhibit A** at 4-6.  Clearly, both Marsh and his lawyer believed that Marsh was fully competent of the nature and consequences of the proceedings against him, and was rendering his guilty plea in a knowing and voluntary manner.  After a thorough colloquy pursuant to Fed. R. Crim. P. 11, the Court concluded that "the defendant is fully competent and capable of entering an informed plea; that the defendant is aware of the nature of the charges and the consequences of the plea; and that the plea of guilty is a knowing and voluntary plea...."  *Id*. at 23-24.

In light of all of the foregoing circumstances, the government submits that the mental health issues raised in Dr. Ebert's report simply do not constitute "reasonable cause" to order a competency hearing under 18 U.S.C. § 4241.  Although a state judge granted Marsh's motions for a new trial based on affidavits submitted by Dr. Ebert and Marsh, himself (see **Exhibits B** and **C**), both of which discussed Marsh's mental impairments at the time of his state plea hearings, the circumstances set forth therein are distinguishable from the circumstances before this Court. Specifically, in support of his motions for a new trial in both state cases, Marsh testified as follows:

- "At the time of this plea I was suffering from a manic episode, which prevented me from understanding the consequences of the plea, and prevented me from making voluntary and rational decisions."

- "At the time of plea, I just wanted to get the case over with."

- "My lawyer told me to plea and I did."

- "I did not really understand what the consequences of this plea were, nor did I really understand what was going on around me."

- "At the time of my plea, I was suffering from a manic episode and this impaired my ability to make a decision that was knowing and intelligent."

See **Exhibits B** and **C** at Marsh Aff. ¶¶ 11-16 (emphasis added).  Dr. Ebert also submitted affidavits in support of both of Marsh's state motions, in which he testified (inter alia) as follows:

- "[Marsh] is severely impaired by his mental health problems and when not

11

medicated <u>and abusing substances</u>, can act out in irrational and aggressive behaviors."

- "I have reviewed a police report from the Leominster Police Department of an incident that occurred 10/22/099.  Mr. Marsh was causing a disturbance ... and was described by police as 'making loud incoherent noises,' 'could not speak' and when being booked 'had difficulties with his name, address and date of birth.'"

- "I have reviewed a police report from the Fitchburg Police Department of an incident that occurred on 4/30/04.  Mr. Marsh had to be restrained by police because he was 'agitated.' .... he banged his head on the glass barrier 'five to six times' and the police 'kept telling him to relax before he hurt himself.'  During booking 'he would not stop yelling.'"

- "It is my current opinion to a reasonable degree of psychological certainty that <u>on both 10/22/99 and 4/30/04</u>, Mr. Marsh was suffering from symptoms of his major mental illness such as agitation, disorganization, confusion and self destructive behaviors...."

- "It is further my opinion to a reasonable degree of psychological certainty that Mr. <u>Marsh's untreated mental illness continued through the periods that he entered pleas. In this untreated state</u> he would not have had the ability to make a waiver that was knowing and intelligent or a product of clear and rational thought."

<u>See</u> **Exhibits B** and **C** at Ebert Aff. ¶¶3-8 (emphasis added).  The problems raised by both Marsh and Dr. Ebert were limited to the time of the arrests and pleas in the state court proceedings. Nothing in their affidavits raised reasonable cause to believe that Marsh lacked the mental competency to render a valid guilty plea in this case.  See

Instead, the record before this Court supports a determination to proceed to sentencing in this case forthwith.  As discussed more fully above, (1) this Court conducted a thorough colloquy at the Rule 11 hearing, at which both Marsh and his attorney confirmed that Marsh fully understood the nature and consequences of the proceeding and was entering his guilty plea knowingly and intelligently; (2) the affidavits submitted by both Marsh and Dr. Ebert are tailored to the time frame at issue in Marsh's state cases (*see Vamos*, 797 F.2d at 1150 ("[t]he question of competency to stand trial is limited to the defendant's abilities at the time of trial, and failure to conduct a full

competency hearing is not a ground for reversal when the defendant appears competent during trial") (citation omitted)); (3) Marsh had not moved the Court for a competency hearing or any other form of relief relating to his mental health, despite the fact that such motions were made in state court during the pendency of this action, (4) Dr. Ebert's concerns are more relative to Marsh's state court proceedings, at which time Marsh "may have been abusing substances" and his mental illness remained "untreated" (see **Exhibits B** and **C** at Ebert Aff. ¶¶ 7-8), whereas in the instant case, Marsh remained substance-free due to his lengthy incarceration prior to the Rule 11 hearing, during which time, he received mental health counseling in prison; (5) Marsh, by his own sworn testimony, has stated that he "was suffering from a manic episode" and "did [not] understand what was going on around [him]" in his state court proceedings (see **Exhibits B** and **C** at Marsh Aff. ¶¶ 17-18), but had "no" doubt in his mind at all that he understood the full nature of the Rule 11 hearing in this case (see **Exhibit A** at 6); and (6) Marsh's lawyer confirmed his strong belief, based on all of his interactions and communications with Marsh throughout this case, that Marsh was fully competent to enter his guilty plea and remains fully competent to proceed to sentencing (see **Exhibit A** at 6; see also Tr. of Hr'g on March 23, 2007), *see United States v. Muriel-Cruz*, 412 F.3d 9, (1st Cir. 2005) ("[g]iven that defense counsel enjoys a unique vantage for observing whether her client is competent, ... it would be untoward indeed to disqualify her from stating her opinion, particularly since competency means that 'a defendant must be able to understand the proceedings against him and have sufficient *present ability to consult with his lawyer* with a reasonable degree of rational understanding" (emphasis in original)).[1]

---

[1] Finally, it is worth noting that putting all of the foregoing facts aside, the underlying reality is that when a defendant is faced with extremely high federal penalties due to underlying prior state convictions, state courts allow motions to vacate those convictions fairly routinely, often without a significant showing. The government simply raises this point as one of many of

### B.     Effect of Vacating Two Prior State Convictions

The Court also raised the issue of whether an upward departure under U.S.S.G. § 4A1.3(a) is appropriate in light of the recent change in Marsh's "career offender" status. In raising this issue, the Court noted its concern over the practice of vacating prior convictions in order to circumvent otherwise applicable federal sentencing guidelines. This concern raised the additional question of whether the holding in *Shepard v. United States,* 544 U.S. 13 (2005), precludes the Court from considering certain information underlying Marsh's vacated state convictions when determining whether to upwardly depart under U.S.S.G. § 4A1.3(a).

As set forth in the revised PSR, Marsh faces a GSR of 120 months' imprisonment based on a Total Offense Level ("TOL") of 23 and a Criminal History Category ("CHC") of IV, yielding a GSR of 70-87 months, which is trumped by the 120-month mandatory minimum. The Court's determination of whether to upwardly depart under U.S.S.G. § 4A1.3(a) is governed by the provisions of this guideline and applicable case law applying it. The Supreme Court's ruling in *Shepard v. United States,* 544 U.S. 13 (2005), is not relevant to this determination. Instead, *Shepard* instructs courts to take a categorical approach  – looking at the *elements* of a crime, not the *facts and circumstances* underlying that crime –  when determining whether a certain crime is a "crime of violence" under the Bail Reform Act. Since the *Shepard* decision, courts may look at the charging document alone to determine the elements of the offense (or, if the elements are not clear from the charging document alone, courts may turn to jury instructions and/or a plea colloquy) in order to determine if a prior conviction constitutes a "crime of violence" for purposes of

---

the facts and circumstances that this Court will consider in determinating whether "reasonable cause" exists under 18 U.S.C. § 4241. If the Court does, indeed, harbor reservations of its own, it can order a competency evaluation under 18 U.S.C. § 4241. For all of th reasons set forth in this memorandum, the government, however, respectfully submits that there is no legitimate question of Marsh's competency.

sentencing enhancements.  Courts may not look at underlying police reports and other such documents to make this determination.

In short, *Shepard* is not at issue here.  Instead, the Court's decision rests on the provisions of U.S.S.G. § 4A1.3 and case law interpreting those provisions.  According to § 4A1.3:

> If <u>reliable information</u> indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure may be warranted.

U.S.S.G. § 4A1.3(a)(1) (emphasis added).  Section 4A1.3(a)(2) sets forth an non-exhaustive list of the types of information that form the basis for an upward departure, including:

(A)  Prior sentence(s) not used in computing the criminal history category (<u>e.g.</u>, sentences for foreign and tribal offenses).

(B)  Prior sentence(s) of substantially more than one year imposed as a result of independent crimes committed on different occasions.

(C)  Prior similar misconduct established by a civil adjudication or by a failure to comply with an administrative order.

(D)  Whether the defendant was pending trial or sentencing on another charge at the time of the instant offense.

(E)  Prior similar adult criminal conduct not resulting in a criminal conviction.

U.S.S.G. § 4A1.3(a)(2).  The guideline prohibits the Court from using "[a] prior arrest record itself" to support an upward departure under § 4A1.3.  <u>See</u> U.S.S.G. § 4A1.3(a)(3).  Finally, the guideline instructs that if the Court does, in fact, decide to grant an upward departure, "[e]xcept as provided in subdivision (B) [which governs upward departures from CHC VI], <u>the court shall determine the extent of the departure under this subsection by using, as a reference, the criminal history category applicable to defendants whose criminal history or likelihood to recidivate most closely resembles that of the defendant's</u>."  U.S.S.G. § 4A1.3(a)(4)(A) (emphasis added).

Here, Marsh's success in vacating his two state "career offender" predicates reduced his CHC from VI to IV.  <u>See</u> PSR at ¶ 95.  Marsh's CHC of IV is based on five criminal history points, plus two points because Marsh committed the instant offense while under a criminal justice sentence imposed on July 17, 2003.  <u>See</u> PSR at ¶¶ 90, 93.  For reasons that were highlighted at the last hearing in this case and which will be further discussed at the upcoming sentencing hearing, at this time, the government does not seek an upward departure from Marsh's CHC of IV.  In support of this position, the government notes the nature of the offenses that comprise Marsh's CHC and the fact that the 120-month mandatory minimum trumps any increase in Marsh's GSR based on a CHC of V or VI.  The government respectfully requests leave to supplement its position on this issue orally at the upcoming hearing.

### III.  CONCLUSION

In light of the foregoing circumstances, the government respectfully submits that neither issue discussed above presents an obstacle to sentencing the defendant, Matthew Marsh, and that this Honorable Court should, in fact, proceed with sentencing on April 9, 2007.  For the reasons discussed at the last hearing in this matter, which will be further discussed at the upcoming sentencing, the government recommends a sentence of 120 months' imprisonment, a term of supervised release of 8 years, a fine of $10,000 unless the Court finds that Marsh is unable to pay a fine, and a special assessment of $300.

Dated:   April 6, 2007                                    Respectfully submitted,

                                                          MICHAEL J. SULLIVAN
                                                          United States Attorney

                                          By:       ___/s/ Lisa M. Asiaf_____
                                                          LISA M. ASIAF
                                                          Assistant U.S. Attorney
                                                          Tel:  (617) 748-3268

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 6, 2007.

                                          _____/s/ Lisa M. Asiaf_____
                                                          LISA M. ASIAF

# **EXHIBIT A**

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3

4    United States of America,      )
                    Plaintiff,      )
5                                   )
                                    )
6    vs.                            )    CR No. 05-40025
                                    )
7                                   )
     Matthew Marsh,                 )
8                    Defendant.     )

9

10   BEFORE:   The Honorable F. Dennis Saylor, IV

11

12                          Rule 11

13

14

15                              United States District Court
                                Courtroom No. 2
16                              595 Main Street
                                Worcester, Massachusetts
17                              October 23, 2006

18

19

20

21

22
                        Marianne Kusa-Ryll, RMR, CRR
23                        Official Court Reporter
                        United States District Court
24                       595 Main Street, Room 514A
                         Worcester, MA 01608-2093
25                              508-929-3399
                    Mechanical Steno - Transcript by Computer

1    APPEARANCES:

2    United States Attorney's Office
     Lisa M. Asiaf, Assistant U.S. Attorney
3    Major Crimes Unit
     John Joseph Moakley U.S. Courthouse
4    One Courthouse Way, Suite 9200
     Boston, Massachusetts 02210
5    for the Plaintiff

6    Alan J. Black, Esquire
     1383 Main Street
7    Springfield, Massachusetts 01103
     for the Defendant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        P R O C E E D I N G S

2

3           THE CLERK:  All rise.  Court is now open.  You may be

4      seated.

5           Case No. 05-40025, United States versus Matthew Marsh.

6      Counsel, please note your appearance for the record.

7           MS. ASIAF:  Good afternoon, your Honor.  Lisa Asiaf on

8      behalf of the United States.

9           THE COURT:  Good afternoon.

10          MR. BLACK:  Good afternoon, your Honor.  Attorney Alan

11     Black for Mr. Marsh.

12          THE COURT:  All right.  Good afternoon.  I understand

13     that we are here for a change of plea pursuant to a plea

14     agreement; is that right, Ms. Asiaf?

15          MS. ASIAF:  That's correct, your Honor.

16          THE COURT:  All right.  Mr. Marsh, if you would please

17     take the stand.

18          Mr. Black, you may join him up there.

19          THE CLERK:  Please raise your right hand.

20                    MATTHEW MARSH, SWORN

21          THE CLERK:  Please be seated.

22          THE COURT:  All right.  Do you understand that you are

23     now under oath; and if you answer any of my questions falsely,

24     your answers may later be used against you in another

25     prosecution for perjury, or making a false statement?

1        THE DEFENDANT:  Yes, I do.

2        THE COURT:  What is your full name?

3        THE DEFENDANT:  Matthew Amos Marsh.

4        THE COURT:  How old are you?

5        THE DEFENDANT:  I'm 31.

6        THE COURT:  Can you move the microphone just a little

7   bit closer to your mouth, but not too close.

8        How far did you go in school?

9        THE DEFENDANT:  I did a semester of community college

10  after high school.

11       THE COURT:  Are you a citizen of the United States?

12       THE DEFENDANT:  Yes, I am.

13       THE COURT:  Have you been treated recently for any

14  mental illness, or psychiatric, or psychological problem of any

15  kind?

16       THE DEFENDANT:  Yes, I have.

17       THE COURT:  What is that?

18       THE DEFENDANT:  Rapid cycle bipolar disorder.

19       THE COURT:  I'm sorry.  Bipolar disorder?

20       THE DEFENDANT:  Yes, sir.

21       THE COURT:  And I didn't catch the first part of your

22  answer.

23       THE DEFENDANT:  Rapid cycle bipolar disorder.  It's a

24  form of bipolar.  It's just it's a rapid cycle, rather than the

25  normal cycle, I guess.

1          THE COURT:  Rapid cycle?

2          THE DEFENDANT:  Yes.

3          THE COURT:  And are you on any medication for that?

4          THE DEFENDANT:  No, sir.

5          THE COURT:  Are you receiving any treatment for that

6    at all?

7          THE DEFENDANT:  Yes, I am.

8          THE COURT:  What treatment are you receiving?

9          THE DEFENDANT:  Monthly counseling appointments with a

10   psychologist in the facility that I'm at.

11         THE COURT:  I'm sorry.  What was that?  I didn't catch

12   the ending.

13         THE DEFENDANT:  I have monthly psychology appointments

14   at the institution that I'm at.  I'm supposed to be on

15   medication, but I'm actually not on medication, because of the

16   adverse effects I have on that.  So I decline the medication.

17         THE COURT:  So you've tried the medication, and you

18   didn't like it, because of the adverse effects?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  So you're presently unmedicated?

21         THE DEFENDANT:  Yes.

22         THE COURT:  All right.  And does your disorder

23   interfere in any way with your ability to understand what's

24   going on here today?

25         THE DEFENDANT:  No, sir.

1          THE COURT:  Is there any doubt in your mind at all

2     that you understand what we're about to do here?

3          THE DEFENDANT:  No, sir.

4          THE COURT:  All right.  Mr. Black, is there any reason

5     you're aware of why we should not continue?

6          MR. BLACK:  Not at all.  I have been aware of his

7     mental illness for quite some time, and I have never had any

8     trouble being understood by him, understanding him,

9     communicating with him in any way, including up until today.

10          THE COURT:  Okay.  Mr. Marsh, have you been treated

11     recently for any drug problem, or alcohol problem, or addiction

12     of any kind?

13          THE DEFENDANT:  No, sir.

14          THE COURT:  As you sit here today, are you under the

15     influence of any drug, or medication, or alcoholic beverage of

16     any kind?

17          THE DEFENDANT:  No, sir.

18          THE COURT:  Have you received a copy of the indictment

19     pending against you, that is the written charges made against

20     you in this case?

21          THE DEFENDANT:  Yes, I have.

22          THE COURT:  Have you fully discussed those charges and

23     the facts and circumstances of your case with Mr. Black as your

24     lawyer?

25          THE DEFENDANT:  Yes, I have.

1          THE COURT:  Are you fully satisfied with the counsel

2    and representation and advice given to you in this case by Mr.

3    Black as your lawyer?

4          THE DEFENDANT:  Yes, I am.

5          THE COURT:  Do you understand that you have entered

6    into a plea agreement with the United States Government?

7          THE DEFENDANT:  Yes, I do.

8          THE COURT:  Did you sign it?

9          THE DEFENDANT:  Yes, I have.

10         THE COURT:  Is that your signature on the last page

11   there?

12         THE DEFENDANT:  Yes, it is.

13         THE COURT:  Ms. Asiaf, would you please summarize the

14   plea agreement.

15         MS. ASIAF:  Yes, your Honor.  The salient terms of the

16   plea agreement are as follows:  First, that the defendant will

17   plead guilty today to Counts 1 through 3 in the indictment.

18   The parties have agreed to the maximum penalties applicable to

19   Counts 1 through 3, which are set forth at paragraph two in the

20   plea agreement.

21         The parties took no position with respect to the

22   defendant's Criminal History Category, leaving it to probation,

23   with the exception of agreeing to the 1996 drug conviction upon

24   which his 851 information is based.

25         As to drug weight, the parties agree that the total

1     weight applicable here is between 5 and 20 grams of crack

2     cocaine; therefore, the defendant's base offense level, the

3     parties agree, is 26; and the government agreed that if the

4     defendant accepts responsibility today, that the Court should

5     decrease that by the three levels leaving an adjusted offense

6     level of 23.

7          The parties also agree to exchange any sentencing

8     motions at least seven days before the sentencing hearing.

9          Those are the main provisions of the plea agreement,

10    your Honor.

11         THE COURT:  Is there a waiver of appeal?

12         MR. BLACK:  No, there is not.

13         MS. ASIAF:  There is not.

14         MR. BLACK:  There is not.

15         THE COURT:  All right.  Mr. Marsh, do you understand

16    that that was only a summary of the plea agreement and that the

17    written plea agreement contains all of the terms to which you

18    have agreed?

19         THE DEFENDANT:  Yes, I do.

20         THE COURT:  Do you believe that you understand the

21    terms of the plea agreement?

22         THE DEFENDANT:  Yes, I do.

23         THE COURT:  Is this the only agreement that you have

24    with the United States Government?

25         THE DEFENDANT:  Yes, it is.

1          THE COURT:  Has anyone made any other, or different,

2     promise or assurance of any kind to you in an effort to get you

3     to plead guilty in this case?

4          THE DEFENDANT:  No, they haven't.

5          THE COURT:  Are you -- do you understand that the

6     terms of the plea agreement concerning sentencing are merely

7     recommendations to the Court?

8          THE DEFENDANT:  Yes.

9          THE COURT:  And I can reject those recommendations

10    without permitting you to withdraw your plea of guilty?

11         THE DEFENDANT:  Yes, I do.

12         THE COURT:  And do you understand that if I do reject

13    the recommendations, among the options I may have would be to

14    impose a sentence that's more severe than what you might

15    anticipate?

16         THE DEFENDANT:  Yes, I do.

17         THE COURT:  Has anyone attempted in any way to force

18    you to plead guilty in this case?

19         THE DEFENDANT:  No, they haven't.

20         THE COURT:  Are you pleading guilty of your own free

21    will, because you are, in fact, guilty?

22         THE DEFENDANT:  Yes, I am.

23         THE COURT:  Do you understand that the offenses to

24    which you are pleading guilty are felonies?

25         THE DEFENDANT:  Yes, I do.

1          THE COURT:  Do you understand if I accept your plea
2     you will be adjudged guilty of those offenses?
3          THE DEFENDANT:  Yes, I do.
4          THE COURT:  And do you understand that by being
5     adjudged guilty of felonies, you may lose valuable civil
6     rights, such as the right to vote, the right to hold public
7     office, the right to serve on a jury, and the right to possess
8     a gun, or another kind of firearm?
9          THE DEFENDANT:  Yes, I do.
10          THE COURT:  Ms. Asiaf, would you please state the
11     maximum possible penalties provided by law and any applicable
12     mandatory minimum penalty.
13          MS. ASIAF:  Yes, your Honor.  Due to the defendant's
14     prior conviction in a filing of the information under
15     Section 851, with respect to Count 1, the maximum penalties are
16     as follows -- and minimums:  At least ten years up to life, a
17     fine of up to $4 million, a term of supervised release of at
18     least eight years up to life, and a mandatory special
19     assessment of $100.
20          As to Counts 2 and 3, which are the distribution
21     counts, the defendant faces a term of imprisonment of up to 30
22     years, a fine of up to $2 million, a term of supervised release
23     of at least six years up to life, and a mandatory special
24     assessment of $100 on each count.
25          THE COURT:  All right.  Mr. Marsh, do you understand

1     that in terms of imprisonment that I will be required to

2     sentence you to at least ten years and may sentence you up to

3     life imprisonment?

4              THE DEFENDANT:  Yes, I do.

5              THE COURT:  And do you understand that I could also

6     impose a fine of up to $4 million?

7              THE DEFENDANT:  Yes, I do.

8              THE COURT:  And do you understand that I will be

9     required to give you a term of supervised release of at least

10    eight years and may impose a term up to life?

11             THE DEFENDANT:  Yes, I do.

12             THE COURT:  Do you understand that if you violate the

13    conditions of your supervised release that you could be given

14    additional time in prison?

15             THE DEFENDANT:  Yes, I do.

16             THE COURT:  Do you understand that in addition to

17    everything else that you'll be subject to a mandatory special

18    assessment of $100 on each count, for a total of $300?

19             THE DEFENDANT:  Yes, I do.

20             THE COURT:  Do you understand all of those possible

21    consequences of your plea; that is, a term of imprisonment of

22    at least ten years, the payment of a fine, a term of supervised

23    release of at least eight years, and the payment of special

24    assessment of $300?

25             THE DEFENDANT:  Yes, I do.

1          THE COURT:  All right.  I now want to talk to you

2     about the United States sentencing guidelines and how they

3     might affect your sentence.

4          The sentencing guidelines have been issued by the

5     United States Sentencing Commission for judges to follow in

6     determining a sentence in a criminal case.  They are not

7     mandatory.  I do not have to follow them.  Nonetheless, they

8     are important, and I will give them substantial weight in

9     determining your sentence.

10          Have you and Mr. Black talked about how the sentencing

11     guidelines might apply to your case?

12          THE DEFENDANT:  Yes, we have.

13          THE COURT:  Do you understand that I will not be able

14     to determine a guideline sentence for your case until after a

15     presentence report has been completed?

16          THE DEFENDANT:  Yes, I do.

17          THE COURT:  And do you understand that probation will

18     prepare that presentence report, and it will contain

19     a -- various facts about you and your criminal history, and it

20     will recommend an application of the sentencing guidelines?

21          THE DEFENDANT:  Yes, I do.

22          THE COURT:  Do you understand that both you and the

23     government will have the opportunity to challenge the facts

24     set forth in that report and the application of the guidelines

25     recommended by the probation office?

1            THE DEFENDANT:  Yes, I do.

2            THE COURT:  Do you understand that under the

3    guidelines themselves, I will have the authority in some

4    circumstances to depart and impose a sentence that is more

5    severe or less severe than what the guidelines call for?

6            THE DEFENDANT:  Yes, I do.

7            THE COURT:  And do you further understand that because

8    I'm not required to follow the guidelines, I also have the

9    authority to sentence you anywhere up to the maximum sentence

10   and at or above the minimum sentence provided that the sentence

11   I impose is reasonable under the circumstances?

12           THE DEFENDANT:  Yes, I do.

13           THE COURT:  And do you understand that you will not be

14   permitted to withdraw your plea of guilty, because your

15   sentence is longer than what you expected, because you are

16   unhappy with your sentence, or because it's different from any

17   sentence that your attorney may have predicted?

18           THE DEFENDANT:  Yes, I do.

19           THE COURT:  Do you understand that parole has been

20   abolished, and that if you are sentenced to prison you will not

21   be released on parole?

22           THE DEFENDANT:  Yes, I do.

23           THE COURT:  Do you understand that under some

24   circumstances you or the government may have the right to

25   appeal any sentence that I impose?

1          THE DEFENDANT:  Yes, I do.

2          THE COURT:  All right.  Do you understand that you

3     have the right to plead not guilty to any offense charged

4     against you and to go to trial?

5          THE DEFENDANT:  Yes, I do.

6          THE COURT:  Do you understand that you have the right

7     to a trial by jury?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Do you understand that at such a trial you

10    would be presumed to be innocent, and the government would have

11    to prove your guilt beyond a reasonable doubt?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Do you understand that at such a trial you

14    would have the right to the assistance of counsel for your

15    defense?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Do you understand that at such a trial you

18    would have the right to see and hear all the witnesses and to

19    have them cross-examined in your defense?

20         THE DEFENDANT:  Yes.

21         THE COURT:  Do you understand that at such a trial you

22    would have the right to require witnesses to appear and

23    testify?

24         THE DEFENDANT:  Yes, I do.

25         THE COURT:  And do you understand that you would have

1    the right to refuse to testify, unless you voluntarily elected
2    to do so?

3              THE DEFENDANT:  Yes, I do.

4              THE COURT:  Do you understand that if you decided not
5    to testify, or not to put on any evidence, that those facts
6    could not be used against you?

7              THE DEFENDANT:  Yes.

8              THE COURT:  Do you further understand that by entering
9    a plea of guilty here today, that if I accept your plea, there
10   will be no trial, and you will have waived, or given up, your
11   right to a trial, as well as the rights that come with a trial?

12             THE DEFENDANT:  Yes.

13             THE COURT:  Ms. Asiaf, would you please summarize the
14   three charges describing the elements -- the essential elements
15   of the offenses charged.

16             MS. ASIAF:  Yes, your Honor.  Count 1 is a charge of
17   conspiracy to distribute cocaine base, and there are three
18   elements to that charge:  First, that the agreement charged in
19   the indictment, that is to possess with intent to distribute or
20   to distribute cocaine base, also known as crack, existed
21   between the defendant and at least one other person; second,
22   that the defendant willfully joined in that agreement; and
23   third, that the defendant intended to effectuate the object of
24   that conspiracy here to distribute 5 grams or more of crack
25   cocaine.

1    With respect to Counts 2 and 3, which are distribution

2    counts, there are three elements:  First, that on or about the

3    date alleged here, November 9th, 2004, the defendant

4    transferred cocaine base, also known as crack cocaine, to

5    another person, or possessed it with intent to transfer it to

6    another person; second, that the defendant knew that the

7    substance was a controlled substance; and third, that the

8    defendant acted intentionally, that is that it was his

9    conscious object to transfer the controlled substance to

10   another person.

11        THE COURT:  All right.  Ms. Asiaf, would you please

12   state the factual basis for the plea, that is what the

13   government would be prepared to prove if this case were to go

14   to trial.

15        MS. ASIAF:  Yes, your Honor.  If this case were to go

16   to trial, the government would prove the following facts beyond

17   a reasonable doubt:  First, that from at least October 2004,

18   through their arrest on November 9, 2004, the defendant Matthew

19   Marsha assisted his codefendant Nydia Bernabel in distributing

20   crack cocaine to customers in the City of Fitchburg,

21   Massachusetts.  During this time period, defendant drove

22   Bernabel around to obtain crack cocaine from her sources and to

23   deliver it to her customers.  Bernabel has a very poor driving

24   record, including several suspended licenses, so she needed

25   Marsh to drive her around.  Bernabel paid the defendant for his

1    services by giving him crack cocaine for his personal use in

2    lieu of money.

3        The government would prove that the investigation

4    began on or about October 21st, 2004, when a confidential

5    informant working with the DEA, the Drug Enforcement

6    Administration, who I will refer to as the CI, called Bernabel

7    and arranged to introduce her to an undercover DEA agent, who

8    was posing as a crack customer.  They agreed to meet on

9    Leighton Street in Fitchburg where Bernabel agreed to sell $200

10   worth of crack cocaine to the undercover agent.

11       She told the CI, however, that she wasn't working that

12   night so she would send a courier.  The deal did take place

13   that evening on the corner of Leighton and Foster Street in

14   Fitchburg.  The CI and undercover agent met with Bernabel's

15   courier and exchanged $200 for the crack cocaine.  The courier,

16   who was in the car, gave the CI permission to give Bernabel's

17   cell phone number to the undercover agent so he could schedule

18   further crack cocaine customers -- crack cocaine deals with

19   her.

20       The DEA sent that package to a lab, which confirmed

21   that there was 3.3 grams of cocaine base sold to the undercover

22   from Ms. Bernabel.

23       With respect to Count 2, on November 9th, 2004, at

24   approximately 5:00 p.m., the undercover agent called Bernabel

25   directly using that number she got at the end of -- he got at

the end of October.  The undercover and Bernabel agreed to meet on Leighton Street again in about an hour, where she would sell eight $40 bags, which was 24 grams each, of crack cocaine to the undercover agent for $320.  At approximately ten minutes to 6:00, Bernabel and the defendant Matthew Marsh arrived to meet the undercover agent on Leighton Street as planned.

The two codefendants arrived in a Jeep Cherokee. Bernabel was driving, and Mr. Marsh was seated in the passenger seat.  The undercover agent approached the driver's side window and asked if the drugs looked good.  As she replied affirmatively, Mr. Marsh placed a package of crack cocaine in her hand, which she displayed to the undercover agent.  The undercover agent then explained to Bernabel that he only had $300, rather than the agreed upon 320.  She said not to worry about it and gave him the package of crack cocaine and took the $300.  Bernabel then handed the $300 to Mr. Marsh, who counted the money.

The DEA sent that package to a laboratory, which confirmed that Mr. Marsh and Bernabel sold 1.7 grams of cocaine base to the undercover that night.

A short time later, again on November 9, 2004, a second confidential informant, who I will refer to as CI No. 2, met with members of the DEA drug task force and said he could set up a crack deal with Ms. Bernabel.  CI No. 2 set up the meeting where he would introduce another undercover DEA agent

1   posing as a crack customer to Bernabel at a $600 crack

2   transaction.  On a recorded telephone call, CI No. 2 called Ms.

3   Bernabel to confirm the deal.  Again, she agreed to meet CI

4   No. 1 and CI No. 2 for the deal.  This time they met on Birch

5   Street, across from St. Anthony's School in Fitchburg.  At

6   approximately 6:30, the same Jeep Cherokee, occupied by the

7   defendant and Ms. Bernabel arrived at the meeting location and

8   pulled up alongside CI No. 2 and the second undercover agent.

9   This time, Mr. Marsh was in the driver's seat, and Ms. Bernabel

10  was in the passenger seat.

11        Bernabel rolled down the window, and CI No. 2

12  introduced undercover agent No. 2 to her.  Bernabel then handed

13  a package of crack cocaine to the undercover agent in exchange

14  for $600.

15        DEA sent that substance to a lab, which confirmed that

16  that consisted of 4.7 grams of cocaine base.

17        Approximately half an hour later, a Fitchburg patrol

18  officer pulled that Jeep Cherokee over for an investigatory

19  stop.  Both the defendant, Matthew Marsh, and Ms. Bernabel,

20  produced identification showing that they were, in fact, the

21  occupants of that Jeep Cherokee.  The police officer ran the

22  plates and the identifications and learned that the Jeep was

23  unregistered and both defendants had outstanding warrants.

24  They were both placed under arrest and booked at the Fitchburg

25  Police Station.

1          During booking, the officer seized 18 currency bills

2     from Ms. Bernabel, which were -- which matched the serialized

3     numbers used in the crack cocaine deal.  The government would

4     also prove that all of these transactions making up Counts 1

5     through 3 were recorded and observed by surveillance agents,

6     and that after each sale experienced agents observed the

7     substance that Bernabel and Marsh sold to the undercovers, and

8     that it looked like crack cocaine.

9          In summary fashion, your Honor, that's what the

10    government would prove if this case did go to trial.

11         THE COURT:  All right.  Mr. Marsh, do you disagree

12    with anything in the government's description of the facts?

13         (Defendant conferred with counsel.)

14         MR. BLACK:  Mr. Marsh doesn't understand the very

15    first set of facts that Ms. Marsh -- I'm sorry -- that Ms.

16    Asiaf read, seeming to feel that that didn't apply to him.  I

17    don't know what he's referring to, but it was the very first.

18         THE COURT:  Why don't you repeat it quickly, if you

19    would, Ms. Asiaf.

20         MS. ASIAF:  Repeat it, or --

21         THE COURT:  Just the first transaction.

22         MR. BLACK:  The first transaction.

23         MS. ASIAF:  The first transaction took place on or

24    about October 21st. That is when the investigation began.  The

25    investigation began when the CI began working with DEA, and

1    arranged -- called Bernabel and arranged to introduce her to an

2    undercover agent, the UC that was in the second deal, who was

3    posing as a crack customer.  They agreed to meet on Leighton

4    Street in Fitchburg, where Bernabel agreed to sell $200 worth

5    of crack cocaine to the undercover agent.  She told the CI she

6    wasn't working, so she would send a courier to Leighton Street

7    to deliver the crack for her.  The deal took place that evening

8    on the corner of Leighton and Foster Streets in Fitchburg.  The

9    CI and undercover met Bernabel's courier and exchanged $200 for

10   the crack cocaine.  The courier, who was driving, gave the CI

11   permission to give Bernabel's cell phone number to the

12   undercover agent so that he could contact Bernabel directly to

13   set up future crack cocaine deals.

14        And that package was sent to a lab, which confirmed it

15   was 3.3 grams of crack cocaine that Bernabel sent -- sold to

16   the undercover agent.  And the government concludes that those

17   facts, your Honor, only to put context to how the undercover

18   agent got the cell phone number and started beginning to deal

19   with Bernabel directly, how the November 9th deal was

20   ultimately arranged, and because the Count 1 charges that

21   beginning in or about October 2004, that's the beginning of the

22   conspiracy period, so --

23        MR. BLACK:  He understands -- he understands now, your

24   Honor, and he was just confused by why that was mentioned, and

25   he wasn't involved, but he understands that was just

1    contextual.

2        THE COURT:  All right.  And you understand Count 1 is

3    conspiracy count, which means to say that you're held

4    responsible for all the acts of your coconspirators.  With

5    regard to drug weight, it has to be the amount that is

6    attributable to you.  It's a little bit different standard.

7        But do you understand that, that you are charged with

8    a conspiracy, and the facts she has related described what

9    appear to be the beginning of the conspiracy?

10       THE DEFENDANT:  Yes, I do.

11       THE COURT:  All right.  Let me ask you now about drug

12   weight.  Do you agree that the total weight of drugs for which

13   you are responsible is between 5 and 20 grams of cocaine base?

14       THE DEFENDANT:  It has come to realization after the

15   lab reports came back, but at the time I didn't know how much

16   drugs -- how much weight was being sold.

17       THE COURT:  As you sit here today, do you admit that

18   the total weight of the cocaine base was between 5 and 20

19   grams?

20       THE DEFENDANT:  Yes, I do.

21       THE COURT:  And do you admit the cocaine base was in

22   the form of crack cocaine?

23       THE DEFENDANT:  Yes, I do.

24       THE COURT:  Okay.  All right.  Is there any reason I

25   should not take the plea?

1           Ms. Asiaf.

2           MS. ASIAF:  No, your Honor.

3           THE COURT:  Mr. Black.

4           MR. BLACK:  No, your Honor.

5           THE COURT:  All right.  I will take the change of

6   plea.

7           THE CLERK:  Please stand.  Matthew Marsh, on Criminal

8   No. 05-40025, on Counts 1 through 3 of a three-count

9   indictment, you have previously pled not guilty.

10          Do you now wish to change your plea?

11          THE DEFENDANT:  Yes, I do.

12          THE CLERK:  What say you now as to Count 1, guilty or

13  not guilty?

14          THE DEFENDANT:  Guilty.

15          THE CLERK:  As to Count 2, guilty or not guilty?

16          THE DEFENDANT:  Guilty.

17          THE CLERK:  As to Count 3, guilty or not guilty?

18          THE DEFENDANT:  Guilty.

19          THE CLERK:  You may be seated.

20          THE COURT:  All right.  It is the finding of the Court

21  in the case of the United States versus Matthew Marsh that the

22  defendant is fully competent and capable of entering an

23  informed plea; that the defendant is aware of the nature of the

24  charges and the consequences of the plea; and that the plea of

25  guilty is a knowing and voluntary plea supported by an

1   independent basis in fact containing each of the essential

2   elements of the offense.

3           The plea is therefore accepted, and the defendant is

4   now adjudged guilty of the offenses charged.

5           Mr. Marsh, a written presentence report will be

6   prepared by probation to assist me in determining your

7   sentence, as I indicated.

8           You will be asked to give information for that report.

9   Your attorney may be present, if you wish.  It is important

10  that the report be accurate, as accurate as you can make it.

11  It will affect not only your sentence; but if you are sentenced

12  to prison, it will affect such things as where you are assigned

13  and what happens to you when you get there.

14          So no detail is too small to correct if it isn't

15  correct -- if it isn't right.

16          Obviously, you and your counsel will have an

17  opportunity to read the report and to file any objections

18  before the time of sentencing; and both you and your lawyer

19  will have the opportunity to speak on your behalf at the

20  sentencing.

21          I'm therefore going to refer you to the probation

22  office for the presentence investigation and report.  I'm going

23  to set the date of sentencing for Tuesday, January 16, 2007, at

24  three o'clock p.m.

25          Does that date work for both counsel?

1          Mr. Black.

2          MR. BLACK:  It works for me, your Honor.

3          THE COURT:  Ms. Asiaf.

4          MS. ASIAF:  Yes, your Honor.

5          THE COURT:  All right.  Tuesday, January 16th at 3:00.

6          I think the last issue prior to the issue of detention

7    is I understand the United States has filed an information

8    under Section 851; is that right, Ms. Asiaf?

9          MS. ASIAF:  That is correct, your Honor.

10         THE COURT:  All right.  Mr. Marsh, I am required after

11   your plea of guilty, but before I pronounce sentence, to

12   inquire of you whether you affirm or deny that you have been

13   previously convicted as alleged in this information.  The

14   information alleges that on or about September 6, 1996, Matthew

15   Marsh, the defendant herein, was convicted in the United States

16   District Court for the District of Massachusetts, Boston,

17   Massachusetts, of conspiracy to import cocaine base in

18   violation of 21 USC Section 963; importation of cocaine base in

19   violation of 21 USC, Section 952; and possession with intent to

20   distribute cocaine base in violation of 21 USC, Section 841(a)(1)

21   in the case of the United States versus Matthew Marsh, Criminal

22   Docket No. 95-10244-REK.

23         Do you affirm or deny that you were previously

24   convicted as alleged in the information?

25         THE DEFENDANT:  I affirm, your Honor.

1           THE COURT:  You affirm it?

2           THE DEFENDANT:  Yes, sir.

3           THE COURT:  All right.  Then I advise you that any

4   challenge to a prior conviction, which is not made before

5   sentence is imposed, may not thereafter be raised to attack the

6   sentence.

7           Is there anything further on the 851?

8           MS. ASIAF:  No, your Honor.

9           THE COURT:  Mr. Black, anything further on that score?

10          MR. BLACK:  No, your Honor.

11          THE COURT:  All right.  I understand that the

12   defendant has been detained pending sentence; is that right?

13          MS. ASIAF:  That's correct, your Honor.

14          THE COURT:  All right.  I will order he remain

15   detained pursuant to Section 3143(a)(2).

16          Is there anything further, Ms. Asiaf?

17          MS. ASIAF:  Nothing, your Honor.

18          THE COURT:  Mr. Black.

19          MR. BLACK:  Nothing, your Honor.

20          THE COURT:  All right.  Thank you.  We will stand in

21   recess.

22          (At 2:38 p.m., the Court was adjourned.)

23

24

25

1               C E R T I F I C A T E

2

3          I, Marianne Kusa-Ryll, Certified Realtime

4    Reporter, do hereby certify that the foregoing transcript,

5    consisting of 26 pages inclusive, is a true and accurate

6    transcription of my stenographic notes in Case No. 05-40025,

7    United States of America versus Matthew Marsh, before F. Dennis

8    Saylor, IV, on October 23, 2006, to the best of my skill,

9    knowledge, and ability.

10

11

12                         *Marianne Kusa-Ryll*

13                    Marianne Kusa-Ryll, RMR, CRR

14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

# **<u>EXHIBIT B</u>**

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

LEOMINSTER DISTRICT COURT
9961CR1900

COMMONWEALTH            )
                        )
                        )
                        )
V.                      )
                        )
                        )
MATTHEW MARSH.          )

## DEFENDANT'S MOTION FOR A NEW TRIAL

Now comes the Defendant, and pursuant to Mass. R. Crim. P. 30(b), moves that this Honorable Court allow him to withdraw his plea to Resisting Arrest under C. 268, Section 32B and allow a new trial on the above-captioned complaint.

As cause therefore, as set forth more fully in the attached affidavits and memorandum of law incorporated herein by reference, the defendant states that he was deprived of rights guaranteed to him under Article XII of the Massachusetts Declaration of Rights and the Sixth and Fourteenth Amendments to the Constitution of the United States, because of his incompetency to understand and subsequently waive his right and enter a plea at the time the plea was entered.

The defendant did not possess a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding or a factual understanding of the proceedings against him as required under both the Constitutions of the United States, the Commonwealth of Massachusetts and the courts of both the above mentioned jurisdictions.

Further, the defendant alleges that he was deprived of rights guaranteed to him under Article XII of the Massachusetts Declaration of Rights and the Fifth and Fourteenth Amendments to the Constitution of the United States, because his plea was not voluntary. The defendant's plea was not a voluntary expression of his own choice because it did not constitute a knowing and

intelligent act done with sufficient awareness of the relevant circumstances and the likely consequences.

The Defendant requests a hearing on this motion and requests that the case be sent out to the judge who took the plea, Judge Mandell. Time is of the essence on this motion as it appears that because of the two prior convictions for resisting arrest, the defendant has been classified as a career offender in federal court and on March 23, 2007 is facing 30 to life in Worcester Federal District Court.

The Defendant further requests that the exhibits be made part of the record of the Motion for a New Trial and are therefore attached to this Motion as Exhibits 1-5.

Respectfully submitted,

THE DEFENDANT

By:_____
ALAN JAY BLACK
1383 Main Street
Springfield, MA 01103
(413) 732-5381
BBO# 553768

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.                          LEOMINSTER DISTRICT COURT
                                       9961CR1900

COMMONWEALTH              )
                          )
                          )
                          )
V.                        )
                          )
                          )
MATTHEW MARSH,            )

MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION FOR A NEW TRIAL

Prior Proceedings

On October 22, 1999, the defendant was charged with resisting arrest under M.G.L. c..
268, Section 32B, with disturbing the peace under M.G.L. c. 272, Section 53, with disorderly
conduct under M.G.L. c. 272, Section 53F and with assault and battery on a police officer under
M.G.L. c. 265, Section 13D. (See exhibits 1-2) On January 13, 2000 the defendant entered into a
plea to the resisting arrest and disorderly person charges. The other two charges were dismissed
upon request of the commonwealth. (See exhibits 1 and 2)  The defendant was sentenced to a
$100. fine on the resisting arrest and disorderly person charges. (Exhibits 1 and 2)

Facts

On October 22, 1999, Leominster Police were called to the Denny's Coffee Shop where
the defendant was sitting at a table causing a disturbance by throwing food and yelling at other
customers. (See Exhibit 4) Marsh was observed by the officers to be incoherent and severely
incapacitated. (See Exhibit 4) While being put in the cruiser, the defendant began to thrash and
kick the officers. (Exhibit 4) Pepper spray was used by the police. (Exhibit 4) In the defendant's
affidavit, the defendant swore under pains and penalties of perjury that he suffers from a bi-polar
disorder, which when untreated causes him to behave in a manic manner. (Affidavit of

Defendant) The defendant further avers that he was not on medication at the time of this incident and plea. (Affidavit of Defendant) The defendant finally avers that at the time of this plea he was not medicated which exacerbated his bi-polar symptoms, which prevented him from understanding the consequences of the plea, and prevented him from making voluntary and rational decisions. (Affidavit of Defendant)

## Motion for a New Trial

Attached to the defendant's motion for a new trial are affidavits submitted by the defendant, present counsel, and Dr. Ronald Ebert.

The defendant has pled guilty to drug charges out of the Federal District Court in Worcester. Dr. Ebert was appointed to conduct an evaluation for purposes of the Federal Sentencing Guidelines. (Exhibit 5) Specifically, Dr. Ebert concluded that Mr. Marsh sufferers from bipolar disorder, alcohol and cocaine addiction and posttraumatic stress disorder. (Exhibit 5) He further stated that these mental diseases have caused sever deficits in his functioning and that jointly these problems cause the defendant to engage in self-destructive, self sabotaging behaviors and to be vulnerable to the influence of other. (Exhibit 5) Specifically in his affidavit Dr. Ebert states that by reviewing the defendant's actions at the time of his arrest he can conclude to a reasonable degree of medical certainty that at the time of the defendant's plea he was not medicated and this would certainly exacerbate his bi-polar disorder which would impair his ability to made a waiver that is knowing and intelligent and that is a product of clear and rational thought. (Affidavit of Dr. Ebert)

## Discussion

## I

**Did the Defendant possess a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and did he possess a rational as well as factual understanding of the proceedings against him?**

Both the United States Supreme Court and the Supreme Judicial Court of the Commonwealth of Massachusetts have ruled that the competency standard to plead guilty is the same as the standard of incompetence to stand trial. Godinez v. Moran, 509 U.S. 389, 396-401 (1993); and Commonwealth v. L'Abbe, 421 Mass. 262, 268 (1995).

Therefore, the test is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him. Godinez v. Moran, 509 U.S. 389, 396-401 (1993); United States v. Lebron, 76 F.3d 29, 31 (1st Cir. 1995); and Commonwealth v. Russin, 420 Mass. 309, 316-317 (1995).

In the case at hand, the affidavit of Dr. Ebert Specifically, Dr. Ebert concluded that Mr. Marsh sufferers from bipolar disorder, alcohol and cocaine addiction and posttraumatic stress disorder. (Exhibit 5) He further stated that these mental diseases have caused sever deficits in his functioning and that jointly these problems cause the defendant to engage in self-destructive, self sabotaging behaviors and to be vulnerable to the influence of other. (Exhibit 5) Specifically in his affidavit Dr. Ebert states that by reviewing the defendant's actions at the time of his arrest he can conclude to a reasonable degree of medical certainty that at the time of the defendant's plea he was not medicated which would exacerbate his bi-polar symptoms and this would therefore impair his ability to made a decision that is a product of clear and rational thought. (Affidavit of Dr. Ebert) This would make this plea involuntary under the laws of the Commonwealth of Massachusetts.

Therefore, it cannot be said that the defendant had at the time of his plea a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and that he had a rational as well as factual understanding of the proceedings against him. Godinez v. Moran, 509 U.S. 389, 396-401 (1993); United States v. Lebron, 76 F.3d 29, 31 (1st Cir. 1995); and Commonwealth v. Russin, 420 Mass. 309, 316-317 (1995).

## II

**Was the Defendant's plea a voluntary expression of his own choice in so much that the plea was intelligently made and a knowing, intelligent act done with sufficient awareness of the relevant circumstances and the likely consequences?**

Guilty pleas in order to be valid must be both equally intelligent and voluntary. <u>Godinez v. Moran</u>, 509 U.S. 389, 399 (1993); and <u>Commonwealth v. Quinones</u>, 414 Mass. 423 (1993). The Constitution requires that under the inevitable pressures and uncertainties, the accused, guided by counsel, shall have a fair understanding of alternatives in the degree that his intelligence permits, and make a choice in that light. <u>Parke v. Raley</u>, 506 U.S. 20, 28 (1992). In order for a plea to be found involuntary, there must be a showing or a peculiar susceptibility which rendered the defendant "so gripped of fear . . . that he . . . could not . . . rationally weight the advantages of going to trial against the advantages of pleading guilty. <u>Brady v. United States</u>, 397 U.S. 742, 750 (1970); and <u>Commonwealth v. Tirrell</u>, 382 Mass. 502 (1981).

According to Dr. Ebert one of the significant factors of the defendant's bipolar disorder is his vulnerability to being influenced by events around him. In light of the observed behavior of the defendant in the police report, the defendant's impaired capacity for understanding and to make decisions which are a product of clear and rationale thought had been significantly impaired. (Exhibit 5 and Affidavit of Dr. Ebert)

Therefore, a showing was made that the defendant at the time of his change of plea was "so gripped of fear . . . that he . . . could not . . . rationally weight the advantages of going to trial against the advantages of pleading guilty. <u>Brady v. United States</u>, 397 U.S. 742, 750 (1970); and <u>Commonwealth v. Tirrell</u>, 382 Mass. 502 (1981).

## III

**Was the Defendant deprived of his constitutional right to effective assistance of counsel by his attorney's failure to investigate, prepare, present an adequate defense and to advise the defendant adequately as to which defenses were available to him and also was the defendant unable to understand his attorney's advise and participate in his defense due to his incompetency which was not brought to light due to ineffective assistance of counsel?**

As with any defendant accused of a crime, Matthew Marsh enjoyed a constitutionally guaranteed right to effective assistance of counsel. U.S. Const., Amend. XI, XIV; Mass. Decl. of Rights, Art. XII; Strickland v. Washington, 466 U.S. 668 (1984); Commonwealth v. White, 409 Mass. 266 (1991); Commonwealth v. Satterfield, 373 Mass. 109 (1977); Commonwealth v. Saferian, 366 Mass. 89 (1974). That right is violated when "serious incompetency, inefficiency, or inattention of counsel--behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer--and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defense." Id. at 96.

The Court ruled in Commonwealth v. Haggerty, 400 Mass. 437, 441-442 (1987) that "this is not a case where 'where arguably reasoned tactical or strategic judgments . . . are called into question . . .'" Id quoting Commonwealth v. Rondeau, 378 Mass. 408, 413 (1979). "Rather, in this case, defense counsel did not investigate the only realistic defense the defendant had to the charge of murder in the first degree." Id. "In that respect, it is analogous to those cases where, at trial, defense counsel abandons the only defense available to a defendant and leaves the defendant without any defense at all." Id citing Commonwealth v. Westmoreland, 388 Mass. 269 (1983); Commonwealth v. Street, 388 Mass. 281 (1983). "Failure to investigate the only defense a defendant has, if facts known to or with minimal diligence accessible to counsel support that defense, falls beneath the level of competence expected." Id, citing Osborne v. Commonwealth, 378 Mass. 104, 111 (1979); Commonwealth v. Cepulonis, 9 Mass. App. Ct. 302, 305 (1980).

Furthermore, in addressing the validity of a guilty plea, the Supreme Court in Boykin v. Alabama, 395 U.S. 238 (1969), stated that "admissibility of a confession must be based on a 'reliable determination on the voluntariness issue which satisfies the constitutional rights of the defendant." Jackson v. Denno, 378 U.S. 368 (1964). "The requirement that the prosecution put on the record the prerequisites of a valid waiver is no constitutional innovation." Boykin v.

Alabama, 395 U.S. 238 (1969). "Ignorance, incomprehension, coercion, terror, inducements, subtle or blatant threats might be a perfect cover-up of unconstitutionality." Id.

Due to the fact that a guilty plea involves these constitutional rights, "the plea is valid only when the defendant offers it voluntarily, with sufficient awareness of the relevant circumstances, and with the advise of competent counsel. Commonwealth v. Fernandez, 390 Mass. 714, 715, (1983).

Where a defendant enters a guilty plea upon counsel's advise, the voluntariness of the plea depends upon whether the advice "was within the range of competence demanded of attorneys in criminal cases. Commonwealth v. Chetwynde, 31 Mass. App. Ct. 8, 12 (1991); Hill v. Lockhart, 474 U.S. 52, 56, 59 (1985).

In determining whether that level of competence has been met, the courts in Massachusetts are guided by the standard stated above which defines incompetence as that behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defense." Commonwealth v. Saferian, 366 Mass. 89, 96 (1974); Commonwealth v. Triplett, 398 Mass. 561, 568 (1986); Commonwealth v. Montanez, 410 Mass. 290, 295 (1991)

In the case at hand trial counsel never brought to the attention of the trial judge at the time of the plea, any problem with defendant's mental health. This was the case in spite of the fact that the defendant had a serious mental health issue, which was manifested by his behavior at the time of his arrest.

The second prong of the Saferian test is that the defendant must make some showing that better work might have accomplished something material for the defense. Commonwealth v. Saferian, 366 Mass. at p. 96; Commonwealth v. Satterfield, 373 Mass. 109, 115 (1977). In circumstances involving a motion to withdraw a guilty plea this prong has been interpreted to mean whether the defendant was so misled by counsel's alleged ineffective and false advise that

he prematurely waived his right to a jury trial. <u>Commonwealth v. Chetwynde</u>, 31 Mass. App.
Ct.8, 14 (1991).

In the case at hand, if trial counsel asked the defendant about his mental health history,
the defendant might not have been allowed to plea guilty. Certainly, the defendant was misled by
counsel's ineffectiveness to such an extent that he involuntarily waived his right to a jury trial. <u>Id</u>.

Conclusion

For the foregoing reasons, the defendant was deprived of his right to effective assistance
of counsel, was incompetent at the time of his plea, and his plea was therefore not voluntary,
which is why the defendant pled to second degree murder. Therefore, this court should afford
him a new trial or order an evidentiary hearing.

Respectfully submitted,

THE DEFENDANT

By:_____
ALAN JAY BLACK
1383 Main Street
Springfield, MA 01103
(413) 732-5381
BBO# 553768

1

## COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.                    LEOMINSTER DISTRICT COURT
                                  9961CR1900

COMMONWEALTH           )
                       )
                       )
                       )
V.                     )
                       )
                       )
MATTHEW MARSH.         )

### AFFIDAVIT OF MATTHEW MARSH

1. I am the defendant in the above entitled matter

2. I have pled guilty to a federal drug charge, in Federal District Court in Worcester, MA

3. On March 23, 2007 I am going to be sentenced on the Federal drug charges.

4. I suffer and have suffered for most of my life from bi-polar disorder and PTSD based upon abuse from my father as a child.

5. I tend to self medicate with alcohol and cocaine and therefore suffer from alcohol and drug addiction issues as well.

6. On October 22, 1999, I was charged with resisting arrest under M.G.L. c.. 268, Section 32B, with disturbing the peace under M.G.L. c. 272, Section 53, with disorderly conduct under M.G.L. c. 272, Section 53F and with assault and battery on a police officer under M.G.L. c. 265, Section 13D. (See exhibits 1-2)

7. On January 13, 2000, I entered into a plea to the resisting arrest and disorderly person charges.

8. The other two charges were dismissed upon request of the commonwealth. (Exhibits 1 and 2)

9. I was sentenced to a $100. fine on the resisting arrest and disorderly person charges. (Exhibits 1 and 2)

10. I suffer from a bi-polar disorder, which when untreated causes me to behave in a manic manner.

11. I am supposed to take certain medication to control this disorder, but the medication causes side effects, which make it difficult to take.

12. I was not on medication at the time of this incident and plea.

13. At the time of this plea I was suffering from a manic episode, which prevented me from understanding the consequences of the plea, and prevented me from making voluntary and rational decisions.

14. These issues have caused severe deficits in my functioning and that these problems cause me to engage in self-destructive, self-sabotaging behaviors and to be vulnerable to the influence of others.

15. At the time of plea, I just wanted to get the case over with.

16. My lawyer told me to plea and I did.

17. I did not really understand what the consequences of this plea was, nor did I really understand what was going on around me.

18. At the time of my plea, I was suffering from a manic episode and this impaired my ability to made a decision that was knowing and intelligent.

MATTHEW MARSH          3/8/07

# COMMONWEALTH OF MASSACHUSETTS

Leominster District Court                    Docket #: 9961cr1900

| | |
|---|---|
| Commonwealth | ) |
| | ) |
| **vs.** | ) |
| | ) |
| | ) |
| Matthew Marsh (2) | ) |
| | ) |

## AFFADIVIT OF RONALD S. EBERT, PH.D.

1. My name is Ronald S. Ebert, Ph.D.

2. I was retained by attorney Alan J. Black to conduct an evaluation of his client, Matthew marsh. I interviewed Mr. Marsh on 2/1/07 and 2/23/07, conducted a psychological evaluation and I administered psychological tests. Based upon my assessment, it was my opinion that Mr. Marsh suffers from a major mental illness misdiagnosed as bipolar disorder with manic episodes. I also determined that he suffers from posttraumatic stress disorder and has an alcohol and cocaine addiction (report attached).

3. It was my further professional opinion that he is severely impaired by his mental health problems and when not medicated and abusing substances, can act out in irrational and aggressive behaviors.

4. I have reviewed a police report from the Leominster Police Department of an incident that occurred 10/22/99. Mr. Marsh was causing a disturbance in a coffee shop and was described by police as "making loud incoherent noises," "could not speak" and when being booked "had difficulties with his name, address and date of birth."

5. I have reviewed a police report from the Fitchburg Police Department of an incident that occurred on 4/30/04. Mr. Marsh had to be restrained by police because he was "agitated." It is noted that when he was put into the police car he banged his head on the glass barrier "five to six times" and the police "kept telling him to relax before he hurt himself." During booking "he would not stop yelling."

6. Based on material that I have reviewed it appears that Mr. Marsh entered pleas in both cases.

7. It is my current opinion to a reasonable degree of psychological certainty that on both 10/22/99 and 4/30/04, Mr. Marsh was suffering from symptoms of his major mental illness such as agitation, disorganization, confusion and self destructive behaviors. In addition, Mr. Marsh has reported to me that he does not cooperate with medication and appears not to have been taking medication at those times. He may have been abusing substances, which only worsens his psychiatric condition.

8. It is further my opinion to a reasonable degree of psychological certainty that Mr. Marsh's untreated mental illness continued through the periods that he entered pleas. In his untreated state he would not have had the ability to make a waiver that was knowing and intelligent or a product of a clear and rational thought.

Submitted under pains of penalty this 8th day of March, 2007.

Ronald S. Ebert, Ph.D.
Diplomate in Forensic Psychology, American
Board of Professional Psychology
Director, Psychological Services, Inc.
Senior Consulting Forensic Psychologist, McLean Hospital
Psychologist, Harvard Medical School

RSE/ys

Enclosure: (1)

**<u>Enclosure to Ebert Affidavit Omitted</u>**
**(Psychological Evaluation Report dated March 5, 2007)**
**(attached to PSR)**

**EXHIBIT C**

# COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

FITCHBURG DISTRICT COURT
0416CR000938

COMMONWEALTH )
)
)
)
V. )
)
)
)
MATTHEW MARSH. )

## DEFENDANT'S MOTION FOR A NEW TRIAL

Now comes the Defendant, and pursuant to Mass. R. Crim. P. 30(b), moves that this Honorable Court allow him to withdraw his plea to Resisting Arrest under C. 268, Section 32B and allow a new trial on the above-captioned complaint.

As cause therefore, as set forth more fully in the attached affidavits and memorandum of law incorporated herein by reference, the defendant states that he was deprived of rights guaranteed to him under Article XII of the Massachusetts Declaration of Rights and the Sixth and Fourteenth Amendments to the Constitution of the United States, because of his incompetency to understand and subsequently waive his right and enter a plea at the time the plea was entered.

The defendant did not possess a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding or a factual understanding of the proceedings against him as required under both the Constitutions of the United States, the Commonwealth of Massachusetts and the courts of both the above mentioned jurisdictions.

Further, the defendant alleges that he was deprived of rights guaranteed to him under Article XII of the Massachusetts Declaration of Rights and the Fifth and Fourteenth Amendments to the Constitution of the United States, because his plea was not voluntary. The defendant's plea was not a voluntary expression of his own choice because it did not constitute a knowing and

intelligent act done with sufficient awareness of the relevant circumstances and the likely consequences.

The Defendant requests a hearing on this motion and requests that the case be sent out to the judge who took the plea, Judge Mandell. Time is of the essence on this motion as it appears that because of the two prior convictions for resisting arrest, the defendant has been classified as a career offender in federal court and on March 23, 2007 is facing 30 to life in Worcester Federal District Court.

The Defendant further requests that the exhibits be made part of the record of the Motion for a New Trial and are therefore attached to this Motion as Exhibits 1-6.

Respectfully submitted,

THE DEFENDANT

By:_____
ALAN JAY BLACK
1383 Main Street
Springfield, MA 01103
(413) 732-5381
BBO# 553768

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.                          FITCHBURG DISTRICT COURT
                                       0416CR000938

COMMONWEALTH            )
                        )
                        )
                        )
V.                      )
                        )
                        )
MATTHEW MARSH,          )

MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION FOR A NEW TRIAL

Prior Proceedings

On April 30, 2004 the defendant was charged with resisting arrest under M.G.L. c. 268, Section 32B and with Disorderly Conduct under M.G.L. c. 272, Section 53F. (See exhibits 1-2) On May 3, 2004 the defendant entered into a plea to both counts. He was sentenced to probation on Count One and as to Count Two; the charge was filed after a plea of guilty. (See exhibits 1 and 2)

Facts

On April 30, 2004 the defendant Marsh was seen by officers fighting with some individuals in a crowd, which had gathered around North Street in Fitchburg. When officers attempted to arrest the defendant a struggle ensued. Both on the street and in the cruiser, the defendant attempted to pull away, hit his face repeatedly against the glass in the car, and caused the arresting officer to fall to the ground. (Exhibit 5) The defendant had cuts on his face and knee. (Exhibit 5) In the defendant's affidavit, the defendant swore under pains and penalties of perjury that he suffers from a bi-polar disorder, which when untreated causes him to behave in a manic manner. (Affidavit of Defendant) The defendant further avers that he was not on medication at the time of this incident and plea. (Affidavit of Defendant) The defendant finally

avers that at the time of this plea he was suffering from a manic episode, which prevented him from understanding the consequences of the plea, and prevented him from making voluntary and rational decisions. (Affidavit of Defendant)

## Motion for a New Trial

Attached to the defendant's motion for a new trial are affidavits submitted by the defendant, present counsel, and Dr. Ronald Ebert.

The defendant has pled guilty to drug charges out of the Federal District Court in Worcester. Dr. Ebert was appointed to conduct an evaluation for purposes of the Federal Sentencing Guidelines. (Exhibit 6) Specifically, Dr. Ebert concluded that Mr. Marsh sufferers from bipolar disorder, alcohol and cocaine addiction and posttraumatic stress disorder. (Exhibit 5) He further stated that these mental diseases have caused severe deficits in his functioning and that jointly these problems cause the defendant to engage in self-destructive, self-sabotaging behaviors and to be vulnerable to the influence of others. (Exhibit 6) Specifically in his affidavit Dr. Ebert states that by reviewing the defendant's actions at the time of his arrest and based upon his current evaluation of the defendant he can conclude to a reasonable degree of medical certainty that at the time of the defendant's plea he was suffering from a manic episode and this would certainly impair his ability to made a decision that knowing and intelligent, i.e. is a product of clear and rational thought. (Affidavit of Dr. Ebert)

## Discussion

## I

### Did the Defendant possess a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and did he possess a rational as well as factual understanding of the proceedings against him?

Both the United States Supreme Court and the Supreme Judicial Court of the Commonwealth of Massachusetts have ruled that the competency standard to plead guilty is the

same as the standard of incompetence to stand trial. <u>Godinez v. Moran</u>, 509 U.S. 389, 396-401 (1993); and <u>Commonwealth v. L'Abbe</u>, 421 Mass. 262, 268 (1995).

Therefore, the test is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him. <u>Godinez v. Moran</u>, 509 U.S. 389, 396-401 (1993); <u>United States v. Lebron</u>, 76 F.3d 29, 31 (1st Cir. 1995); and <u>Commonwealth v. Russin</u>, 420 Mass. 309, 316-317 (1995).

In the case at hand, the affidavit of Dr. Ebert specifically, concluded that Mr. Marsh sufferers from bipolar disorder, alcohol and cocaine addiction and posttraumatic stress disorder. (Exhibit 5) He further stated that these mental diseases have caused sever deficits in his functioning and that jointly these problems cause the defendant to engage in self-destructive, self sabotaging behaviors and to be vulnerable to the influence of other. (Exhibit 6) Specifically in his affidavit Dr. Ebert states that by reviewing the defendant's actions at the time of his arrest he can conclude to a reasonable degree of medical certainty that at the time of the defendant's plea he was suffering from a manic episode and this would have certainly impaired his ability to made a decision that is knowing and intelligent and a product of clear and rational thought. (Affidavit of Dr. Ebert) This would make this plea involuntary under the laws of the Commonwealth of Massachusetts.

Therefore, it cannot be said that the defendant had at the time of his plea a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and that he had a rational as well as factual understanding of the proceedings against him. <u>Godinez v. Moran</u>, 509 U.S. 389, 396-401 (1993); <u>United States v. Lebron</u>, 76 F.3d 29, 31 (1st Cir. 1995); and <u>Commonwealth v. Russin</u>, 420 Mass. 309, 316-317 (1995).

## II

**Was the Defendant's plea a voluntary expression of his own choice in so much that the plea was intelligently made and a knowing, intelligent act done with sufficient awareness of the relevant circumstances and the likely consequences?**

4

Guilty pleas in order to be valid must be both equally intelligent and voluntary. <u>Godinez v. Moran</u>, 509 U.S. 389, 399 (1993); and <u>Commonwealth v. Quinones,</u> 414 Mass. 423 (1993). The Constitution requires that under the inevitable pressures and uncertainties, the accused, guided by counsel, shall have a fair understanding of alternatives in the degree that his intelligence permits, and make a choice in that light. <u>Parke v. Raley</u>, 506 U.S. 20, 28 (1992). In order for a plea to be found involuntary, there must be a showing or a peculiar susceptibility which rendered the defendant "so gripped of fear . . . that he . . . could not . . . rationally weight the advantages of going to trial against the advantages of pleading guilty. <u>Brady v. United States</u>, 397 U.S. 742, 750 (1970); and <u>Commonwealth v. Tirrell</u>, 382 Mass. 502 (1981).

According to Dr. Ebert one of the significant factors of the defendant's bipolar disorder is his vulnerability and ability to be influenced by events around him. In light of the observed behavior of the defendant in the police report, and the evaluation of the defendant, the defendant's capacity for understanding and to make decisions which are a product of clear and rationale thought had been significantly impaired. (Exhibit 6 and Affidavit of Dr. Ebert)

Therefore, a showing was made that the defendant at the time of his change of plea was "so gripped of fear . . . that he . . . could not . . . rationally weight the advantages of going to trial against the advantages of pleading guilty. <u>Brady v. United States</u>, 397 U.S. 742, 750 (1970); and <u>Commonwealth v. Tirrell</u>, 382 Mass. 502 (1981).

## III

**Was the Defendant deprived of his constitutional right to effective assistance of counsel by his attorney's failure to investigate, prepare, present an adequate defense and to advise the defendant adequately as to which defenses were available to him and also was the defendant unable to understand his attorney's advise and participate in his defense due to his incompetency which was not brought to light due to ineffective assistance of counsel**?

As with any defendant accused of a crime, Matthew Marsh enjoyed a constitutionally guaranteed right to effective assistance of counsel. U.S. Const., Amend. VI, XIV; Mass. Decl. of Rights, Art. XII; <u>Strickland v. Washington</u>, 466 U.S. 668 (1984); <u>Commonwealth v. White</u>, 409

Mass. 266 (1991); <u>Commonwealth v. Satterfield</u>, 373 Mass. 109 (1977); <u>Commonwealth v. Saferian</u>, 366 Mass. 89 (1974). That right is violated when "serious incompetency, inefficiency, or inattention of counsel--behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer--and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defense." <u>Id</u>. at 96.

The Court ruled in <u>Commonwealth v. Haggerty</u>, 400 Mass. 437, 441-442 (1987) that "this is not a case where 'where arguably reasoned tactical or strategic judgments . . . are called into question . . .'" <u>Id</u> quoting <u>Commonwealth v. Rondeau</u>, 378 Mass. 408, 413 (1979). "Rather, in this case, defense counsel did not investigate the only realistic defense the defendant had to the charge of murder in the first degree." <u>Id</u>. "In that respect, it is analogous to those cases where, at trial, defense counsel abandons the only defense available to a defendant and leaves the defendant without any defense at all." <u>Id</u> citing <u>Commonwealth v. Westmoreland</u>, 388 Mass. 269 (1983); <u>Commonwealth v. Street</u>, 388 Mass. 281 (1983). "Failure to investigate the only defense a defendant has, if facts known to or with minimal diligence accessible to counsel support that defense, falls beneath the level of competence expected." <u>Id</u>, citing <u>Osborne v. Commonwealth</u>, 378 Mass. 104, 111 (1979); <u>Commonwealth v. Cepulonis</u>, 9 Mass. App. Ct. 302, 305 (1980).

Furthermore, in addressing the validity of a guilty plea, the Supreme Court in <u>Boykin v. Alabama</u>, 395 U.S. 238 (1969), stated that "admissibility of a confession must be based on a 'reliable determination on the voluntariness issue which satisfies the constitutional rights of the defendant." <u>Jackson v. Denno</u>, 378 U.S. 368 (1964). "The requirement that the prosecution put on the record the prerequisites of a valid waiver is no constitutional innovation." <u>Boykin v. Alabama</u>, 395 U.S. 238 (1969). "Ignorance, incomprehension, coercion, terror, inducements, subtle or blatant threats might be a perfect cover-up of unconstitutionality." <u>Id</u>.

Due to the fact that a guilty plea involves these constitutional rights, "the plea is valid only when the defendant offers it voluntarily, with sufficient awareness of the relevant circumstances, and with the advise of competent counsel. <u>Commonwealth v. Fernandez</u>, 390 Mass. 714, 715, (1983).

Where a defendant enters a guilty plea upon counsel's advise, the voluntariness of the plea depends upon whether the advice "was within the range of competence demanded of attorneys in criminal cases. <u>Commonwealth v. Chetwynde</u>, 31 Mass. App. Ct. 8, 12 (1991); <u>Hill v. Lockhart,</u> 474 U.S. 52, 56, 59 (1985).

In determining whether that level of competence has been met, the courts in Massachusetts are guided by the standard stated above which defines incompetence as that behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defense." <u>Commonwealth v. Saferian</u>, 366 Mass. 89, 96 (1974); <u>Commonwealth v. Triplett</u>, 398 Mass. 561, 568 (1986); <u>Commonwealth v. Montanez</u>, 410 Mass. 290, 295 (1991)

In the case at hand trial counsel never brought to the attention of the trial judge at the time of the plea, any problem with defendant's mental health. This was the case in spite of the fact that the defendant had a serious mental health issue and a mental health history, which was manifested by his behavior at the time of his arrest.

The second prong of the <u>Saferian</u> test is that the defendant must make some showing that better work might have accomplished something material for the defense. <u>Commonwealth v. Saferian</u>, 366 Mass. at p. 96; <u>Commonwealth v. Satterfield,</u> 373 Mass. 109, 115 (1977). In circumstances involving a motion to withdraw a guilty plea this prong has been interpreted to mean whether the defendant was so misled by counsel's alleged ineffective and false advise that he prematurely waived his right to a jury trial. <u>Commonwealth v. Chetwynde</u>, 31 Mass. App. Ct.8, 14 (1991).

In the case at hand, if trial counsel asked the defendant about his mental health history, the defendant might not have been allowed to plea guilty. Certainly, the defendant was misled by counsel's ineffectiveness to such an extent that he involuntarily waived his right to a jury trial. <u>Id</u>.

## Conclusion

For the foregoing reasons, the defendant was deprived of his right to effective assistance of counsel, was incompetent at the time of his plea, and his plea was therefore not voluntary, which is why the defendant pled to the charges against him. Therefore, this court should afford him a new trial or order an evidentiary hearing.

Respectfully submitted,

THE DEFENDANT

By:_____
ALAN JAY BLACK
1383  Main Street
Springfield, MA 01103
(413) 732-5381
BBO# 553768

# COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

FITCHBURG DISTRICT COURT
0416CR000938

COMMONWEALTH     )
                              )
                              )
                              )
V.                        )
                              )
                              )
MATTHEW MARSH,_____)

## AFFIDAVIT OF DEFENDANT MATTHEW MARSH

1. I Matthew Marsh swear and depose the following under the pains and penalties of perjury on March 8 , 2007: I am the defendant in the above entitled matter

2. I have pled guilty to a federal drug charge, in Federal District Court in Worcester, MA

3. On March 23, 2007 I am going to be sentenced on the Federal drug charges.

4. I suffer and have suffered for most of my life from bi-polar disorder and PTSD based upon abuse from my father as a child.

5. I tend to self medicate with alcohol and cocaine and therefore suffer from alcohol and drug addiction issues as well.

6. On April 30, 2004, I was charged with resisting arrest under M.G.L. c. 268, Section 32B and with Disorderly Conduct under M.G.L. c. 272, Section 53F. (See exhibits 1-2)

2

7. On May 3, 2004 I entered into a plea to both counts. He was sentenced to probation on Count One and as to Count Two; the charge was filed after a plea of guilty. (See exhibits 1 and 2)

8. I suffer from a bi-polar disorder, which when untreated causes me to behave in a manic manner.

9. I am supposed to take certain medication to control this disorder, but the medication causes side effects, which make it difficult to take.

10.   I was not on medication at the time of this incident and plea.

11.   At the time of this plea I was suffering from a manic episode, which prevented me from understanding the consequences of the plea, and prevented me from making voluntary and rational decisions.

12.   These issues have caused severe deficits in my functioning and that these problems cause me to engage in self-destructive, self-sabotaging behaviors and to be vulnerable to the influence of others.

13.   At the time of plea, I just wanted to get the case over with.

14.   My lawyer told me to plea and I did.

15.   I did not really understand what the consequences of this plea were, nor did I really understand what was going on around me.

16.   At the time of my plea, I was suffering from a manic episode and this impaired my ability to made a decision that was knowing and intelligent.

MATTHEW MARSH

## COMMONWEALTH OF MASSACHUSETTS

Fitchburg District Court                          Docket #: 0416cr000938

```
┌─────────────────────────────┐
  Commonwealth          )
                        )
        vs.             )
                        )
                        )
  Matthew Marsh (2)     )
└─────────────────────────────┘
```

## AFFADIVIT OF RONALD S. EBERT, PH.D.

1. My name is Ronald S. Ebert, Ph.D.

2. I was retained by attorney Alan J. Black to conduct an evaluation of his client, Matthew marsh. I interviewed Mr. Marsh on 2/1/07 and 2/23/07, conducted a psychological evaluation and I administered psychological tests. Based upon my assessment, it was my opinion that Mr. Marsh suffers from a major mental illness misdiagnosed as bipolar disorder with manic episodes. I also determined that he suffers from posttraumatic stress disorder and has an alcohol and cocaine addiction (report attached).

3. It was my further professional opinion that he is severely impaired by his mental health problems and when not medicated and abusing substances, can act out in irrational and aggressive behaviors.

4. I have reviewed a police report from the Leominster Police Department of an incident that occurred 10/22/99. Mr. Marsh was causing a disturbance in a coffee shop and was described by police as "making loud incoherent noises," "could not speak" and when being booked "had difficulties with his name, address and date of birth."

5. I have reviewed a police report from the Fitchburg Police Department of an incident that occurred on 4/30/04. Mr. Marsh had to be restrained by police because he was "agitated." It is noted that when he was put into the police car he banged his head on the glass barrier "five to six times" and the police "kept telling him to relax before he hurt himself." During booking "he would not stop yelling."

6. Based on material that I have reviewed it appears that Mr. Marsh entered pleas in both cases.

7. It is my current opinion to a reasonable degree of psychological certainty that on both 10/22/99 and 4/30/04, Mr. Marsh was suffering from symptoms of his major mental illness such as agitation, disorganization, confusion and self destructive behaviors. In addition, Mr. Marsh has reported to me that he does not cooperate with medication and appears not to have been taking medication at those times. He may have been abusing substances, which only worsens his psychiatric condition.

8. It is further my opinion to a reasonable degree of psychological certainty that Mr. Marsh's untreated mental illness continued through the periods that he entered pleas. In his untreated state he would not have had the ability to make a waiver that was knowing and intelligent or a product of a clear and rational thought.

Submitted under pains of penalty this 8th day of March, 2007.

Ronald S. Ebert, Ph.D.
Diplomate in Forensic Psychology, American
Board of Professional Psychology
Director, Psychological Services, Inc.
Senior Consulting Forensic Psychologist, McLean Hospital
Psychologist, Harvard Medical School

RSE/ys

Enclosure: (1)

**<u>Enclosure to Ebert Affidavit Omitted</u>**
**(Psychological Evaluation Report dated March 5, 2007)**
**(attached to PSR)**